No. 25-2717

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

Susan Webber, Jonathan St. Goddard,
Rhonda Mountain Chief and David Mountain Chief,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, THE UNITED
STATES OF AMERICA, and,
in her official capacity, KRISTI NOEM
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Montana
No. CV 25-26-GF-DLC
Hon. Dana Christensen

_____

## APPELLANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

_____

Monica J. Tranel
TRANEL LAW FIRM, P.C.
401 Washington Street
Missoula, MT 59802
(406) 926-2662
*mtranel@tranelfirm.com*

*Attorneys for Appellants*
Susan Webber, Jonathan St. Goddard,
Rhonda Mountain Chief and David Mountain Chief

## DISCLOSURE STATEMENT

No Disclosure statement is required pursuant to FRAP 26.1 as the Plaintiffs are all individuals, enrolled members of the Blackfeet Tribe.


Date: May 1, 2025

<div style="margin-left: 40%;">

TRANEL LAW FIRM, P.C.


By: _/s/ Monica Tranel_
     Monica Tranel

*Attorneys for Appellants*

</div>

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT...................................................................i

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ................................................................................1

LEGAL STANDARD ..........................................................................3

REASONS TO GRANT RELIEF AND FACTS RELIED UPON ..........................4

    I.    Fair chance of success on the merits.......................................4

        A.    Tribal members are asserting rights under the Indian Commerce Clause ...........................................................................4

        B.    Jay Treaty recognized rights......................................12

    II.    The Appellants are experiencing irreparable harm.............7

    III.    Equities and public interest favor an injunction .................20

    IV.    The Court Should Not Require Security............................21

CONCLUSION .................................................................................22

STATEMENT OF RELATED CASES ...................................................22

CERTIFICATE OF COMPLIANCE ......................................................23

CERTIFICATE OF SERVICE.............................................................24

# TABLE OF AUTHORITIES

*Alliance for Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)..................................................................4

*Am. Foreign Serv. Ass'n v. Trump*,
    2025 WL 435415 (D.D.C. Feb. 7, 2025) ......................................20

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014)..................................................20

*Arizona v. Navajo Nation*,
    143 S. Ct. 1804 (2023) ...................................................................9

*Akins v. U.S.*,
    551 F.2d 1222 (1977) ....................................................................13

*Akins v. Saxbe*,
    380 F. Supp. 1210 (D. Me. 1974) ...............................................13

*Board of Comm'rs v. Seber*,
    318 U.S. 705 (1943)........................................................................8

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) .....................................................21

*Cherokee Nation v. Georgia*,
    5 Pet. 1, 8 L.Ed. 25 (1831) .....................................................6, 8

*Club One Casino, Inc. v. Bernhardt*,
    959 F.3d 1142 (9th Cir. 2020)......................................................8

*Coeur D'Alene Tribe v. Hawks*,
    933 F.3d 1052 (9th Cir. 2019)....................................................10

*Cotton Petroleum Corp. v. New Mexico*,
    490 U.S. 163 (1989)..................................................................8, 10

iii

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ...........................................................20

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011)...................................................................21

*E. Bay Sanctuary v. Biden*,
    993 F.3d 640 (9th Cir. 2021)..................................................................4, 11

*E. Bay v. Garland*,
    994 F.3d 962 (9th Cir. 2020).....................................................................19

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................................20

*Env't Prot. Info. Ctr. v. Carlson*,
    968 F.3d 985 (9th Cir. 2020)......................................................................3

*Gardiner v. Virgin Islands Water and Power Authority*,
    6 F.3d 786 (Fed. Cir. 1993).......................................................................16

*Grondal v. United States*,
    513 F. Supp. 3d 1262 (E.D. Wash. 2021) ....................................................5

*Gibbons v. Ogden*,
    22 U.S. 1 (1824)......................................................................................12

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ...................................................... 3, 9, 11-12, 14

*Ind. Envtl. Ntwk v. Trump*,
    428 F. Supp. 3d 296 (D. Mont. 2019) .........................................................3

*Int'l Custom Prods., Inc. v. U.S.*,
    791 F.3d 1329 (Fed. Cir. 2015)................................................................13

*J.G.G. v. Trump*,
    Civil Action 25-766 (JEB) (D.D.C. Apr. 16, 2025).....................................11

iv

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009)...................................................21

*Kalispel Tribe of Indians v. U.S. Dep't of the Interior*,
    999 F.3d 683 (9th Cir. 2021)...........................................................9

*K-Mart Corp. v. Cartier, Inc.*,
    485 U.S. 176 (1988)........................................................................9

*Kolek v. Engen*,
    869 F.2d 1281 (9th Cir. 1989).......................................................10

*Lone Wolf v. Hitchcock*,
    187 U.S. 553, 566–568 (1903).......................................................11

*Marceau v. Blackfeet Housing Auth.*,
    540 F.3d 916 (9th Cir. 2008)...........................................................8

*McGirt v. Oklahoma*,
    140 S. Ct. 2452 (2020)..................................................................11

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012).........................................................20

*Minnesota v. Chippewa Indians*,
    526 U.S. 172 (1999)......................................................................13

