# SUPREME COURT OF THE UNITED STATES

———————

No. 24A1007

———————

A. A. R. P., ET AL. *v.* DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.

ON APPLICATION FOR INJUNCTION

[May 16, 2025]

PER CURIAM.

The President has invoked the Alien Enemies Act (AEA), Rev. Stat. §4067, 50 U. S. C. §21, to remove Venezuelan nationals who are members of Tren de Aragua (TdA), a designated foreign terrorist organization. See Presidential Proclamation No. 10903, 90 Fed. Reg. 13033 (2025). Applicants are two detainees identified as members of TdA and a putative class of similarly situated detainees in the Northern District of Texas. All of the alleged TdA members in the putative class are currently being held in U. S. detention facilities. In the application before the Court, the detainees seek injunctive relief against summary removal under the AEA.

I

On April 17, 2025, the District Court denied the detainees' motion for a temporary restraining order (TRO) against summary removal under the AEA. No. 25–cv–59, ECF Doc. 27. The detainees allege that, hours later, putative class members were served notices of AEA removal and told that they would be removed "tonight or tomorrow." ECF Doc. 30, p. 1. On April 18 at 12:34 a.m. central time, the detainees moved for an emergency TRO. See *ibid.* At 12:48 p.m., the detainees moved for a ruling on that motion or a status conference by 1:30 p.m. ECF Doc. 34. At 3:02 p.m., they appealed "the constructive denia[l]" of the emergency TRO

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

A. A. R. P. *v.* TRUMP

Per Curiam

to the Fifth Circuit. ECF Doc. 36, p. 1. The detainees also applied to this Court for a temporary injunction.

We understood the Government to assert the right to remove the detainees as soon as midnight central time on April 19. The Government addressed the detainees' allegations on April 18 only at an evening hearing before the District Court for the District of Columbia, where the detainees had separately sought relief. The Government guaranteed that no putative class members would be removed that day. Tr. of Proceedings in *J. G. G.* v. *Trump*, No. 25−cv−766, ECF Doc. 93, p. 9. But it further represented that, in its view, removal of putative class members as soon as the next day "would be consistent with" its due process obligations, and it "reserve[d] the right" to take such action. *Id.*, at 26; see *id.*, at 16 (explanation by the court that "tomorrow . . . starts at 12:01 a.m."). Evidence now in the record (although not all before us on April 18) suggests that the Government had in fact taken steps on the afternoon of April 18 toward removing detainees under the AEA—including transporting them from their detention facility to an airport and later returning them to the facility. See Supp. App. to Reply 1a–5a. Had the detainees been removed from the United States to the custody of a foreign sovereign on April 19, the Government may have argued, as it has previously argued, that no U. S. court had jurisdiction to order relief. See Application To Vacate Injunction in *Noem* v. *Abrego Garcia*, No. 24A949 (Apr. 7, 2025), pp. 11–20.

At 12:52 a.m. eastern time (11:52 p.m. central time), we ordered the Government—in light of all these circumstances—"not to remove any member of the putative class of detainees" in order to preserve our jurisdiction to consider the application. 604 U. S. ___ (2025). We invited the Government to respond to that application after the Fifth Circuit ruled. The Fifth Circuit dismissed the detainees' appeal for lack of jurisdiction and denied their motion for injunction pending appeal as premature, on the ground that

the detainees "gave the [district] court only 42 minutes to act." No. 25−10534, ECF Doc. 14, p. 2. We now construe the application as a petition for writ of certiorari from the decision of the Fifth Circuit. See Reply 15. We grant the petition as well as the application for injunction pending further proceedings, vacate the judgment of the Fifth Circuit, and remand for further proceedings.

## II

The Fifth Circuit erred in dismissing the detainees' appeal for lack of jurisdiction. Appellate courts have jurisdiction to review interlocutory orders that have "the practical effect of refusing an injunction." *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 84 (1981). A district court's inaction in the face of extreme urgency and a high risk of "serious, perhaps irreparable," consequences may have the effect of refusing an injunction. 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3924.1, pp. 174, 180–181 (3d ed. 2012) (quoting *Baltimore Contractors, Inc.* v. *Bodinger*, 348 U. S. 176, 181 (1955)). Here the District Court's inaction—not for 42 minutes but for 14 hours and 28 minutes—had the practical effect of refusing an injunction to detainees facing an imminent threat of severe, irreparable harm. Accordingly, we vacate the judgment of the Court of Appeals.