*Morton v. Mancari*,
    417 U.S. 535 (1974)........................................................................8

*Newtok Vill. v. Patrick*,
    21 F.4th 608 (9th Cir. 2021) ...........................................................8

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................4

*Oneida Indian Nation v. County of Oneida*,
    414 U.S. 661 (1974)......................................................................10

v

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013)......................................................................21

*Simon v. City and Cnty. of San Francisco*,
    24-1025, 24-6052 (9th Cir. 2025) ..................................................................3

*S. Coast Specialty Surgery Ctr., Inc. v. Blue Cross of Cal.*,
    90 F.4th 953 (9th Cir. 2024) ...........................................................................4

*State of Washington et al v. Trump et al*,
    No. 25-807 (Feb. 19, 2025).......................................................................4, 11

*Textile, Inc. v. ABMH*,
    240 F.3d 781 (9th Cir. 2001)...........................................................................3

*United States v. Lara*,
    541 U.S. 193 (2004).........................................................................................8

*United States v. Holliday*,
    70 U.S. 407 (1865).........................................................................................12

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011).........................................................................................9

*United States v. Michigan*,
    471 F. Supp. 192 (W.D. Mich. 1979) ..........................................................15

*W.B. v. Noem*,
    25-cv-03407-EMC (N.D. Cal. 2025) ............................................................20

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..............................................................................................3

*Worcester v. Georgia*,
    31 U.S. (6 Pet.) 515 (1832) ...........................................................................12

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579, 610-11 (1952)............................................................................3

vi

**Statutes and Constitutional Provisions:**

U.S. Constitution
      Article I, Section 8, Clause 3 (Indian Commerce Clause) ......... 1, 4-9, 13, 22
      Article III, Section 2, Clause 1....................................................5, 8

28 U.S.C. § 1331 ...........................................................................4,5

28 U.S.C. § 1337 ...........................................................................4

28 U.S.C. § 1346 ...........................................................................5

28 U.S.C. § 1362 ...........................................................................5, 10

28 U.S.C § 1581(i)(1)(B), (D) ......................................................5

28 U.S.C § 1631 ...................................................................5-6, 10-11


**Rules**

Fed. R. Civ. P. 62(g)(1).................................................................4
Fed. R. Civ. P. 65(c).......................................................................21
Fed. R. App. P. 8(a)(2)(D)..............................................................3
Fed. R. App. P. 27(c)......................................................................4


**Treaties and International Agreements:**

The Jay Treaty of 1794, 8 Stat. 116 .......................................39, 40, 42

Explanatory Article, May 5, 1796.............................................. 40-41

Treaty of Ghent, 1814, 8 Stat. 218, Article IX.......................... 41-42, 44

Proclamation of 1763 ............................................................... 26-27

**OTHER AUTHORITIES**

Ned Blackhawk
The Rediscovery of America, Native Peoples and the Unmaking of U.S. History (2023)
pp. 155-158, 178-179, 204-206, 229-230, 235-236 ...........................7, 12, 15

Gregory Ablavsky, *Empire States: The Coming of Dual Federalism*,
Yale Law Journal Vol. 128 No. 7 (May 2019) ...............................................7

Felix Cohen,
Handbook of Federal Indian Law (1982), pp. 207-208 .................................8

John Dobson,
Two Centuries of Tariffs (1976), p. 1 .........................................................15

## INTRODUCTION

Like an undesirable hot potato, Susan Webber, Jonathan St. Goddard, Rhonda Mountain Chief, and David Mountain Chief, enrolled members of the Blackfeet Tribe, got tossed out by the District Court. Without considering irreparable harm and need for immediate relief, the District Court sent this constitutional challenge under the Indian Commerce Clause to the Court of International Trade that has no subject matter jurisdiction over this case.

Appellants respectfully move this Court for a preliminary injunction pursuant to FRAP 8(a)(2)(A)(2). They seek to preserve rights pending appeal that they asked to be preserved the day they filed their Complaint in District Court.

Appellants seek to enjoin: Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended;[1] Section 14 of Proclamations 10896 and 10895;[2] and, Sections 2, 3(a), (b), (c), (d), (e) and (f), Section 4 (a), (b), (c), and (d) of Executive Order 14257[3] as amended. The Orders are collectively referred to as the Canada Orders. Appellants filed their complaint and motion for preliminary injunctive relief 3 days after Executive Order 14257 was issued, seeking immediate relief to retain the status quo. [4]

---

[1] Doc. 9-9.
[2] Docs. 9-2, 9-3.
[3] Doc. 9-12.
[4] Doc. 1 (Complaint); Doc. 3 (Motion for Preliminary Injunction) filed April 5, 2025.

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**                    1

Rather than consider the injunctive relief, the District Court sent Appellants packing. It found the CIT has exclusive jurisdiction over Indian plaintiffs seeking relief under the Indian Commerce Clause regarding regulation of commerce by the executive on a cross-border Tribe.

This Court can fix that mistake.