"[T]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." *Trump* v. *J. G. G.*, 604 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 3) (internal quotation marks omitted). "Procedural due process rules are meant to protect" against "the mistaken or unjustified deprivation of life, liberty, or property." *Carey* v. *Piphus*, 435 U. S. 247, 259 (1978). We have long held that "no person shall be" removed from the United States "without opportunity, at some time, to be heard." *The Japanese Immigrant Case*, 189 U. S. 86, 101 (1903). Due process requires notice that is "reasonably calculated, under all the

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

A. A. R. P. *v.* TRUMP

Per Curiam

circumstances, to apprise interested parties" and that "afford[s] a reasonable time . . . to make [an] appearance." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314 (1950). Accordingly, in *J. G. G.*, this Court explained—with all nine Justices agreeing—that "AEA detainees must receive notice . . . that they are subject to removal under the Act . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief" before removal. 604 U. S., at ____ (slip op., at 3). In order to "actually seek habeas relief," a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief.

The Government does not contest before this Court the applicants' description of the notice afforded to AEA detainees in the Northern District of Texas, nor the assertion that the Government was poised to carry out removals imminently. The Government has represented elsewhere that it is unable to provide for the return of an individual deported in error to a prison in El Salvador, see *Abrego Garcia* v. *Noem*, No. 25−cv−951 (D Md.), ECF Docs. 74, 77, where it is alleged that detainees face indefinite detention, see Application for Injunction 11. The detainees' interests at stake are accordingly particularly weighty. Under these circumstances, notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster. But it is not optimal for this Court, far removed from the circumstances on the ground, to determine in the first instance the precise process necessary to satisfy the Constitution in this case. We remand the case to the Fifth Circuit for that purpose.

To be clear, we decide today only that the detainees are entitled to more notice than was given on April 18, and we grant temporary injunctive relief to preserve our jurisdiction while the question of what notice is due is adjudicated. See *post*, at 13 (ALITO, J., dissenting). We did not on April

19—and do not now—address the underlying merits of the parties' claims regarding the legality of removals under the AEA. We recognize the significance of the Government's national security interests as well as the necessity that such interests be pursued in a manner consistent with the Constitution. In light of the foregoing, lower courts should address AEA cases expeditiously.

### III

The dissent disputes both the Court's jurisdiction and the availability of classwide relief. We do not find its reasoning persuasive.

First, we reject the dissent's characterization of the events that transpired on April 18, which lead it to question our jurisdiction. District courts should approach requests for preliminary relief with care and consideration, see *post*, at 3–4 (ALITO, J., dissenting), but exigent circumstances may impose practical constraints. Preliminary relief is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Lackey* v. *Stinnie*, 604 U. S. ___, ___ (2025) (slip op., at 6) (quoting *University of Tex.* v. *Camenisch*, 451 U. S. 390, 395 (1981)). The purpose of such relief is "merely to preserve the relative positions of the parties" pending further proceedings. *Lackey*, 604 U. S., at ___ (slip op., at 6) (quoting *Camenisch*, 451 U. S., at 395).

In this case, the record before the District Court, although limited, indicated that removals of putative class members were likely imminent. Contra, *post*, at 4–6 (ALITO, J., dissenting). The detainees attached four declarations to their emergency motion for a TRO. In one, for example, an attorney relayed a detainee's report that immigration officers "had informed them that they will be deported either today or tomorrow." ECF Doc. 30–1. In a second, a nonprofit director described conversations with

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

A. A. R. P. *v.* TRUMP

Per Curiam

family members of detainees and linked to a video of detainees holding notices of removal as evidence that detainees "were being removed." ECF Doc. 30–2.

Importantly, the relevant question for purposes of our jurisdiction is whether, at the time this Court was called upon to intervene, the District Court's inaction had the effect of refusing an injunction. In their application to this Court, the detainees represented that "[m]any individuals [had] already been loaded on to buses, presumably headed to the airport." Application for Injunction 1. Shortly thereafter, the Government represented on the record in federal court that it reserved the right to remove detainees after midnight. We had the power to issue injunctive relief to prevent irreparable harm to the applicants and to preserve our jurisdiction over the matter. 28 U. S. C. §1651(a). Now that the Fifth Circuit has ruled, our certiorari jurisdiction also supports review in the ordinary course.