In the meantime, the Canada Orders should be enjoined pending a final decision on the merits of the appeal for two reasons:

*First*, Appellants are likely to prevail regarding jurisdiction. The alternative is that they are without a forum for relief. This is about jurisdiction – not venue. The transfer order violates Appellants' fundamental right to seek – as tribally enrolled members – redress for their constitutional claims under the Indian Commerce Clause. The Court of International Trade does not have jurisdiction over Indian Tribes.

The text of Article I, Section 8, Clause 3 could not be clearer: "Congress shall have Power…To regulate Commerce with foreign Nations, and among the several States, ***and with the Indian Tribes***." The Commerce Clause draws a clear distinction between "States," "foreign Nations," and "Indian Tribes." The executive is constitutionally prohibited from engaging in commerce with the Indian Tribes, and the Canada Orders are illegal as to these Appellants. The Orders

also violate Native American trade rights recognized by the Jay Treaty of 1794 and exercised continuously ever since.

*Second*, Appellants have suffered and are continuing to suffer injury in fact from the Canada Orders, and their injury will be redressed by the Court's injunction. *Youngstown v. Ohio* sets the bedrock constitutional principle that commerce lies exclusively with Congress.[5] *Haaland v. Brackeen* is the bedrock principle that Congress alone regulates commerce with the Indian Tribes, which includes enrolled members of the Tribe.[6] These two foundational constitutional principles tip the scales in favor of Appellants, giving them a fair chance of success on the merits.

## LEGAL STANDARD

Appellants "must establish [1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest."[7] A preliminary injunction preserves the status quo until a final order on the merits.[8]

---

[5] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952)*; Ind. Envtl. Ntwk v. Trump*, 428 F.Supp.3d 296, 309-310 (D. Mont. 2019).
[6] *Haaland v. Brackeen,* 143 S. Ct. 1609, 1655-1656.
[7] *Simon v. City and Cnty. of San Francisco*, 24-1025, 24-6052, 16 (9th Cir. 2025); *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020); *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).
[8] Rule 8(a)(2)(A)(2); *Textile, Inc. v. ABMH,* 240 F.3d 781, 786 (9th Cir. 2001)

Appellants must show likely success on their appeal. The motions panel "is predicting the likelihood of success of the appeal" – not the likelihood of success of the underlying litigation.[9] The appeal is narrow: did the District Court err in transferring a constitutional challenge based on the Indian Commerce Clause to the CIT? In a *de novo* review, all allegations are taken as true and reasonable inferences drawn in Appellants' favor.[10]

On a sliding scale, if Appellants can raise "serious questions going to the merits" and show a "balance of hardships that tips sharply towards [them]," they are entitled to preliminary injunctive relief "so long as … [they also show] there is a likelihood of irreparable injury and that the injunction is in the public interest."[11]

## REASONS TO GRANT RELIEF AND FACTS RELIED UPON

### I.   Fair chance of success on the merits.

#### A.   Tribal members are asserting rights under the Indian Commerce Clause.

Appellants asserted jurisdiction under the Constitution and laws of the United States: 28 U.S.C. § 1331 (federal question); 1337 (regulation of

---

[9] *State of Washington et al v. Trump et al,* No. 25-807 p. 2 (Feb. 19, 2025), Forrest, J. concurring, citing Cf. Fed. R. Civ. P. 62(g)(1); Fed. R. App. P. 8(a)(2)(D); Fed. R. App. P. 27(c); *East Bay Sanctuary v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021).
[10] *S. Coast Specialty Surgery Ctr., Inc. v. Blue Cross of Cal.*, 90 F.4th 953, 957 (9th Cir. 2024); *U.S. ex. rel. v. Millennium,* 885 F.3d 623, 625 (9th Cir. 2018).
[11] *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024); *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**          **4**

commerce); 1346 (U.S. as defendant); and 28 U.S.C. § 1362 (Indian Tribes).[12]

The District Court did not analyze 28 U.S.C. § 1661 which require it to first find a want of jurisdiction prior to analyzing whether another court has exclusive jurisdiction.[13] In its final Order (Doc. 40) the Court held:

[…] the decision of whether to transfer this matter is not a discretionary one; where, as here, a matter falls within the exclusive jurisdiction of the Court of International Trade, the district court is divested of its jurisdiction and the matter must be transferred […]

Appellants' challenge […] fall[s] squarely within the exclusive subject matter jurisdiction of the Court of International Trade. 28 U.S.C. § 1581(i)(1)(B), (D). Therefore, pursuant to Section 1581(i), this Court is divested of its jurisdiction and the case must be transferred.[14]

This is clear error.[15] Appellants' challenge is based on the Indian Commerce Clause that gives exclusive jurisdiction to regulate commerce "with the Indian Tribes" to Congress. Appellants are enrolled members of the Blackfeet Nation.

---

[12] Doc. 15, Amended Complaint, ¶ 7.
[13] Transfer Order, Doc. 40.
[14] Doc. 40 p. 17, emphasis added.
[15] Art. III, Section 2, Cl. 1; 28 U.S.C. § 1331; 28 U.S.C. § 1362; *Gardiner v. Virgin Islands Water and Power Authority*, 6 F.3d 786 (Fed. Cir. 1993)(transfer only possible under 28 U.S.C. Sec. 1631 if transferee court has jurisdiction).