Finally, this Court may properly issue temporary injunctive relief to the putative class in order to preserve our jurisdiction pending appeal.* Named applicants A. A. R. P. and W. M. M. assert that they are at imminent risk of being classified as alien enemies and removed from the United

————————

*We note that the District Court recently denied class certification as to the detainees' underlying habeas claims challenging the validity of removal under the AEA. See ECF Doc. 67. By its own terms, the District Court's order is "automatically vacated" by our order granting a writ of certiorari. *Id.*, at 2. And in any event, the District Court's order primarily addressed the detainees' ability to challenge the validity of AEA removal on a classwide basis. The application before this Court seeks only to vindicate notice rights on a classwide basis. To the extent the District Court's order addressed due process, see *post*, at 12 (ALITO, J., dissenting) (citing ECF Doc. 67, pp. 29–31, 33, 38–39), the District Court's concerns as to the propriety of classwide relief focused on considerations downstream of the initial notice necessary for detainees to raise any substantive claims against AEA removal, see ECF Doc. 67, pp. 29–31, 33, 38–39.

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

States, but the record does not indicate that they have received any formal notice of removal under the AEA. See ECF Doc. 38, pp. 5–6. The named applicants, along with putative class members, are entitled to constitutionally adequate notice prior to any removal, in order to pursue appropriate relief. Although the putative class members may ultimately take different steps to protect their own interests in response to such notice, the notice to which they are entitled is the same. And because courts may issue temporary relief to a putative class, see 2 W. Rubenstein, Newberg & Rubenstein on Class Actions §4:30 (6th ed. 2022 and Supp. 2024), we need not decide whether a class should be certified as to the detainees' due process claims in order to temporarily enjoin the Government from removing putative class members while the question of what notice is due is adjudicated.

We recognize that the Government "has agreed to forgo removing the named petitioners pursuant to the AEA while their habeas proceedings are pending." Opposition to Emergency Application 11. But we reject the proposition that a class-action defendant may defeat class treatment, if it is otherwise proper, by promising as a matter of grace to treat named plaintiffs differently. Cf. *FBI* v. *Fikre*, 601 U. S. 234, 241 (2024) (explaining that voluntary cessation of challenged conduct does not moot a claim). And we are skeptical of the self-defeating notion that the right to the *notice* necessary to "actually seek habeas relief," *J. G. G.*, 604 U. S., at ___ (slip op., at 3), must *itself* be vindicated through individual habeas petitions, somehow by plaintiffs who have not received notice.

\*     \*     \*

The application for an injunction pending further proceedings is granted. The motion for leave to file a supplemental appendix under seal is also granted. Additionally, applicants suggested this Court treat the application as a

A. A. R. P. *v.* TRUMP

Per Curiam

petition for a writ of certiorari; doing so, the petition is
granted.  The judgment of the Fifth Circuit is vacated, and
the case is remanded to the Fifth Circuit.  In resolving the
detainees' appeal, the Fifth Circuit should address (1) all
the normal preliminary injunction factors, including likeli-
hood of success on the merits, as to the named plaintiffs'
underlying habeas claims that the AEA does not authorize
their removal pursuant to the President's March 14, 2025,
Proclamation, and (2) the issue of what notice is due, as to
the putative class's due process claims against summary re-
moval.  The Government is enjoined from removing the
named plaintiffs or putative class members in this action
under the AEA pending order by the Fifth Circuit and dis-
position of the petition for a writ of certiorari, if such writ
is timely sought.  Should the petition for a writ of certiorari
be denied, this order shall terminate automatically.  In the
event the petition for a writ of certiorari is granted, the or-
der shall terminate upon the sending down of the judgment
of this Court.

   The Government may remove the named plaintiffs or pu-
tative class members under other lawful authorities.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 24A1007

## A. A. R. P., ET AL. *v.* DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.

ON APPLICATION FOR INJUNCTION

[May 16, 2025]

JUSTICE KAVANAUGH, concurring.

I understand and agree with the Court's decision to grant a temporary injunction. The injunction simply ensures that the Judiciary can decide *whether* these Venezuelan detainees may be lawfully removed under the Alien Enemies Act *before* they are in fact removed. The underlying legal questions that the courts may need to decide before the removals occur include: (i) whether the Alien Enemies Act (as distinct from the ordinary removal process under the Immigration and Nationality Act) authorizes removal of these detainees and (ii) if so, what notice is due before removal. Several Federal District Courts have already issued conflicting rulings on the underlying legal issues. Compare *A. S. R.* v. *Trump*, No. 3:25–cv–113 (WD Pa., May 13, 2025), with *G. F. F.* v. *Trump*, No. 1:25–cv–2886 (SDNY, May 6, 2025), *D. B. U.* v. *Trump*, No. 1:25–cv–1163 (D Colo., May 6, 2025), and *J. A. V.* v. *Trump*, No. 1:25–cv–72 (SD Tex., May 1, 2025).