The *only* court that has subject matter jurisdiction over enrolled Blackfeet tribal members assertion of their Constitutional right under the Indian Commerce Clause is the District Court. Importantly, the District Court did not find that it was transferring this case for "want" of jurisdiction under 28 U.S.C. § 1631; rather, the District Court found that the CIT had exclusive jurisdiction. That is incorrect.

The District Court erred in conflating Indian Tribes with foreign nations. The CIT has no jurisdiction over Indian Tribes. The jurisprudence interpreting Indian Tribes and the Commerce Clause of Article I, Section 8, Clause 3 makes this point very clear.

The text of Article I, Section 8, Clause 3 provides: "Congress shall have Power…To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Commerce Clause draws a clear distinction between "States," "foreign Nations," and "Indian Tribes."

Justice Marshall observed in *Cherokee Nation:* "[t]he objects, to which the power of regulating commerce might be directed, are divided into three distinct classes –  foreign nations, the several states, and Indian Tribes. When forming this article, the convention considered them as entirely distinct." [16] The Commerce

---

[16] *Cherokee Nation v. Georgia*, 5 Pet. 1, 18, 8 L.Ed. 25 (1831).

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**      **6**

Clause "no more admits of treating Indian tribes as States than treating foreign nations as States."[17]

This is foundational to the Constitution.

In the 1770s, 13 confederated states faced three intractable economic threats: states with different economies, based on an approach that would lead to civil war; foreign nations with superior navies and inland reach; and the Indian Tribes.[18] Ned Blackhawk writes:

> "the federal government's ultimate power, authority, and sovereignty over Native peoples (and of the American continent) became enshrined in the U.S. Constitution. "[19]

When the Treaty of Paris ended the revolutionary war in 1783, each of these nation-ending economic threats remained. The Commerce Clause addressed each of them, separately. The "lack of debate over Indian affairs revealed a rare consensus among the delegates."[20]

---

[17] *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989).

[18] Ned Blackhawk, The Rediscovery of America, Native Peoples and the Unmaking of U.S. History, (2023) Ch. 5 Settler Uprising, The Indigenous Origins of the American Revolution, pp. 155- 158; Professor Blackhawk advised Historian Ryan Hall whose Declaration (Doc. 26) describes the Blackfoot people 1700s – 1800s; Exhibit 27, Proclamation of 1763.

[19] Blackhawk, *id*., Ch. 6 *Colonialism's Constitution, The Origins of Federal Indian Policy*, pp. 178-179.

[20] Blackhawk, *id*., Ch. 6 *Indians and the U.S. Constitution*, pp. 204 – 206; see also Ablavsky, Gregory, *Empire States: The Coming of Dual Federalism*, Yale Law Journal Vol. 128 No. 7, May 2019.

In 1788 the Constitution was ratified. Article I, Section 8, Clause 3 transformed the power of the new nation to conduct commerce *among the states*, with *foreign nations*, and *with the Indian Tribes* by explicitly granting that power to Congress alone. Article III, Section 2, Clause 1 gave federal courts power to hear all cases arising under the Constitution "and Treaties made [..] under their authority."[21]

Two centuries later, *Cotton Petroleum* affirmed what the Founders intended: the Interstate Commerce and the Indian Commerce Clause have very different applications.[22] The central function of the Interstate Commerce Clause is concerned with maintaining free trade *among* the states. But "the central function of the Indian Commerce Clause is to provide Congress with the *plenary* power to legislate in the field of Indian affairs."[23]

*Cotton Petroleum Corp*. and *Cherokee Nation* apply with even more force in the context of the Indian Commerce Clause, where the government owes a special duty.[24] Neither the state Interstate Commerce Clause nor the Foreign Nation

---

[21] *Newtok Vill. v. Patrick*, 21 F.4th 608 (9th Cir. 2021), citing Art. III § 2 Cl. 1.
[22] *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. at 191-92*; Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142 (9th Cir. 2020); *United States v. Lara* , 541 U.S. 193, 200 (2004).
[23] *Cotton Petroleum, id*., c.f. *Morton v. Mancari*, 417 U.S. 535, 551-552, (1974); F. Cohen, Handbook of Federal Indian Law, 207-208 and nn. 2, 3, and 9-11(1982).
[24] *Morton v. Mancari*, 417 U.S. 535, 552 (1974); *Board of Comm'rs v. Seber*, 318 U.S. 705, 715-716 (1943); *Marceau v. Blackfeet Housing Auth.*, 540 F.3d 916, 921

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**          **8**

Commerce Clause contain the additional element in which the U.S. has a fiduciary duty, as it does toward Indian Tribes.[25]

Only in the context of Indian people does the federal government have a fiduciary relationship. The Court stated in *Haaland* "[T]he 'trust relationship between the United States and Indian people' informs the exercise of legislative power. [..]. As we have explained, the Federal Government has 'charged itself with moral obligations of the highest responsibility and trust' toward Indian Tribes."[26]

The District Court's fundamental error was to consider transfer akin to venue.[27] The Indian Commerce Clause of Article I, Section 8, Clause 3, makes this far more than a question of dueling jurisdictions.[28] It is a fundamental jurisdiction issue and the CIT has no jurisdiction. The transfer Order sends the Appellants out of Court completely with no available redress for their Constitutional claims. It does what the federal government has done too many times to the Indian Tribes – leaves them nowhere to go.