The Executive Branch and the detainees agree about the urgency and importance of those legal questions: The Executive Branch has represented that this case is important for America's national security and that it is "critical to remove TdA members subject to the Proclamation quickly." Application To Vacate Orders in *Trump* v. *J. G. G.*, No. 24A931 (Mar. 28, 2025), p. 37; see Opposition to Emergency Application 3, 5. For their part,

A. A. R. P. *v.* TRUMP

KAVANAUGH, J., concurring

the detainees have explicitly requested that the Court move fast and grant certiorari before judgment.  See Reply 4.

The circumstances call for a prompt and final resolution, which likely can be provided only by this Court.  At this juncture, I would prefer not to remand to the lower courts and further put off this Court's final resolution of the critical legal issues.  Rather, consistent with the Executive Branch's request for expedition—and as the detainees themselves urge—I would grant certiorari, order prompt briefing, hold oral argument soon thereafter, and then resolve the legal issues.

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

# SUPREME COURT OF THE UNITED STATES

———————

No. 24A1007

———————

A. A. R. P., ET AL. *v.* DONALD J. TRUMP, PRESIDENT
OF THE UNITED STATES, ET AL.

ON APPLICATION FOR INJUNCTION

[May 16, 2025]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting.

I cannot join the decision of the Court. First and most important, we lack jurisdiction and therefore have no authority to issue any relief. Second, even if we had such authority, the applicants have not satisfied the requirements for the issuance of injunctive relief pending appellate review. Third, granting certiorari before any decision on the merits has been made by either the District Court or the Court of Appeals is unwarranted.

## I
### A

"Jurisdiction is power to declare the law," and "[w]ithout jurisdiction the court cannot proceed at all." *Ex parte McCardle*, 7 Wall. 506, 514 (1869). So in order for us to do anything in this matter, "we must assure ourselves that we have jurisdiction." *Abbott* v. *Perez*, 585 U. S. 579, 594 (2018).

The Court's theory of jurisdiction, as I understand it, is as follows. Under 28 U. S. C. §1254, we have jurisdiction to review a "case" that is properly before one of the federal courts of appeals. This case was properly before the Court of Appeals for the Fifth Circuit because the two habeas petitioners, A. A. R. P. and W. M. M., took an appeal from a District Court order that refused to issue "an injunction."

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

A. A. R. P. *v.* TRUMP

ALITO, J., dissenting

§1292(a)(1).  Although the District Court never actually is-
sued such an order or said that it would do so, the District
Court constructively denied injunctive relief by failing to
act under circumstances where prompt intervention was
urgently needed.  See *ante*, at 3.

This theory rests on a mischaracterization of what hap-
pened in the District Court.  I do not dispute that a district
court's failure to act expeditiously may, in some circum-
stances, have "the practical effect of refusing an injunction"
and thus entitle a party to take an interlocutory appeal.
*Carson* v. *American Brands, Inc.*, 450 U. S. 79, 84 (1981);
see also §1292(a)(1).  But that principle does not apply here
where (a) the District Court had no good reason to think
that either A. A. R. P. or W. M. M. was in imminent danger
of removal, (b) the record at that time contained only
sketchy evidence about any imminent threat to members of
the class of alien detainees they sought to have certified, (c)
the court took the entirely reasonable position that it would
wait for the Government to respond to the applicants' re-
quest for a temporary restraining order (TRO) before act-
ing, (d) the court set a very short deadline for the filing of
the Government's response, and (e) the court was working
diligently on the difficult issues presented by the appli-
cants' request for relief for themselves and the members of
the putative class.

The Court asserts that the District Court failed to act "for
14 hours and 28 minutes," *ante*, at 3, but that is misleading.
Here is what actually happened.  On the evening of April
17, lawyers for A. A. R. P. and W. M. M. made a phone call
in which they demanded "to talk to the Judge immediately
. . . and have the Judge issue an order."  Order in No. 1:25–
cv–59 (ND Tex., Apr. 21, 2025), ECF Doc. 47–1, p. 2.  As the
District Court has since correctly noted, judges are gener-
ally not permitted to consider such *ex parte* communica-
tions.  See ECF Doc. 47, at 1–2 (citing Code of Conduct for
Federal Judges, Canon 3(A)(4)); see also Fed. Rule Civ.

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

Proc. 65(b)(1). So the judge issued an electronic order admonishing the attorneys and stating that "[t]o the extent either party seeks emergency relief, it may file a motion to do so. If an emergency motion is filed, the opposing party shall have 24 hours to file a response." ECF Doc. 29.

Thus, when the attorneys for A. A. R. P. and W. M. M. filed their renewed motion for a TRO at 12:34 a.m. on April 18, they were fully aware that the District Court intended to give the Government 24 hours to file a response. But in that motion, the attorneys said nothing about a plan to appeal if the District Court elected to wait for that response.