---

(9th Cir. 2008); *Kalispel Tribe of Indians v. U.S. Dep't of the Interior*, 999 F.3d 683 (9th Cir. 2021); but see *Arizona v. Navajo Nation*, 143 S.Ct. 1804 (2023).
[25] *Haaland*, n.6, *supra*, 599 U.S. 255, 274-275 (2023).
[26] *Haaland*, *id*. at 274-275, citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176, (2011); *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942)
[27] Doc. 40, Order p. 16.
[28] Doc. 40, citing *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 183 (1988).

The Commerce Clause distinguishes Indian Tribes from foreign nations. Congress has plenary authority over Indian commerce.[29] The CIT's jurisdiction under 28 U.S.C. § 1581(i) applies only to international trade matters. It does not grant authority over tribal commerce, rendering the transfer legally invalid. The District Court has exclusive jurisdiction over Indian Tribes as set out in 28 U.S.C. § 1362 and in Article III § 2 Cl. 1.

Nothing in 28 U.S.C. § 1581(i)(1)(B), (D) vests exclusive subject matter jurisdiction in the CIT over Indian Tribes. The specific grant of jurisdiction to District Courts in § 1362 means there is no jurisdiction at the CIT. 28 U.S.C. § 1362 confers jurisdiction over *all* civil actions, brought by an Indian tribe (which includes the individuals that make it up), that *arise under the Constitution*, laws, or treaties of the United States.[30]

The District Court failed to analyze jurisdiction under 28 U.S.C. § 1631:

> Whenever a civil action is filed in a court as defined in section 610 of this title […] ***and that court finds that there is a want of jurisdiction***, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court […] in which the action or appeal could have been brought at the time it was filed or noticed, […].[31]

The District Court erred by failing to apply these steps sequentially. Rather, the

---

[29] *Cotton Petroleum*, 490 U.S. at 191-92, *Cherokee Nation,* at 18.
[30] *Coeur D'Alene Tribe v. Hawks*, 933 F.3d 1052 (9th Cir. 2019), citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 663 (1974)
[31] *Kolek v. Engen* , 869 F.2d 1281, 1284 (9th Cir. 1989), *Grondal v. United States*, 513 F.Supp.3d 1262 (E.D. Wash. 2021), 28 U.S.C. § 1631.

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**     **10**

starting point was whether the CIT had exclusive jurisdiction, to which the District Court answered, erroneously, yes. But, to transfer this case to the Court of International Trade under § 1631, the District Court was required to first determine that it *lacked* jurisdiction. This step it never took.

While not a consideration at the motions stage, Appellants are likely to win on their claim that the Constitution does not allow the executive branch to regulate commerce with the Indian Tribes.[32] An unbroken line of cases holds commerce with the Indian Tribes to be in Congress' constitutional ambit, not the President's. James Madison discussed the importance of a single authority regulating trade with the Indians.[33] Justice Gorsuch confirmed: "[T]he Legislature['s] constitutional authority [over] tribal relations [.. ] belongs to Congress alone."[34] The Canada Orders transgress constitutional limitations.[35]

Finally, to clarify, commerce with the Indian Tribes means "commerce with *the individuals* composing those Tribes."[36]

[..] if commerce [..] is carried on with an Indian tribe, or with a member of such tribe, it is subject to be regulated by Congress [.. ] The right to exercise

---

[32] See fn. 10, *supra*, *Washington*, concurring opinion, *East Bay*, 993 F.3d at 660.
[33] James Madison, Federalist Paper No. 42.
[34] *McGirt v. Oklahoma*, 140 S.Ct. 2452, 2462, citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566–568 (1903).
[35] *J.G.G. v. Trump*, Civil Action 25-766 (JEB) (D. D.C. Apr 16, 2025), *Abourzek v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986)
[36] *Haaland*, n. 6 *supra*, 599 U.S. 255, 274-75.

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**          **11**

it in reference to any Indian tribe, or any person who is a member of such tribe, is absolute[..][37]

Commerce with foreign nations [..] means commerce between citizens of the United States and citizens or subjects of foreign governments, as individuals. And so commerce with the Indian tribes, means commerce with the individuals composing those tribes.[38]

Enrolled members of the Blackfeet Tribe bring Constitutional claims. They can only be heard in District Court.[39]

### B.    Jay Treaty recognized rights.

The Jay Treaty was the Republic's first treaty with a European power. The treaty recognizes Native American rights to conduct cross-border trade, and underscores the sovereignty of Native people. The rights it recognizes "endure to this day […] In no small measure, Indian affairs informed America's first "international" treaty."[40]

The District Court failed to consider this treaty protection, violating established principles of tribal sovereignty and federal trust responsibility.[41] The District Court incorrectly considered the Jay Treaty as a *source* of rights – not a *recognition* of rights.