It was not until their 12:48 p.m. emergency motion for an immediate status conference that the attorneys suddenly informed the court that they would file an appeal if the District Court did not act within 42 minutes, *i.e.*, by 1:30 p.m. No. 1:25–cv–59 (ND Tex., Apr. 18, 2025), ECF Doc. 34, p. 2. The attorneys then filed their appeal at 3:02 p.m., just 133 minutes after they put the District Court on notice that they would seek appellate relief. Reply 10. Whether or not the actions taken by applicants' attorneys are thought to be justified under the circumstances, delivering such an ultimatum to a district court judge ("Act on my motion on a complex matter within 42 or 133 minutes or I'll file an appeal and divest you of jurisdiction") represented a very stark departure from what is usually regarded as acceptable practice.

Faced with applicants' extraordinary demand, the District Court proceeded in an entirely reasonable manner. The Court characterizes the District Court's behavior during the period in question as "inaction," *ante*, at 3, but in my judgment, that is unfair. Rather, as the judge has noted, he "was working with utmost diligence to resolve [the] important and complicated issues [presented by the motion] as quickly as possible." ECF Doc. 41, p. 4. The judge explained that he had not yet ruled because he could

A. A. R. P. *v.* TRUMP

ALITO, J., dissenting

not "shirk [his] responsibility to decide . . . complicated is-
sues of law without at least some opportunity to review the
pleadings and attachments and to get thoughtful responses
from the parties." *Id.*, at 5. And the judge "was prepared
to issue an order" "as soon as practicable after the govern-
ment filed its response shortly after midnight, if not
sooner." *Id.,* at 4.

We should commend this careful approach, not criticize
it. In the past few months alone, we have vacated or stayed
district court orders that granted temporary injunctive re-
lief without adequate consideration of the relevant issues.
See *Trump* v. *J. G. G.*, 604 U. S. ___ (2025) (*per curiam*);
*Department of Education* v. *California*, 604 U. S. ___ (2025)
(*per curiam*). But in this case, a District Court judge is
deemed to have constructively denied an injunction by fail-
ing to act within the space of a little over two hours on an
application that required consideration of important and
difficult questions and that was supported by factual sub-
missions that, as I will explain below, were very weak.

Under these circumstances, I cannot agree that the Dis-
trict Court's failure to act amounted to a constructive denial
of the applicants' request for relief.

B

As I mentioned, the factual support provided to the Dis-
trict Court was weak. The Court claims that the facts pre-
sented to the District Court on April 18 showed that there
was an emergency entailing a high risk of "serious, perhaps
irreparable, consequences." *Ante,* at 3 (internal quotation
marks omitted). But it is important not to conflate the in-
formation that was in the record on April 18 with the new
information that was presented to this Court several days
later.

The record that was before the District Court on April 18
(which is the same record that was before us at midnight on
that date) included no concrete evidence that any removals

were so imminent that a ruling had to be made immediately. The applicants' factual support consisted of six sworn declarations and a photograph that the applicants asserted was an image of a notice of removal. See App. to Application 32–37, 56–65. But neither the declarations nor the photograph showed "extreme urgency." *Ante*, at 3.

The declarations certainly did not show that action was urgently needed to protect A. A. R. P. or W. M. M. The Government had represented in District Court that it would not remove either of those men—the only parties who were indisputably before the court—while their habeas petitions were pending. Order in No. 1:25–cv–59 (ND Tex., Apr. 17, 2025), ECF Doc. 27, p. 1. And the two declarations concerning those individuals included no allegations about imminent removal. App. to Application 32–37. Indeed, the declarations concerning them were signed on April 15, prior to the Government's representation that they would not be removed while their habeas petitions were pending. As a result, the declarations were outdated and provided no support for the claim that either A. A. R. P. or W. M. M. was threatened with removal on April 18 or 19.[1]

The remaining evidence in the record at that time concerned only the unnamed members of the as-yet uncertified

_____

[1] The Government "unequivocally" told the District Court that it did not "'presently expect to remove A.A.R.P. or W.M.M. under the [Alien Enemies Act (AEA)] until after the pending habeas petition is resolved,'" and that it would "'update'" the District Court if that changed. ECF Doc. 27, at 1. And in their application for relief before this Court, the applicants did not assert that A. A. R. P. or W. M. M. in particular were at risk of being removed. To the contrary, the applicants represented that they had contacted the Government and were told that "the two named Applicants had not been given [removal] notices." Application 5, n. 3. The Government later confirmed in its filings before this Court that it "has agreed not to remove pursuant [to] the AEA those AEA detainees who do file habeas claims," including the named applicants. Opposition to Emergency Application 2.