---

[37] *U.S. v. Holliday*, 70 U.S. 407, 418 (1865); *Gibbons v. Ogden,* 22 U.S. 1 (1824).
[38] *Holliday*, at 417, citing and quoting *Gibbons.*
[39] *Coeur D'Alene,* n. 30 *supra; Holliday*; *Worcester v. State*, 31 U.S. 515, 580-581 (1832).
[40] Blackhawk, n. 20 *supra*, "Jay's Treaty, the Treaty of Greenville, and Foreign and Domestic Affairs" pp. 235-236.
[41] *Haaland*, 599 U.S. at 274-75.

The cases cited in the District Court's Order discuss *congressional* regulation of commerce with Indian Tribes.[42] The issue here is whether the *executive* can regulate commerce with the Indian Tribes. The Jay Treaty is critical evidence that Congress *alone* regulates commerce with the Indian Tribes. Canons of treaty interpretation require consideration of historical context.[43] Where rights of Tribes are at issue, context is particularly significant.

In 1788 the U.S. Constitution was ratified; it took effect on March 4, 1789. Article I Section 8 Clause 1 of the Constitution gave Congress exclusive power to collect taxes and duties, and to regulate Commerce with foreign Nations, and among the several States, ***and with the Indian Tribes***.

Congress promptly set to it. Four months later, in July of 1789, Congress passed the first national tariff act to raise revenue and pay the national debt.[44] On March 2, 1799, Congress passed the Tariff Act of 1799, exempting Indians from tariffs "for the purpose of conforming this act to certain stipulations contained in treaties made and ratified [...] as settled by the treaty of peace [...]".[45]

---

[42] *Akins v. U.S.*, 551 F.2d 1222, (1977); *Akins v. Saxbe*, 380 F.Supp 1210, 1217 (D.Me. 1974)(deferring to Congressional purpose); *U.S. v. Garrow*, 88 F.2d 318, 24 CCPA 410 (1937)(challenging Tariff Act of 1930 (19 U.S.C.A. § 1001, par. 411)); *Int'l Custom Prods., Inc. v. U.S.*, 791 F.3d 1329 (Fed. Cir. 2015)(classification for "white sauce" under Harmonized Tariff Schedule).
[43] *Minnesota v Chippewa Indians*, 526 U.S. 172 (1999), citing *Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943).
[44] Exhibit 23, An Act for laying a Duty on Goods (July 4, 1789).
[45] Exhibit 24, An Act to regulate duties, Sec. 104-105, March 2, 1799.

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**      **13**

Jay's Treaty, signed on November 19, 1794 further emphasized that Indian

Tribes are exempt from tariffs. Article III provided:

> It is agreed that it shall at all Times be free ... to the Indians dwelling on either side of the said Boundary Line, […] into the respective Territories and Countries of the Two Parties on the Continent of America . .. freely to carry on trade and commerce with each other.

> . .. [N]or shall the Indians passing or repassing with their own proper Goods and Effects of whatever nature, pay for the same any Impost or Duty whatever. But Goods in Bales, or other large Packages unusual among Indians shall not be considered as Goods belonging bona fide to Indians.

In 1796, the parties added an explanatory article to Article III:

> That no stipulations in any treaty subsequently concluded […], can be understood to derogate […] the rights of free intercourse and commerce secured by the [Jay Treaty] to the Indians dwelling on either side of the boundary-line aforesaid; but that all the said persons shall remain at full liberty freely […] on either side of the said boundary-line, […] to carry on trade and commerce with each other, […].[46]

The Jay Treaty acknowledged that an artificial border was superimposed on

existing Tribes; as self-executing, it cannot be abrogated or terminated by an

executive order.[47]

After the War of 1812 the Treaty of Ghent, signed in 1814, affirmed the

rights of Indian tribes:

> The United States of America engage to put an end, immediately after the

---

[46] Exhibit 25, Explanatory Article to Jay Treaty, May 5, 1796.
[47] *Haaland v. Brackeen*, 143 S.Ct. 1609, 216 L.Ed.2d 254 (2023); *Menominee Tribe v. U.S.*, 391 U.S. 404, 413 (1968).

ratification of the present treaty, to hostilities with all tribes of nations of

Indians with whom they may be at war at the time of such ratification; and

forthwith to restore to such tribes or nations, respectively, all the

possessions, rights, and privileges, which they may have enjoyed or been

entitled to in one thousand eight hundred and eleven, previous to such

hostilities […][48]

The framers of the Constitution executed treaties with the Indian Tribes prior to

and after 1787. These treaties acknowledging Native American rights were

intended and understood to be the Supreme Law of the land.[49]

The 1883 Tariff Act included substantially the same language of Section 105

of the 1799 Tariff Act, which is identical to Article III.[50] Exemption from tariffs

through the 19th century, when tariffs provided between 50% and 90% of the

federal government's income, is significant.[51]

The Blackfoot people traded freely across the 49th parallel, without

limitation, as nations interacting with other nations.[52] When the commerce clause

---

[48] *U.S. v. Michigan*, 471 F. Supp. 192, 205-206 (W.D.Mich. 1979), Treaty of Ghent, 8 Stat. 218, Article IX.
[49] *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 571-2, 8 L. Ed. 483 (1832), Article II, Section 2, Cl. 2; Article VI Cl. 2; Blackhawk, n. 20 supra, *Indian Treaty Making and the Practices of Federal Power*, pp. 229-230.
[50] Exhibit 26, Act of March 3, 1883, ch. 121, § 2512, 22 Stat. 488, 523; Exh. 24.
[51] John Dobson, Two Centuries of Tariffs p. 1 (1976).
[52] Doc. 26, Declaration of Ryan Hall.

was written, the Blackfoot were trading in Canada and the U.S., optimizing their economic well-being to ensure survival in their homeland.[53]

This history, together with the recognition of commerce rights in the Jay Treaty, means the Canada Orders cannot apply to the Appellants.