A. A. R. P. *v.* TRUMP

ALITO, J., dissenting

class. And of the four declarations concerning those individuals, only *one* said anything about when removal might happen. In that declaration, a lawyer swore that she spoke on the phone with an unidentified Venezuelan man who said that "ICE had informed them that they will be deported either today or tomorrow to Venezuela." *Id.*, at 56. In other words, the most specific piece of evidence in the record was a double-hearsay statement that cannot be traced back to any specific government official. Outside of that, *none* of the remaining declarations said anything about imminent removal. They merely stated that certain aliens were receiving deportation notices, but it was not claimed that these notices specified when removal might occur. See *id.*, at 57–58 (Brané decl.); *id.,* at 59–60 (Collins decl.); *id.,* at 61 (Siegel decl.). And the image of a document labeled "Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act," which the applicants termed a removal notice, likewise said nothing about the time of removal. See *id.*, at 64–65. Other than these declarations, the court was left with unsupported attorney assertions in the application itself.

Ignoring these deficiencies in the record before the District Court, the Court relies on information that was not in the District Court record, namely, (a) statements made by a Government attorney in a hearing in another case that was held in Washington, D. C., during the evening on April 18, well after applicants filed their appeal and (b) evidence that we received several days later. See *ante,* at 2. But in evaluating whether the District Court effectively refused to issue injunctive relief, we must consider the facts as they were known to that court at the time in question.[2]

———————
[2]Moreover, it appears to me that the Court overstates what the Government attorney actually said during the April 18 hearing. The attorney represented that it was "definitive" that "there are no flights tonight," and that "the people [he] spoke to were not aware of any plans for flights tomorrow." Tr. of Proceedings in *J. G. G.* v. *Trump*, ECF Doc. 93,

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

For these reasons, I agree with the unanimous Court of Appeals panel that the District Court did not constructively deny an application for an injunction. As the panel stated, there was no reason to doubt the "diligence and ability" of the District Court to act appropriately under the circumstances. Order in No. 25–10534 (CA5, Apr. 18, 2025), ECF Doc. 14–1, p. 2. And his "failure to issue the requested ruling" within the extraordinarily short period specified by the applicants cannot reasonably be viewed as "an effective denial of injunctive relief." *Id.*, at 4 (Ramirez, J., concurring).

## II

Even if the District Court had denied the applicants' motion, there would be no ground for reversal because the applicants failed to satisfy the requirements for emergency injunctive relief, one of which is a showing of likelihood of success on the merits. *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). And here, in order to obtain what the application sought (and what the Court now provides)—*i.e.*, relief for the members of the class that applicants asked to have certified—applicants had to show that they were likely to establish that class relief is available in a habeas proceeding and, if such relief is available, that the standard requirements for class certification could likely be met.[3]

---

p. 15. Although the attorney also said that the Department of Homeland Security "reserve[d] the right to remove people tomorrow," he repeated numerous times that no flights were planned for April 19. *Id.*, at 26; see also *id.*, at 9, 15, 29–30. The attorney's statements showed that there was a possibility of future injury but not that such an injury was certainly impending. *Clapper* v. *Amnesty Int'l, USA*, 568 U. S. 398, 410 (2013).

[3]The Court asserts that "courts may issue temporary relief to a putative class" without "decid[ing] whether a class should be certified." *Ante,* at 7. In support of that proposition, the Court cites to no precedent of this Court. Instead, it cites to a treatise that provides no substantive reasoning in support of the proposition. See *ibid.* (citing 2 W. Rubenstein, Newberg & Rubenstein on Class Actions §4:30 (6th ed. 2022 and Supp. 2024).

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

A. A. R. P. *v.* TRUMP

Alito, J., dissenting

In my judgment, applicants were not likely to prevail on either of those issues.

### A

### 1

First, it is doubtful that class relief may be obtained in a habeas proceeding. We have never so held, and it is highly questionable whether it is permitted. Although habeas proceedings are classified as civil, the Federal Rules of Civil Procedure apply only "to the extent that the practice in [habeas] proceedings . . . previously conformed to the practice in civil actions." Rule 81(a)(4)(B); see also Rule 1. And in accordance with Rule 81, we have acknowledged that some Federal Rules are inapplicable in habeas.

In *Harris* v. *Nelson*, 394 U. S. 286 (1969), for example, we held that Rule 33—concerning interrogatories—does not apply in habeas proceedings because it has no analogue in historical habeas practice and is a poor fit in a habeas proceeding. *Id.,* at 292–298. Among other things, we noted that the prevalence of fact-finding in habeas proceedings was a relatively recent development, and that the specific scope of Rule 33 was "ill-suited to the special problems and character of [habeas] proceedings." *Id.*, at 296.