## II.     The Appellants are experiencing irreparable harm.

Rhonda and David Mountain Chief's cab company depends on tourism. Bookings are severely down, because of the Canada Orders.[54] In 2024 Mountain Chief had over 30 bookings for June; for June of 2025, Mountain Chief has 5.[55]

 

Jackie and Stephen Conway own and operate a campground at St. Mary, a few miles south of Canada. Their business depends on tourism during a very short season, beginning when Logan Pass opens and ending in September. Their employees depend on the income from the summer season for survival. The Conways had to close during the Covid pandemic, and know from experience they

---

[53] Doc. 26 ¶ 6.
[54] Doc. 44-1, ¶¶ 2-5, Doc. 44-2; Webber 2nd Declaration.
[55] Doc. 44-1 ¶¶ 2-5.

can't make up lost income. Every day matters.[56] In 2024 the Conways had 247 bookings from Canada for a total of 512 nights. This year, the Conways have 63 bookings from Canada for a total of 151 nights.

**2024**

| United States | US | 2803 | 9263 |
|---|---|---|---|
| Canada | CA | 247 | 512 |
| | | 91 | 175 |
| France | FR | 17 | 32 |
| Netherlands | NL | 16 | 36 |
| Germany | DE | 15 | 30 |
| United Kingdom | GB | 9 | 16 |
| Australia | AU | 8 | 12 |
| Poland | PL | 8 | 16 |
| Belgium | BE | 6 | 12 |
| Switzerland | CH | 5 | 16 |
| Italy | IT | 5 | 6 |

**Nationalities** — **2025**

| COUNTRY | | ARRIVING GUESTS | GUEST NIGHTS |
|---|---|---|---|
| United States | US | 1142 | 5115 |
| | | 180 | 493 |
| Canada | CA | 63 | 151 |
| Germany | DE | 22 | 30 |
| Netherlands | NL | 18 | 40 |
| United Kingdom | GB | 12 | 24 |
| Israel | IL | 10 | 16 |
| Australia | AU | 8 | 8 |
| France | FR | 4 | 4 |
| Czechia | CZ | 3 | 6 |

Enjoining the Canada Orders will bring much-needed tourism back to the border businesses that are dependent on this economic resource for survival. It's more than business – it's a way of life.[57]

Two of the 14 Canadian border crossings along Montana's 545 mile northern border, are on lands of the Blackfeet Nation. Chief Mountain, a place sacred to the Blackfoot people, is the border crossing on the Chief Mountain Highway through Waterton and Glacier National parks.[58] The Blackfoot people have travelled extensively across their ancestral territory of Alberta and Montana

---

[56] Doc. 44-4, Doc. 44-5 Conway Declarations.
[57] Doc. 44-4, ¶ 4.
[58] Doc. 15 ¶ 31.

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**      17

for thousands of years.[59]

In response to the Canada Orders, border crossings and hotel bookings are down, and Canadian youth sports teams have cancelled competitions in Montana.[60] Border crossings at Roosville decreased 14.8% in February and 26% in March.[61]

An injunction can fix this harm. The Canada Orders are destroying jobs, ruining businesses, and harming farmers and ranchers.[62]

Wayne Smith, a rancher, contracted grain for hauling to Canada. The first loads went fine before the Canada Orders, but the buyer stopped hauling because of them. 25% tariffs were imposed on a load Smith hauled after April 2, a $1,375 cost on a $5,500 load. Smith is forced to change what he plants, which harms rotational crops and damages long-term operations.[63] The increased costs for fertilizer, unpredictability for crops, and price volatility will crush Montana's agriculture community.[64] An injunction will stop the chaos and restore the status quo until the merits can be resolved.

On March 25, 2025, St. Goddard had a rim break on his tractor wheel. He needed a replacement right away for calving season. St. Goddard found a hub and

---

[59] Doc. 48, Blackfoot Confederacy Chiefs Declaration.
[60] Webber Declaration.
[61] *Id.*
[62] Doc. 5, Schweitzer Declaration ¶¶ 8-10.
[63] Doc. 44-6, Smith Declaration.
[64] Doc. 31-4 Stoltz Declaration; Doc. 31-3 Degn Declaration; Doc. 31-2 Wicks Declaration.

wheel in Medicine Hat, Alberta. The replacement cost $1,790.00 Canadian.[65] St. Goddard drove to pick it up. On the way back, Border Patrol Agent Nelson asked for a receipt. The copy St. Goddard had on his phone didn't work because service was spotty. Border Patrol Agent Nelson told St. Goddard he would have to go through Sweet Grass, over 100 miles away. St. Goddard walked around trying to get a signal, but wasn't able to, so he finally went into the office where they had a booster, got a signal, and sent the invoice to Border Patrol.