There are similar reasons to believe that Rule 23, which authorizes class actions, is not applicable in habeas. Neither courts nor commentators have found historical support for the practice. One commentator, writing in 1968, noted that "no case has been found in which anything resembling a class action was used in habeas corpus." Note, Multiparty Federal Habeas Corpus, 81 Harv. L. Rev. 1482, 1493 (1968).

---

Even if the Court were correct, its position would not justify its decision to entirely sidestep the issue of certification. A court considering whether to issue preliminary injunctive relief must consider whether the movant is likely to succeed on the merits. And to consider whether a request for classwide relief is likely to succeed on the merits, a court must at least consider whether class certification is likely.

Two years later, another commentator observed that "[c]lass actions for habeas corpus relief have rarely been attempted, perhaps because Rule 81(a)(2) [now Rule 81(a)(4)] seems to bar the application of the civil class action rule to habeas proceedings." Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1170 (1970) (footnotes omitted). Indeed, there appears to be some historical debate over whether even *joinder* was permitted in habeas practice. Compare Note, 81 Harv. L. Rev., at 1494 ("The issue of joinder was not explicitly ruled upon in any of these cases, and no case has been found which expressly sanctions the procedure"), with Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev., at 1169 (arguing that "the rules on joinder and consolidation apply under even the most restrictive interpretation of Rule 81," but citing contrary dicta found in at least one case (footnotes omitted)).

2

Despite this lack of historical support, some lower courts have held that our decision in *Harris* sometimes permits procedures that resemble those used in a class action. As noted, *Harris* held that Rule 33, which concerns interrogatories, does not apply in habeas, but the Court also observed that habeas courts "may fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage," when such modes of procedure are necessary to "the habeas corpus jurisdiction and the duty to exercise it." 394 U. S., at 299. On this ground, *Harris* held that a habeas court may use its authority under the All Writs Act, 28 U. S. C. §1651, to fashion a procedure resembling an interrogatory to the extent that such an instrument is "needed" by the court to "perform [its] duty" to "summarily hear and determine the facts, and dispose of the matter as law and justice require." 394 U. S., at 299–300 (internal quotation marks omitted).

Based on this discussion in *Harris,* the Second Circuit

A. A. R. P. *v.* TRUMP

ALITO, J., dissenting

held that while Federal Rule of Civil Procedure 23 does not itself apply in habeas, "a multi-party proceeding similar to" a Rule 23 class action is sometimes allowed. *United States ex rel. Sero* v. *Preiser*, 506 F. 2d 1115, 1125 (CA2 1974). And it concluded that this procedure was appropriate in "the unusual circumstances" present in the case at hand. *Ibid.*; see also *Bijeol* v. *Benson*, 513 F. 2d 965, 968 (CA7 1975).

This reading of *Harris* is highly questionable. Where a particular rule does not apply in habeas, a court cannot circumvent that limitation by simply saying that it is importing the same feature under a different rubric. *Harris* concluded that something like an interrogatory was allowed because it was needed under the circumstances to help the habeas court carry out a duty clearly imposed by law, that is, to "'determine the facts'" that are material to the claim made by the petitioner who was before the court. 394 U. S., at 299 (quoting 28 U. S. C. §2243).

The situation here is different. No provision of law imposes on a habeas court the duty to determine facts or decide legal issues regarding parties who are not before the court. And as a general matter, the class action device is uniquely "ill-suited" for habeas proceedings, *id.*, at 296, which often turn on individualized and fact-specific determinations regarding the confinement of a specific prisoner.

B

Even if something resembling a class action could be used in a habeas proceeding, it is very questionable whether the requirements for class certification could be met in this case. Rule 23(a)(3) provides that named plaintiffs may sue as representatives of a class "only if," among other things, "the claims or defenses of the representative parties are typical of the claims or defenses of the class." And when a court certifies a class, the court is supposed to define the precise "claims" that will be adjudicated on a class-wide basis. See Rule 23(c)(1)(B). That ensures that the only claims

that are adjudicated in a class action are those that the class brings in common and those for which the named plaintiffs are "typical" representatives of the class. See *General Telephone Co. of Northwest* v. *EEOC*, 446 U. S. 318, 330 (1980) ("The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims").

Here, however, the main interim relief sought on behalf of the putative class—adequate notice of plans for removal under the AEA and an opportunity to contest such removal in court, see Application 17–18; Reply 5–7—is not needed by either A. A. R. P. or W. M. M., who already have a pending habeas proceeding and a promise that they will not be removed until that proceeding concludes. For this reason, their situation differs critically from that of many of the putative class members since they have no personal stake in how the court resolves the question of interim relief for the putative class members.