Border Patrol Agent Nelson converted the invoice to U.S. Dollars, and calculated a tariff for the replacement tractor wheel. What came out of St. Goddard's bank account for the wheel was $1,252.89 U.S. Dollars. St. Goddard as not told what conversion rate was being used or how it was being calculated. Border Patrol Agent Nelson told St. Goddard the tariff charge would be $308.77. St. Goddard paid and got a receipt.[66] The Canada Orders are causing irreparable harm to St. Goddard's family ranch.[67]

Appellants' "non-speculative loss of substantial funding" will impact their family businesses and farm and ranch operations. It cannot be made up. It is irreparable.[68] The "loss of opportunity to pursue [a] chosen profession[] constitutes

---

[65] Doc. 5, Doc. 44-7, Doc. 44-8.
[66] Doc. 44-8.
[67] Doc. 5, Schweitzer Declaration.
[68] *E. Bay v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020).

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**　　　**19**

irreparable harm."[69] In addition to the losses to their family and community "the deprivation of constitutional rights unquestionably constitutes irreparable injury."[70]

The Canada Orders are causing ongoing harm.[71] Tribal communities, including the Nez Perce who have significant cross-border relationships, are being harmed every day.[72]

## IV. Equities and public interest favor an injunction.

Where a movant "seeks to enjoin the government, the final two factors — balancing the equities and the public interest — merge."[73] Appellants are presently experiencing harm as a result of the Canada Orders.[74] The harm has already had far-reaching consequences.[75] Appellants are not multi-national corporate importers who can afford to hire economists, accountants and lawyers and ledger the costs for a true-up down the road. These are regular people, who can't off-load the impacts to a different trade zone. The harm is immediate, on the ground, and crushing the hopes of real people who invested their lives and dreams in an

---

[69] *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).
[70] *W.B. v. Noem*, 25-cv-03407-EMC (N.D. Cal. 2025), *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), *Elrod v. Burns*, 427 U.S. 347, 373 (1976).
[71] Doc. 5.
[72] Declaration of Mary Jane Oatman.
[73] *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025) (citation omitted).
[74] *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020).
[75] Dec. of Webber.

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**     **20**

America that follows the rule of law.[76]

The government cannot suffer harm from an injunction that merely ends an unlawful practice, especially when constitutional concerns are at stake.[77] In contrast to personal and irreparable harms to Appellants, a preliminary injunction would not harm the federal government at all, but merely maintain the status quo. The Court will simply be implementing the self-induced pause the government has agreed to; only it will be constitutionally firm, and not subject to change tomorrow.

An injunction is necessary to preserve the status quo. The Canada Orders have upended the commercial and cultural world for the Blackfeet and other tribes; without notice, without an opportunity to be heard, and without addressing the claimed emergency.

## V.    The Court Should Not Require Security.

The Court should not require a bond.[78] The government will not be harmed by an injunction from illegal Orders; Appellants are being harmed every day from the illegal Orders. Basic fairness tips against requiring a security.[79]

---

[76] Oatman Declaration.

[77] *Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023), citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

[78] FRAP 8(a)(2)(E).

[79] *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011); Fed. R. Civ. P. 65(c); *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

**APPELLANT'S MEMORANDUM FOR PRELIMINARY INJUNCTION**          21

## VI.   CONCLUSION

The 1770s and 1780s were turbulent times. The foundational document of a new republic gave Congress exclusive and plenary power to regulate commerce with foreign nations; among the several states; and with the Indian Tribes. The framers had long experience with conflict among the several states; with foreign nations; and with the Indian tribes. They knew what they were doing in giving Congress exclusive and plenary power to regulate commerce. Article I, Section 8 Clause 3 could not be clearer on this point.

As enrolled members of the Blackfeet Tribe, Appellants have one place to challenge the Canada Orders under the Indian Commerce Clause. It is in District Court.

The Canada Orders should be enjoined pending resolution on the merits.

## VII.   RELATED CASES

Plaintiffs are not aware of any related cases at this time.

DATED this 1ˢᵗ day of May, 2025.

TRANEL LAW FIRM P.C.

   */s/ Monica J. Tranel*
Monica J. Tranel
*Attorneys for Appellants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 27(a)(2)(A), I certify that the foregoing brief has a word count including footnotes as calculated by Microsoft Word for Mac of less than 5,200 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Opposing counsel was contacted regarding this motion on April 30, 2025, through the e-filing submission of the Mediation Statement, and given notice of the preliminary injunction request on May 1, 2025, as well as through the e-filing submission to the 9th Circuit Court of Appeals.

DATED this 1st day of May, 2025.

TRANEL LAW FIRM P.C.

*/s/ Monica J. Tranel*
Monica J. Tranel
*Attorneys for Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 1, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 1st day of May, 2025.


*/s/ Monica J. Tranel*
Monica J. Tranel