The Court responds to this problem by suggesting that a class action defendant may not "defeat class treatment, *if it is otherwise proper*, by promising as a matter of grace to treat named plaintiffs differently." *Ante,* at 7 (emphasis added). But the Court provides no analysis suggesting that class certification here is "otherwise proper," and instead asserts that it can ignore the question of class certification at this preliminary stage. *Ibid.* And, in any event, the record does not suggest that the Government is treating the named plaintiffs differently "as a matter of grace." *Ibid*. Rather, it is doing so pursuant to its general policy against removing AEA detainees when they have a pending habeas petition. See Opposition to Emergency Application 2 ("the government has agreed not to remove pursuant [to] the AEA those AEA detainees who do file habeas claims").

## C

We have told district courts that they may certify a class

A. A. R. P. *v.* TRUMP

ALITO, J., dissenting

only after conducting a "'rigorous analysis'" of the question. *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U. S. 338, 351 (2011) (quoting *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 161 (1982)). On April 18, the District Court had no time to engage in such analysis, and as a result, it cannot be said that the court abused its discretion in failing to conclude that applicants' were likely to prevail on their class-action arguments. Cf. *University of Tex.* v. *Camenisch*, 451 U. S. 390, 393–394 (1981).

The District Court has since had time to conduct the "rigorous analysis" that our precedents require, and has concluded that class certification would be improper here. Order in No. 1:25–cv–59 (ND Tex., May 9, 2025), ECF Doc. 67. That development makes the relief issued by the Court today all the more extraordinary. Purporting to exercise its appellate jurisdiction, the Court issues "preliminary relief" to a putative class that the District Court has explicitly refused to certify, and it does so without providing any substantive analysis suggesting that the District Court's analysis of the class certification issue was incorrect.

Instead of substantively engaging with the District Court's order, the Court asserts that the order makes no difference because it "primarily addressed the detainees' ability to challenge the validity of AEA removal on a class-wide basis," whereas "[t]he application before this Court seeks only to vindicate notice rights." *Ante,* at 6, n. *. But the District Court's order did address the notice question. In addition to explaining why the applicants cannot pursue their final merits claims as a class action, the order explains at length why the applicants' claims regarding notice rights also cannot proceed on a class basis. ECF Doc. 67, at 29–31, 33, 38–39. Among other things, the District Court observed that "due process is by its very nature individualized," *id.*, at 33, a proposition plainly supported by our precedents. See *Jennings* v. *Rodriguez*, 583 U. S. 281, 314

Webber MEMO for Injunction
No. 25-2717
EXHIBIT 27

(2018) ("Due process is flexible, we have stressed repeatedly, and it calls for such procedural protections as the particular situation demands" (internal quotation marks and alteration omitted)).

In any event, the District Court also offered several general reasons why class relief would be inappropriate here, and these apply equally to the applicants' claims regarding notice rights. See ECF Doc. 67, at 35–36, 39–45. The Court today issues temporary relief without engaging with *any* of that analysis. And, what's more, it asks the Fifth Circuit to finally adjudicate the notice rights of members of the putative class without asking that court to do its own analysis regarding whether class certification as to those claims would be appropriate. *Ante,* at 8. Clearly, the Court would prefer to ignore the important step of class certification and skip directly to the adjudication of the class members' rights. The Federal Rules do not permit such a shortcut.

## III

Instead of merely ruling on the application that is before us—which asks for emergency relief pending appeal—the Court takes the unusual step of granting certiorari before judgment, summarily vacating the judgment below dismissing the applicants' appeal, and remanding the case to the Court of Appeals with directions regarding the issues that court should address. From the Court's order, it is not entirely clear whether the Court has silently decided issues that go beyond the question of interim relief. (I certainly hope that it has not.) But if it has done so, today's order is doubly extraordinary. Granting certiorari before a court of appeals has entered a judgment is a sharp departure from usual practice, but here neither the Court of Appeals nor the District Court has decided any merits questions.

We have said more times than I care to remember that "we are a court of review, not first view." *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). Even on the Court's

A. A. R. P. *v.* TRUMP

A<small>LITO</small>, J., dissenting

reading of what happened below, all that the District Court and the Court of Appeals decided was that the applicants were not entitled to temporary injunctive relief. If the Court has gone beyond that question, it has blazed a new trail. It has plucked a case from a district court and decided important issues in the first instance. To my eyes, that looks far too much like an expansion of our original jurisdiction.

I must therefore respectfully dissent.