No. 25-2717

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

Susan Webber, Jonathan St. Goddard,
Rhonda Mountain Chief and David Mountain Chief,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, THE UNITED
STATES OF AMERICA, and,
in her official capacity, KRISTI NOEM
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Montana
No. CV 25-26-GF-DLC
Hon. Dana Christensen

---

## APPELLANTS OPENING BRIEF

---

Monica J. Tranel
TRANEL LAW FIRM, P.C.
401 Washington Street
Missoula, MT 59802
(406) 926-2662
*mtranel@tranelfirm.com*


*Attorneys for Appellants*
Susan Webber, Jonathan St. Goddard,
Rhonda Mountain Chief and David Mountain Chief

## DISCLOSURE STATEMENT

No Disclosure statement is required pursuant to FRAP 26.1 as the Plaintiffs are all individuals, enrolled members of the Blackfeet Tribe.


Date: June 9, 2025

TRANEL LAW FIRM, P.C.


By: _ /s/ *Monica Tranel* _____
        Monica Tranel

*Attorneys for Appellants*

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT.....................................................................i

TABLE OF AUTHORITIES................................................................. iii

INTRODUCTION..................................................**Error! Bookmark not defined.**

JURISDICTIONAL STATEMENT .........................................................3

CONSTITUTIONAL AUTHORITY ........................................................4

ISSUES PRESENTED .............................................................................4

STATEMENT OF THE CASE ................................................................4

SUMMARY OF THE ARGUMENT .......................................................9

STANDARD OF REVIEW.....................................................................13

ARGUMENT .........................................................................................13

    I.    Appellants claims arise under the Constitution ...............................13

        A. The Indian Commerce Clause vests exclusive jurisdiction in Montana district court.................................................................14

            1. 28 U.S.C. § 1631 requires a want of jurisdiction .................15

            2. The Constitutional jurisdiction is not changed by 28 U.S.C. § 1362 ....................................................................................16

        B.    Article VI and the Jay Treaty vest exclusive jurisdiction in the Montana district court.................................................................25

    II.    The Appellants claims do not fall within the exclusive jurisdiction of 28 U.S.C. §1581...............................................................................32

        A. The CIT has no jurisdiction over tribal commerce .......................32

ii

      B. Tariffs intended to raise revenue defeat jurisdiction......................35

III.    The interests of justice .........................................................38

IV.    The Court Should Not Require Security..............................21

CONCLUSION .........................................................................40

STATEMENT OF RELATED CASES ...................................41

CERTIFICATE OF COMPLIANCE .....................................42

CERTIFICATE OF SERVICE...............................................49

# TABLE OF AUTHORITIES

## Cases

*AARP v. Trump*,
  605 U.S. ___ (2025), No. 24A1007 issued May 16, 2025) ..........................13

*Abourzek v. Reagan*,
  785 F.2d 1043, 1061 (D.C. Cir. 1986) ...........................................25

*Allen v. Conagra Foods, Inc.,* ,
  Case No. 3:13-cv-01279-WHO (N.D. Cal. Oct 15, 2019) ...........................14

*Arizona Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014).....................................................20

*Arizona v. Navajo Nation*,
  143 S. Ct. 1804 (2023) ..........................................................22

*Arizona v. San Carlos Apache Tribe*,
  463 U.S. 545, 559 n.10 (1983) ....................................................19

*Akins v. U.S.,*
  551 F.2d 1222 (1977)............................................................27

*Akins v. Saxbe*,
  380 F. Supp. 1210 (D. Me. 1974) .................................................27

*Azure v. Kirkegard*,
  Cause No. CV 14-134-BLG-DLC (D. Mont. Oct 10, 2014) .......................15

*Barnes v. Trump*,
  Case No. 18-cv-1025-pp (E.D. Wis. Mar 13, 2019) ................................35

*Califano v. Sanders*,
  430 U.S. 99, 109 (1977)..........................................................38

*Carson v. American Brands, Inc.*,
  450 U.S. 79, 84 (1981)...........................................................13

iv

*Cherokee Nation v. Georgia*,
    5 Pet. 1, 8 L.Ed. 25 (1831) ...................................................................18, 20

*Choctaw Nation v. United States*,
    318 U.S. 423, 432 (1943). .........................................................................27

*Club One Casino, Inc. v. Bernhardt*,
    959 F.3d 1142 (9th Cir. 2020)...................................................................21

*Coeur D'Alene Tribe v. Hawks*,
    933 F.3d 1052 (9th Cir. 2019)...................................................................24

*Cotton Petroleum Corp. v. New Mexico*,
    490 U.S. 163 (1989) ........................................................ 10, 18, 20, 21-22

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ..........................................................20

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*,
    18 F.3d 1581 (Fed. Cir. 1994)...................................................................37

*Davis v. Billington*,
    Civil Action No. 10-00036 (RBW) (D. D.C. Jun 25, 2014). ........................33

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011)...................................................................21

*E. Bay Sanctuary v. Biden*,
    993 F.3d 640 (9th Cir. 2021).....................................................................24

*E. Bay v. Garland*,
    994 F.3d 962 (9th Cir. 2020).....................................................................19

*Elrod v. Burns*,
    427 U.S. 347 (1976) ..................................................................................20

*Emily Ley Paper, Inc. v. Trump*,
    3:25-cv-00464-TKW-ZCB (N.D. Fla.) .......................................................34

*Falck v. Scott Griffith, LLC*,
   25 F.4th 763, 765 (9th Cir. 2022)...................................................13

*Gardiner v. Virgin Islands Water and Power Authority*,
   6 F.3d 786 (Fed. Cir. 1993).........................................................17

*Gila River Indian Cmty. v. Cranford*,
   459 F.Supp.3d 1246 (D. Ariz. 2020)..............................................19

*Grondal v. United States*,
   513 F. Supp. 3d 1262 (E.D. Wash. 2021) .......................................15

*Gibbons v. Ogden*,
   22 U.S. 1 (1824) ........................................................................19

*Haaland v. Brackeen*,
   143 S. Ct. 1609 (2023) ..................................14, 17, 18, 22, 25, 28

*In re U.S. Dept of Educ.*,
   25 F.4th 692, 698 (9th Cir. 2022) ................................................13

*Ind. Envtl. Ntwk v. Trump,*
   428 F. Supp. 3d 296 (D. Mont. 2019) ...........................................14

*Int'l Custom Prods., Inc. v. U.S.*,
   791 F.3d 1329 (Fed. Cir. 2015).....................................................27

*Jaramillo Spices Corp. v. United States*
   531 F.Supp.3d 1354 (CIT 2021) ..................................................36

*J.G.G. v. Trump,*
   Civil Action 25-766 (JEB) (D.D.C. Apr. 16, 2025).........................25

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009).......................................................21

*Kalispel Tribe of Indians v. U.S. Dep't of the Interior*,
   999 F.3d 683 (9th Cir. 2021).........................................................22

*Keirton U.S. Inc. v. U.S. Customs & Border Prot.,*
    C21-224 TSZ (W.D. Wash. Apr 16, 2021)...................................................33

*K-Mart Corp. v. Cartier, Inc.,*
    485 U.S. 176 (1988)...............................................................11, 23, 36

*Kolek v. Engen,*
    869 F.2d 1281 (9th Cir. 1989)..........................................................15

*Learning Resources*
    Civil Action Case 1:25-cv-01248 ......................................................8

*Lone Wolf v. Hitchcock,*
    187 U.S. 553, 566–568 (1903)..........................................................25

*Marceau v. Blackfeet Housing Auth.,*
    540 F.3d 916 (9th Cir. 2008)...........................................................22

*Matlock v. Sullivan,*
    908 F.2d 492, 493-94 (9th Cir. 1990)...................................................38

*McGirt v. Oklahoma,*
    140 S. Ct. 2452 (2020)................................................................25

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012)..........................................................20

*Menominee Tribe v. U.S.,*
    391 U.S. 404, 413 (1968).............................................................28

*Minnesota v. Chippewa Indians,*
    526 U.S. 172 (1999)..................................................................27

*Moe v. Confederated Salish & Kootenai Tribes,*
    425 U.S. 463, 483 (1976)..............................................................19

*Morton v. Mancari,*
    417 U.S. 535 (1974)..................................................................22

vii

*Newtok Vill. v. Patrick*,
   21 F.4th 608 (9th Cir. 2021) ..........................................................21

*Oneida Indian Nation v. County of Oneida*,
   414 U.S. 661 (1974).....................................................................24

*Parsons v. Ryan*, ,
   912 F.3d 486, 503 (9th Cir. 2018)................................................13

*Pentax Corp. v. Myhra*,
   844 F.Supp. 611 (D. Mont. 1994) ..........................................32, 34
   .

*Posnanski v. Gibney*,
   421 F.3d 977, 980 (9th Cir. 2005)................................................13

*Puri v. Gonzales*,
   464 F.3d 1038 (9th Cir. 2006).....................................................15

*Rigsby v. Godaddy Inc.*, ,
   59 F.4th 998 (9th Cir. 2023).......................................................13

*S. Coast Specialty Surgery Ctr., Inc. v. Blue Cross of Cal.*,
   90 F.4th 953 (9th Cir. 2024) ........................................................13

*Seminole Nation v. United States*,
   316 U.S. 286, 296 (1942)..............................................................22

*State of Washington et al v. Trump et al*,
   No. 25-807 (Feb. 19, 2025)...........................................................24

*State of California v. Trump*,
   No. 3:25-cv-03372 (D.N.D. Cali) ...................................................8

*Sybron Corp. v. Carter*,
   438 F.Supp. 863 (W.D. N.Y. 1977) ..............................................33

*Terenkian v. Republic of Iraq*,
   694 F.3d 1122, 1129–30 (9th Cir. 2012) cleaned up ......................3

viii

*Transworld Airlines v. American Coupon Exchange,*
    913 F.2d 676, 680 (9th Cir. 1990)......................................................39

*Trayco, Inc. v. U.S.,*
    994 F.2d 832 (Fed. Cir.1993).........................................................32

*U.S. v. Biehl & Co.,*
    3 CIT 158, 539 F.Supp. 1218, 1221 (1982)...................................32

*U.S. v. Garrow,*
    88 F.2d 318, 24 CCPA 410 (1937)..............................................27

*United States v. Holliday,*
    70 U.S. 407 (1865)......................................................................19

*United States v. Jicarilla Apache Nation,*
    564 U.S. 162 (2011).....................................................................22

*United States v. Michigan,*
    471 F. Supp. 192 (W.D. Mich. 1979)...........................................29

*V.O.S. Selections Inc. v. Trump*
    No. 1:25-cv-00066-(Ct. Intl. Trade)...............................................8

*W.B. v. Noem,*
    25-cv-03407-EMC (N.D. Cal. 2025)............................................20

*Worcester v. State,*
    31 U.S. (6 Pet.) 515 (1832).....................................................19, 30

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579, 610-11 (1952)........................................................14

**Statutes and Constitutional Provisions**

U.S. Constitution
    Article I, Section 8, Clause 3 (Indian Commerce Clause) .. 3, 4, 9, 11, 13-15,
        18, 20, 21, 23, 27, 30, 32
    Article III, Section 2, Clause 1.................................3, 8, 13, 18, 21

Article VI ....................................................10, 13, 15, 18, 25, 30

28 U.S.C. § 1331 ...................................................................3, 17

28 U.S.C. § 1337 ........................................................................3

28 U.S.C. § 1346 ........................................................................3

28 U.S.C. § 1362 ...................................................................16-20

28 U.S.C § 1581(i)(1)(B), (D).............................. 8, 9, 14, 16, 32-37

28 U.S.C § 1631 ..................................................... 9, 14-15, 38

**Rules**
Fed. R. App. P. 8(a)(2)(D)..........................................................39

Treaties and International Agreements:
The Jay Treaty of 1794, 8 Stat. 116 ..................5, 6, 10-11, 13, 25-29, 31

Explanatory Article, May 5, 1796........................................................28

Treaty of Ghent, 1814, 8 Stat. 218, Article IX..................................29-30
Proclamation of 1763 ...............................................................26-27

**OTHER AUTHORITIES**
Ned Blackhawk
The Rediscovery of America, Native Peoples and the Unmaking of U.S. History (2023)
pp. 155-158, 178-179, 204-206, 229-230, 235-236 ...................20, 21, 26, 30

Gregory Ablavsky, *Empire States: The Coming of Dual Federalism*, Yale Law Journal Vol. 128 No. 7 (May 2019) ............................................21

Felix Cohen, Handbook of Federal Indian Law (1982), pp. 207-208 ................................22

John Dobson, Two Centuries of Tariffs (1976), p. 1 .........................................30

x

# INTRODUCTION

Beneath the backbone of the world, between 1720 and 1877, the Blackfoot (Niitsitapi) people controlled a vast region between the Saskatchewan and Yellowstone rivers. As one of the most expansive and powerful Indigenous groups on the continent, they dominated the northern imperial borderlands of North America through their trade and commercial relationships with multiple nations. 3-ER-336–340.

Today, the commercial season for the Blackfoot people is short, dependent on the tourism industry, but vital to their livelihood and well-being. 3-ER-261–262.

Rhonda and David Mountain Chief, a descendant of Mountain Chief, operate a small cab company on the northern borderlands close to Chief Mountain. 3-ER-324–328. Telling the story of the Blackfeet people to the international travelers who visit Waterton and Glacier International Peace Park, or to hike the Continental Divide Trail, is central to their motto "We treat you like family" and "We have your back." 3-ER-325. Their business is word of mouth; their commerce international. They travel across the 49th parallel using only their tribal identification, and they deliver services to people from across the world. *Id*.

Jonathan St. Goddard operates his family's ranch and depends on access to Canada agriculture supply stores and markets. 3-ER-167–169. During calving

season his tractor wheel broke. *Id*. The closest emergency replacement part was across the border in Medicine Hat. Travelling to pick it up he was charged a random tariff in an unexpected and unpredictable way. *Id*.

Susan Webber is a state senator, elected to represent the people of the Blackfeet Tribe in the Montana legislature. 3-ER-164–166; 3-ER-211–215; 3-ER-261–266. The community she represents operates on thin margins, is deeply connected as family to the Blackfeet Nation across the 49th parallel, and has been harmed by the tariffs that have crushed the short but economically vital summer season. *Id*.

To preserve their economic survival in the face of erratic and egregious tariffs that will decimate the short tourist-dependent economy, these people come to this Court seeking relief under the Constitutional provision that Congress shall regulate commerce with the Indian Tribes.

The district court sent the case to the Court of International Trade under its conclusion that exclusive authority for non-revenue tariff matters reside with that Court. 31-ER-2–20. The lower court did not address the fact that these Appellants bring only constitutional claims founded in the Indian Commerce Clause and their treaty rights. *Id*. Without addressing the constitutional claims as the exclusive basis for jurisdiction, the lower court found that that the statutory exclusion of

2

jurisdiction over non-revenue tariffs was the controlling question, and transferred the case to the CIT. *Id.*, 1-ER-21–38.

This Court should reverse the district court on jurisdiction, find the Canada Orders unconstitutional, and enjoin them.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction because the claims arise under the Constitution, Article I, § 2 Cl. 3, Article III § 2 Cl. 1, and laws of the United States, 28 U.S.C. § 1331 (federal question), 1337 (regulation of commerce), and because the individual Defendant is an official of the United States. 28 U.S.C. § 1346(a)(2).

This Court has jurisdiction under the Constitution, Article III § 2 Cl. 1, and 28 U.S.C. § 1291 and §1294. Under 28 U.S.C. §1294, this Court has exclusive jurisdiction over the district court's immediately appealable transfer order where a preliminary injunction is requested to stop unconstitutional executive action.[1] *AARP v. Trump*, May 16, 2025.

The district court order entered its transfer Order on April 25, 2025. 1-ER-2–20. The district court's order denying reconsideration was issued June 2, 2025 1-ER-21–38.

The notice of appeal was timely filed April 25, 2025 3-ER-359–360.

---

[1] *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1129–30 (9th Cir. 2012) cleaned up.

## CONSTITUTIONAL AUTHORITY

Article I, Section 8, Clause 3: "Congress shall have Power…To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Article VI: This Constitution […] and all Treaties made, […], shall be the supreme Law of the Land.

## ISSUES PRESENTED

Whether federal courts have exclusive jurisdiction to decide tribally enrolled members claims that the Canada Orders violate the Indian Commerce Clause and treaty rights guaranteed under the constitution.

If so, whether the Canada Orders should be enjoined and declared unconstitutional.

## STATEMENT OF THE CASE

In the late 1700s a constitution for a new nation carefully assigned the critical power of negotiating and regulating commerce to the legislative branch of the new government. Not to George Washington, then President. Not to the courts. To congress, and congress alone. In doing so, the drafters clearly understood the nation-ending threats posed by three forces: State to state differences in using slaves; Foreign nations; and the Indian Tribes. They addressed them each separately. Congress – and congress alone – was given power to regulate commerce with each one of these three entities: foreign nations, the several states,

4

and the Indian Tribes. These entities are not interchangeable. Art. I, § 8, Cl 3.

At the same time the drafters were crafting these words in Philadelphia, 2000 miles to the west, on the eastern front of the Rocky Mountains, the Blackfeet Nation was a powerful economic force from the Saskatchewan River to the Yellowstone River. 3-ER-336–340. They were not nomadic. They had a strong community that relied on the high plains and mountain regions to sustain and build a way of life. *Id*.

In 1794 the new country entered into its first treaty with an international power – the Jay Treaty, settling the northern border with Britain. 3-ER-240. Britain and the U.S., the two parties to the treaty, acknowledged existing passage and commerce rights of Native Americans, and that those rights could never be abrogated. The commerce rights acknowledged in the Jay Treaty were set out in the tariff statutes adopted by Congress for a century. 3-ER-233–241. The tariff statutes during that time were the primary source of revenue for the federal government, and they exempted Native Americans. *Id*.

250 years after the commerce clause was written and the Jay Treaty acknowledged and reiterated the foundational principle that only congress can regulate commerce with Native Americans, Rhonda Mountain Chief operates a small cab company that traverses the 49th parallel in the short summer tourist season as part of the business she owns and operates. Her business motto is "we

have your back." 3-ER-325–326. She never advertises. Her clients are international hikers who come to hike the Continental Divide Trail starting in the Waterton International Peace Park and heading south into Glacier National Park. Rhonda does not have a passport. *Id*. As an enrolled member of the Blackfeet Tribe, she picks her clients up at an airport in Montana and drives them across the border to start their hike. She can cross using her tribal identification under the Jay Treaty of 1794. Rhonda's husband David is a descendant of Mountain Chief. 3-ER-327–329. Their dream was to expand the small business they have built up over years telling stories of their ancestors to visitors from around the world to show people the sacred places for the Blackfeet people.

Jonathan St. Goddard needed an emergency replacement of a tractor wheel during calving season. 3-ER-167–168. The only replacement wheel he found was in Medicine Hat. He drove to pick it up and on the way back was charged a tariff that was imposed in a random and unpredictable way without any verification of how it was calculated or why it was being imposed. *Id*.

Susan Webber represents people like Wayne Smith, who had grain hauled before April 2 and got full price. After April 2, a 25% tariff was charged. These tariffs are crushing the commercial operations that depend on the short but vital tourism and growing season of the region. 3-ER-219–220.

In January 2025 the incoming President did what George Washington and

6

the founding drafters of this nation deliberately, intentionally, and carefully chose not to do in writing the constitution: he took, without authority, sole and exclusive power to regulate commerce with the Indian Tribes. 2-ER-45–100.

The executive orders regulating commerce had direct and immediate impact. 3-ER-164–233. Appellants asked to have portions of the executive orders affecting them (the Canada Orders) declared unconstitutional and enjoined before clearing of Going to the Sun highway and the Glacier National Park summer tourist season. 3-ER-261–263. The specific sections at issue are:

- Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 (2-ER-51–55), as amended by Section 3 of Executive Order 14197 (Progress on our Northern Border) (2-ER-58–59), and further amended by Executive Order 14231 of March 6, 2025 (Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border) (2-ER-90–91);

- Section 14 of Proclamations 10896 (steel) (2-ER-71–85) and 10895 (aluminum) (2-ER-60–70);

- Sections 2, 3(a), (b), (c), (d), (e) and (f), Section 4 (a), (b), (c), and (d) of Executive Order 14257 issued April 2, 2025 as amended and modified (2-ER-96–97).

Collectively these executive actions are referred to as the Canada Orders. Appellants sought an Order granting relief for their specific trade and commerce

7

across the Blackfeet Nation on the Canada border.

Appellants requested immediate injunctive relief. The government moved to transfer the case to the Court of International Trade. The district court transferred this matter to the Court of International Trade. 1-ER-2–20. This appeal followed. Appellants requested reconsideration.

On May 23, 2025, this Court denied the government's motion to dismiss the appeal pending the district court's ruling on reconsideration. On June 2, 2025 the district court denied reconsideration. 1-ER-21–38.

The lower court concluded that the claims fell within the purview of 28 U.S.C. § 1581(i), which provides the CIT with "exclusive jurisdiction" over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue; [or] (D) administration and enforcement" of such matters. 1-ER-21–38.

The district court acknowledged the split in federal court outcomes on this specific issue of jurisdiction, and that the CIT issued a decision finding that the executive orders are unconstitutional. *Learning Resources* (District court of District of Columbia); *Emily Ley* (N.D. Florida); *California v. Trump* (N.D. CA) and this case. 1-ER-21–38. All these decisions were issued between the time the

district court issued its transfer Order and its Order on reconsideration. None were considered persuasive and the district court did not reverse course.

The injunction is fully briefed and ripe for decision in this Court. Appellants requested expedited briefing.

## SUMMARY OF THE ARGUMENT

The District court erred in two ways.

It failed to address its own exclusive jurisdiction over constitutional claims arising under the commerce clause and the treaty clause.

It also erred in finding the Court of International Trade had exclusive jurisdiction under 28 U.S.C. § 1581, in two ways: first, the CIT does not have jurisdiction over tribal commerce; and second, the tariffs at issue are intended to raise revenue, defeating CIT jurisdiction under § 1581.

## I.  The claims arise under the Constitution giving the District court exclusive jurisdiction.

*First*, the district court erred in failing to address a "want" of jurisdiction under 28 U.S.C. § 1631. The Montana federal district court has exclusive jurisdiction to the claims arising under the constitution, which are the only claims this case presents.

### A.  The Indian Commerce Clause.

The district court has exclusive jurisdiction over claims arising under the Indian Commerce Clause of the constitution, brought by tribally enrolled members,

9

seeking relief that applies to cross-border ports of authority lying entirely on tribal lands. The District court erred in conflating Indian Tribes with foreign nations. The text of Article I, Section 8, Clause 3 provides: "Congress shall have Power…To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Commerce Clause draws a clear distinction between "States," "foreign Nations," and "Indian Tribes."[2] Article III courts have exclusive jurisdiction over constitutional claims of tribal commerce brought by enrolled members of a federally recognized tribe.

### B. Article VI and The Jay Treaty.

The District court has exclusive jurisdiction over claims arising under the Treaty clause of the constitution and the Jay Treaty.

Article VI provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Jay Treaty grants passage and commerce rights to Native Americans. It has never been abrogated by treaty. The Jay Treaty is the basis for legislation proposed in 2024 and a bison exchange in 2025.

---

[2] *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989); *Cherokee Nation v. Georgia*, 5 Pet. 1, 18, 8 L.Ed. 25 (1831).

The precursor court to the CIT addressed Jay Treaty issues. The district court cited those cases as support for its position that the CIT has jurisdiction over this case. The key difference is that those cases address congressional regulation of commerce, which is constitutionally permitted. The question here is whether the executive branch can constitutionally regulate commerce with the Indian Tribes.

Power to act under the constitution is the issue in this case. That requires analysis of Indian law as it relates to the context and history of the constitution, as well as treaty law. The fact that the CIT and its precursor court addressed the Jay Treaty in the context of congressional regulation of commerce in no way confers subject matter jurisdiction over treaty and constitutional rights asserting that the executive branch does not have power to regulate tribal commerce.

## II.   The CIT <u>has no jurisdiction</u> over this case.

*Second*, the district court erred in finding that the CIT has exclusive jurisdiction. This argument has two sub-parts:

### A.      The CIT has no jurisdiction over tribal commerce.

The CIT *has no jurisdiction* over tribal commerce and Indian Tribes. The jurisprudence interpreting Indian Tribes and the Commerce Clause of Article I, Section 8, Clause 3 makes this point very clear.[3] The district court's fundamental

---

[3] 1-ER-2–20, citing *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 183 (1988).

error was to consider transfer akin to venue.[4]

**B.    The tariffs are intended to raise revenue, defeating CIT jurisdiction.**

Exclusive jurisdiction with the CIT is predicated on a statute that applies only to non-revenue tariffs. In fact, the administration is illegally and unconstitutionally imposing tariffs *for the express purpose of* raising revenue, as it has said repeatedly. The CIT's statutory predicate of jurisdiction does not apply where tariffs are being imposed for the purpose of raising revenue.

## III.    The interests of justice.

The district court did not address whether the interests of justice are served by transferring this case to the CIT. Appellants are individuals – operating small businesses and family ranches. 3-ER-164–233. They cannot travel to New York without significant burden. The remedy sought applies on tribal lands that lie within the borders of the state of Montana and to tribally enrolled members in the Blackfoot Nation.

The history and context of the claims are unique to Native American lands and the jurisprudence of Indian law. The question presented is which branch of government has the power to regulate commerce with Indian Tribes, and the import of treaty law from 1794 as it relates to Native American rights. These

---

[4] 1-ER-2–20, Order p. 16.

constitutional claims arise under a body of law that has been developed largely in this circuit. The constitutional claims of these Native Americans, the interpretation of treaty law, and the Indian Commerce Clause, are exclusively within the jurisdiction of this Court.

This Court should reverse, determine that it has jurisdiction, and enjoin the executive orders.

## STANDARD OF REVIEW

This Court reviews subject matter jurisdiction *de novo*.[5]

Transfer orders are only appealable in the circuit of the transferor court.[6] In *AARP v. Trump*, 605 U.S. ___ (2025), No. 24A1007 issued May 16, 2025 the Supreme Court, Per Curiam, held: "Appellate courts have jurisdiction to review interlocutory orders that have "the practical effect of refusing an injunction.""[7]

## ARGUMENT

I.    **Appellants claims arise under the Constitution.**

Article III, Section 2, Clause 1 of the Constitution provides:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties

---

[5] *S. Coast Specialty Surgery Ctr., Inc. v. Blue Cross of Cal.*, 90 F.4th 953, 957 (9th Cir. 2024); *Falck N. Cal. v. Scott Griffith, LLC*, 25 F.4th 763, 765 (9th Cir. 2022); see also *Parsons v. Ryan*, 912 F.3d 486, 503 (9th Cir. 2018).
[6] *Rigsby v. Godaddy Inc.*, 59 F.4th 998 (9th Cir. 2023), *Posnanski v. Gibney*, 421 F.3d 977, 980 (9th Cir. 2005); see also, *In re U.S. Dept of Educ.*, 25 F.4th 692, 698 (9th Cir. 2022).
[7] *AARP* p. 3 citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981).

made, or which shall be made, under their Authority;—[….];—to Controversies to which the United States shall be a Party;—[…].

Appellants ask the Court to declare the Canada Orders unconstitutional as violative of: the Separation of Powers; Article I and Article VI and the Fifth Amendment to the Constitution; and the Jay Treaty.[8]

### A. The Indian Commerce Clause vests exclusive jurisdiction in Montana district court.

The text of Article I, Section 8, Clause 3 could not be clearer: "Congress shall have Power…To regulate Commerce with foreign Nations, and among the several States, *and with the Indian Tribes*." The Commerce Clause draws a clear distinction between "States," "foreign Nations," and "Indian Tribes." The executive is constitutionally prohibited from engaging in commerce with the Indian Tribes.

*Youngstown v. Ohio* sets the bedrock constitutional principle that commerce lies exclusively with Congress.[9] *Haaland v. Brackeen* is the bedrock principle that Congress alone regulates commerce with the Indian Tribes, which means enrolled members of the Tribe.[10]

---

[8] 3-ER-323, Amended Complaint ¶170.
[9] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952)*; Ind. Envtl. Ntwk v. Trump*, 428 F.Supp.3d 296, 309-310 (D. Mont. 2019).
[10] *Haaland v. Brackeen,* 143 S. Ct. 1609, 1655-1656.

### *1.  28 U.S.C. § 1631 requires a want of jurisdiction.*

Without conducting an analysis to determine with jurisdiction existed in the district court, the lower court found that the Appellants complaint "falls squarely within the exclusive subject matter jurisdiction of the [CIT]" under 28 U.S. C. §1581(i)(B), (D). 1-ER-19. That was clear error. Section 1631 only applies in "situations in which a court lacked subject matter jurisdiction."[11]

The district court did not engage in the three step analysis required before a case may be transferred under 28 U.S.C. § 1631.[12] The district court has clear jurisdiction over these claims, which arise under Article I, Section 8, Clause 3, the Indian Commerce Clause; and Article VI, the Treaty clause.[13] The district court never found – and the government never argued – that there was a lack of jurisdiction in the Montana federal district court.

To transfer this case to the Court of International Trade three elements must be shown: (1) this Court lacks subject matter jurisdiction; (2) the case could have been filed in the Court of International Trade at the time it was filed; and (3) the transfer is in the interest of justice.[14]

Whenever a civil action is filed in a court as defined in section 610 of

---

[11] *Allen v. Conagra Foods, Inc.,* Case No. 3:13-cv-01279-WHO (N.D. Cal. Oct 15, 2019).

[12] 28 U.S.C. § 1631, *Azure v. Kirkegard*, Cause No. CV 14-134-BLG-DLC (D. Mont. Oct 10, 2014).

[13] 3-ER-271, Amended Complaint ¶ 7.

[14] *Puri v. Gonzales*, 464 F.3d 1038 (9th Cir. 2006).

this title […] *and that court finds that there is a want of jurisdiction*, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court […] in which the action or appeal could have been brought at the time it was filed or noticed, […].[15]

The district court erred by failing to address the first step of its own jurisdiction. Rather, the district court found that the CIT had *exclusive* jurisdiction: "the question here is not whether this Court has federal question subject matter jurisdiction. The question, rather, is whether the Court of International Trade has *exclusive* subject matter jurisdiction pursuant to Section 1581(i)."[16] On reconsideration the district court reiterated that conclusion without addressing its own jurisdiction.[17]

The district court erred by assessing jurisdiction as it would assess venue. The district court's conclusion elevates the statutory jurisdiction of the CIT above the Constitution. 28 U.S.C. § 1661 requires a want of jurisdiction before any transfer can be made.[18] The district court never took that step.

### 2. *The Constitutional jurisdiction is not changed by 28 U.S.C. § 1362.*

In its order on reconsideration the district court doubled down on its refusal to assess its own jurisdiction first. The district court relied on case law interpreting

---

[15] *Kolek v. Engen*, 869 F.2d 1281, 1284 (9th Cir. 1989), *Grondal v. United States*, 513 F.Supp.3d 1262 (E.D. Wash. 2021), 28 U.S.C. § 1631.

[16] 1-ER-18.

[17] 1-ER-37.

[18] 1-ER-18.

28 U.S.C. § 1362 to conclude that it had no jurisdiction over this case. Just before

reaching that conclusion, however, the district court made an important

acknowledgement. It agreed that "While "Indian tribes" may be more broadly

construed for purposes of the Indian Commerce Clause" the jurisprudence

interpreting § 1362 has interpreted that statute as a grant of jurisdiction to the tribe,

and not the individual members that comprise the tribe. [19]

Two conclusions necessarily flow from that statement. *First*, the district

court acknowledged, as it must, it has jurisdiction over the individual appellants

constitutional claims under the Indian Commerce Clause.[20] No other conclusion is

remotely sound. By the district court's own reasoning, it has jurisdiction, and the

case should remain in Montana.

But the district court turned 180 degrees from the obvious conclusion of its

first sentence regarding individual Indians having the right to bring claims under

the Indian Commerce Clause, and found that "the authority interpreting [..] §

1362" [..] "clearly understand [its] jurisdictional grant to exclude individual

Indians."[21]

This leads to the second necessary conclusion. *Second*, the district court

erred in elevating its interpretation of § 1362 above the constitutional grant of

---

[19] 1-ER-31.
[20] 1-ER-31, citing *Haaland v. Brackeen*, 599 U.S. 255, 274–75 (2023).
[21] 1-ER-31-32.

jurisdiction over cases arising under the Indian Commerce Clause.[22] Appellants' challenge is based on the Indian Commerce Clause that gives exclusive jurisdiction to regulate commerce "with the Indian Tribes" to Congress. The claims arise under the Consitution. Under the *Haaland v. Brackeen* line of cases, and the exclusive jurisdiction federal courts have over commerce with the Indian Tribes as defined in Article I, Section 8, Clause 3, the *only* court that has subject matter jurisdiction over enrolled Blackfeet tribal members assertion of their Constitutional right under the Indian Commerce Clause is the district court.

That interpretation is as old as the Constitution.

Justice Marshall observed in *Cherokee Nation:* "[t]he objects, to which the power of regulating commerce might be directed, are divided into three distinct classes – foreign nations, the several states, and Indian Tribes. When forming this article, the convention considered them as entirely distinct."[23] The Commerce Clause "no more admits of treating Indian tribes as States than treating foreign nations as States."[24] The Commerce Clause distinguishes Indian Tribes from foreign nations. Congress has plenary authority over Indian commerce.[25] The district court has exclusive jurisdiction over Indian Tribes as set out in Article III §

---

[22] Art. III, Section 2, Cl. 1; 28 U.S.C. § 1331; 28 U.S.C. § 1362; *Gardiner v. Virgin Islands Water and Power Authority*, 6 F.3d 786 (Fed. Cir. 1993).
[23] *Cherokee Nation v. Georgia*, 5 Pet. 1, 18, 8 L.Ed. 25 (1831).
[24] *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989).
[25] *Cotton Petroleum*, 490 U.S. at 191-92, *Cherokee Nation,* at 18.

2 Cl. 1: the "judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution."

Commerce with the Indian Tribes means "commerce with *the individuals* composing those Tribes."[26]

> [..] if commerce [..] is carried on with an Indian tribe, or with a member of such tribe, it is subject to be regulated by Congress [.. ] The right to exercise it in reference to any Indian tribe, or any person who is a member of such tribe, is absolute[..][27]

> Commerce with foreign nations [..] means commerce between citizens of the United States and citizens or subjects of foreign governments, as individuals. And so commerce with the Indian tribes, means commerce with the individuals composing those tribes.[28]

Enrolled members of the Blackfeet Tribe bring Constitutional claims. They can only be heard in District court.[29] 28 U.S.C. § 1362 does not defeat these constitutional protections.

In contrast, 28 U.S.C. § 1362 is quite new. Added in 1966, § 1362 intent is to provide federally recognized Indian tribes a direct path to federal court to litigate issues arising under federal law, treaties, or the Constitution, particularly when those issues involve their tribe's rights in federal court.[30] Before § 1362, tribes

---

[26] *Haaland*, n. 6 *supra*, 599 U.S. 255, 274-75.
[27] *U.S. v. Holliday*, 70 U.S. 407, 418 (1865); *Gibbons v. Ogden,* 22 U.S. 1 (1824).
[28] *Holliday*, at 417, citing and quoting *Gibbons.*
[29] *Holliday*; *Worcester v. State*, 31 U.S. 515, 580-581 (1832).
[30] *Gila River Indian Cmty. v. Cranford*, 459 F.Supp.3d 1246 (D. Ariz. 2020), citing *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 559 n.10 (1983).

often faced significant hurdles in bringing such cases. Section 1362 was adopted to give tribes the same footing as the United States when suing.[31]

28 U.S.C. § 1362 does not over-ride and exclude constitutional claims that individual Indians have under the Indian Commerce Clause, which is effectively what the district court did. 28 U.S.C. § 1362 protects tribal sovereignty and places Tribes on equal footing with the United States in all areas of federal rights. That is exactly what Chief Justice Marshall said should be the case for individual Indians and Tribes when the Indian Commerce Clause is at issue. Again, his words in *Cherokee Nation:* "[t]he objects, to which the power of regulating commerce might be directed, are divided into **three distinct classes** – foreign nations, the several states, and Indian Tribes."[32] The Commerce Clause "no more admits of treating Indian tribes as States than treating foreign nations as States."[33]

In adjudicating claims under the Indian Commerce Clause, it is vital to understand the context and history surrounding its inclusion in Article I. In the 1770s, 13 confederated states faced three incapacitating economic threats: states with different economies, based on an approach that would lead to civil war; foreign nations with superior navies and inland reach; and the Indian Tribes.[34]

---

[31] *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 483 (1976).
[32] *Cherokee Nation v. Georgia*, 5 Pet. 1, 18, 8 L.Ed. 25 (1831).
[33] *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989).
[34] Ned Blackhawk, <u>The Rediscovery of America, Native Peoples and the Unmaking of U.S. History</u>, (2023) Ch. 5 *Settler Uprising, The Indigenous Origins*

When the Treaty of Paris ended the revolutionary war in 1783, each of these nation-ending economic threats remained. The Commerce Clause addressed each of them, separately. As a result, "the federal government's ultimate power, authority, and sovereignty over Native peoples (and of the American continent) became enshrined in the U.S. Constitution."[35] The "lack of debate over Indian affairs revealed a rare consensus among the delegates."[36]

In 1788 the Constitution was ratified. Article I, Section 8, Clause 3 transformed the power of the new nation to conduct commerce *among the states*, with *foreign nations*, and *with the Indian Tribes* by explicitly granting that power to Congress alone. Article III, Section 2, Clause 1 gave federal courts power to hear all cases arising under the Constitution "and Treaties made [..] under their authority."[37] Justice Marshall clearly outlined in *Cherokee Nation* what was intended in giving Congress exclusive power to regulate commerce with the Indian tribes, meaning, the individuals within it.

Two centuries later, *Cotton Petroleum* affirmed what the Founders intended,

---

*of the American Revolution*, pp. 155- 158; Ryan Hall Declaration, 3-ER-242; 3-ER-336–340.
[35] Blackhawk, *id*., Ch. 6 *Colonialism's Constitution, The Origins of Federal Indian Policy*, pp. 178-179.
[36] Blackhawk, *id*., Ch. 6 *Indians and the U.S. Constitution*, pp. 204 – 206; see also Ablavsky, Gregory, *Empire States: The Coming of Dual Federalism*, Yale Law Journal Vol. 128 No. 7, May 2019.
[37] *Newtok Vill. v. Patrick*, 21 F.4th 608 (9th Cir. 2021), citing Art. III § 2 Cl. 1.

and Justice Marshall's explanation: the Interstate Commerce and the Indian Commerce Clause have very different applications.[38] The central function of the Interstate Commerce Clause is concerned with maintaining free trade *among* the states. But "the central function of the Indian Commerce Clause is to provide Congress with the *plenary* power to legislate in the field of Indian affairs."[39]

*Cotton Petroleum Corp*. and *Cherokee Nation* apply with even more force in the context of the Indian Commerce Clause, where the government owes a special duty.[40] Neither the state Interstate Commerce Clause nor the Foreign Nation Commerce Clause contain the additional element in which the U.S. has a fiduciary duty, as it does toward Indian Tribes.[41]

Only in the context of Indian people does the federal government have a fiduciary relationship. The Court stated in *Haaland* "[T]he 'trust relationship between the United States and Indian people' informs the exercise of legislative power. [..]. As we have explained, the Federal Government has 'charged itself with

---

[38] *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. at 191-92*; Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142 (9th Cir. 2020); *United States v. Lara* , 541 U.S. 193, 200 (2004).

[39] *Cotton Petroleum, id*., c.f. *Morton v. Mancari*, 417 U.S. 535, 551-552, (1974); F. Cohen, Handbook of Federal Indian Law, 207-208 and nn. 2, 3, and 9-11(1982).

[40] *Morton v. Mancari*, 417 U.S. 535, 552 (1974); *Board of Comm'rs v. Seber*, 318 U.S. 705, 715-716 (1943); *Marceau v. Blackfeet Housing Auth.*, 540 F.3d 916, 921 (9th Cir. 2008); *Kalispel Tribe of Indians v. U.S. Dep't of the Interior*, 999 F.3d 683 (9th Cir. 2021); but see *Arizona v. Navajo Nation*, 143 S.Ct. 1804 (2023).

[41] *Haaland*, n.6, *supra*, 599 U.S. 255, 274-275 (2023).

moral obligations of the highest responsibility and trust' toward Indian Tribes."[42]

The district court's fundamental error in failing to address its own exclusive jurisdiction, in deference to the Court of International Trade, was to consider transfer akin to venue.[43] The Indian Commerce Clause of Article I, Section 8, Clause 3, makes this far more than a question of dueling venues.[44] It is a fundamental jurisdiction issue. The federal district court has exclusive jurisdiction over the case under the Indian Commerce Clause, brought by enrolled members of the Blackfeet Tribe. The transfer Order and order on reconsideration send the Appellants out of Court completely with no available redress.

The district court concluded that "the inclusion of a constitutional claim does not preclude the CIT from exercising its lawful jurisdiction."[45] The district court's two-sentence disposal of the constitutional claims belies the actual Complaint.[46] Appellants did not "artfully" include a constitutional claim. That is the *only* claim they filed. Appellants – individual businesses, ranchers, and tribal members – are asking this Court to protect their constitutional right to have congress regulate their commercial lives. The President cannot, under the Constitution, regulate their

---

[42] *Haaland*, *id*. at 274-275, citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176, (2011); *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942).
[43] 1-ER-18.
[44] 1-ER-18, citing *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 183 (1988).
[45] 1-ER-32.
[46] 3-ER-271.

commercial activities. Appellants constitutional claim is not "included" to slip into federal court by a side door. These individual Appellants are asking to come in the front door, which the Constitution and 250 years of Supreme Court precedent open wide to them. The district court was wrong to shut it.

Appellants acknowledge that 28 U.S.C. § 1585 states that "The Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." The CIT has the same general powers as district courts, including the authority to hear constitutional claims that properly fall within its jurisdiction, and a process for cases involving constitutional questions in 28 U.S.C. § 255. But that applies to claims that are jurisdictionally within the bounds of the CIT. Here, the claims are wholly constitutional, in an area of law that belongs exclusively with the district court.[47] The district court never addressed that. In that lies the reversible error.

Revolution in 1776 arose in significant part from a king imposing tariffs. The Constitution directly addressed that by placing tax and tariff power solely with Congress. If America means anything, it means that the President cannot unilaterally set universal tariffs depending on what he ate for breakfast. The President has no authority to impose tariffs on Indian Tribes. That question can

---

[47] *Coeur D'Alene Tribe v. Hawks*, 933 F.3d 1052 (9th Cir. 2019), citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 663 (1974).

only be decided by a federal district court.[48]

An unbroken line of cases holds commerce with the Indian Tribes to be in Congress' constitutional ambit, not the President's. James Madison discussed the importance of a single authority regulating trade with the Indians.[49] Justice Gorsuch confirmed: "[T]he Legislature['s] constitutional authority [over] tribal relations [.. ] belongs to Congress alone."[50] The Canada Orders transgress constitutional limitations. Only the district court has the power to hear that constitutional challenge.[51]

### B.   Article VI and the Jay Treaty vest exclusive jurisdiction in the Montana district court.

Article VI of the Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Jay Treaty the Republic's first treaty with a European power. The treaty recognizes – it does not grant – Native American rights to conduct cross-border

---

[48] *State of Washington v. Trump,* No. 25-807 p. 2 (Feb. 19, 2025); *East Bay Sanctuary v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021).
[49] James Madison, Federalist Paper No. 42.
[50] *McGirt v. Oklahoma*, 140 S.Ct. 2452, 2462, citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566–568 (1903).
[51] *J.G.G. v. Trump*, Civil Action 25-766 (JEB) (D. D.C. Apr 16, 2025), *Abourzek v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986).

trade, and underscores the sovereignty of Native people. The rights it recognizes existed prior to the artifice of a border, and "endure to this day […] In no small measure, Indian affairs informed America's first "international" treaty."[52]

The district court failed to consider this treaty protection, violating established principles of tribal sovereignty and federal trust responsibility.[53] The district court incorrectly considered the Jay Treaty as a *source* of rights – not a *recognition* of rights. In its order on reconsideration the district court accepted that cases involving the Jay Treaty at the trade court's predecessor involved challenges to congressional, as opposed to executive action.[54] However, the district court was unpersuaded that the branch of government issuing the order "has any bearing on the CIT's jurisdiction."[55] This is the crux of the issue. The district court failed to address the constitutional brick wall that prevents the executive from acting in the way it did. The President cannot impose tariffs on Indian Tribes. Only Congress has that power.

The district court claimed to be "unaware of any requirement that the challenged "law" arise out of a specific branch of government.[56] The executive

---

[52] Blackhawk, n. 20 *supra*, "Jay's Treaty, the Treaty of Greenville, and Foreign and Domestic Affairs" pp. 235-236.
[53] *Haaland*, 599 U.S. at 274-75.
[54] 1-ER-36.
[55] 1-ER-36.
[56] 1-ER-37.

branch *does not have the power* to act in the way it did. Appellants challenge the action as outside constitutional grounds. The power to impose tariffs on Indian Tribes may only issue from Congress. Therefore, the specific branch of government is very much relevant. When the executive does something it does not have the power to do, it violates the constitution. It is true that challenges to executive and congressional action may be brought at the CIT under specific processes. [57] It is not true that a wholly constitutional challenge to the power to act at all may only be brought at the CIT.

The Jay Treaty is critical evidence that Congress *alone* regulates commerce with the Indian Tribes. Canons of treaty interpretation require consideration of historical context.[58] Where rights of Tribes are at issue, context is particularly significant.

In 1788 the U.S. Constitution was ratified; it took effect on March 4, 1789. Article I Section 8 Clause 1 of the Constitution gave Congress exclusive power to collect taxes and duties, and to regulate Commerce with foreign Nations, and among the several States, ***and with the Indian Tribes***.

---

[57] *Akins v. U.S.*, 551 F.2d 1222, (1977); *Akins v. Saxbe*, 380 F.Supp 1210, 1217 (D.Me. 1974)(deferring to Congressional purpose); *U.S. v. Garrow*, 88 F.2d 318, 24 CCPA 410 (1937)(challenging Tariff Act of 1930 (19 U.S.C.A. § 1001, par. 411)); *Int'l Custom Prods., Inc. v. U.S.*, 791 F.3d 1329 (Fed. Cir. 2015)(classification for "white sauce" under Harmonized Tariff Schedule).
[58] *Minnesota v Chippewa Indians*, 526 U.S. 172 (1999), citing *Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943).

Congress promptly set to it. Four months later, in July of 1789, Congress passed the first national tariff act to raise revenue and pay the national debt.[59]

Jay's Treaty, signed on November 19, 1794 emphasized that Indian Tribes are exempt from tariffs. Article III provided:

> It is agreed that it shall at all Times be free ... to the Indians dwelling on either side of the said Boundary Line, […] into the respective Territories and Countries of the Two Parties on the Continent of America . .. freely to carry on trade and commerce with each other.

> . .. [N]or shall the Indians passing or repassing with their own proper Goods and Effects of whatever nature, pay for the same any Impost or Duty whatever. But Goods in Bales, or other large Packages unusual among Indians shall not be considered as Goods belonging bona fide to Indians.

In 1796, the parties added an explanatory article to Article III:

> That no stipulations in any treaty subsequently concluded […], can be understood to derogate […] the rights of free intercourse and commerce secured by the [Jay Treaty] to the Indians dwelling on either side of the boundary-line aforesaid; but that all the said persons shall remain at full liberty freely […] on either side of the said boundary-line, […] to carry on trade and commerce with each other, […].[60]

The Jay Treaty acknowledged that an artificial border was superimposed on existing Tribes; as self-executing, it cannot be abrogated or terminated by an executive order.[61]

---

[59] 3-ER-234–237, An Act for laying a Duty on Goods (July 4, 1789).
[60] 3-ER-240, Explanatory Article to Jay Treaty, May 5, 1796.
[61] *Haaland v. Brackeen*, 143 S.Ct. 1609, 216 L.Ed.2d 254 (2023); *Menominee Tribe v. U.S.*, 391 U.S. 404, 413 (1968).

The language of the Jay Treaty was picked up in the Tariff Act of 1799, passed March 2, 1799. In it, Congress exempted Indians from tariffs "for the purpose of conforming this act to certain stipulations contained in treaties made and ratified […] as settled by the treaty of peace […]".

Section 104 of the Tariff Act of 1799 declared that Indians could freely carry on trade and commerce with the citizens of the U.S., and Section 105 exempted Indians from duties and tariffs in doing so, repeating nearly verbatim the language of the Jay Treaty:

> SEC. 104. *And be it further enacted*, That for the purpose of conforming this act to certain stipulations contained in treaties made and ratified under the authority of the United States, it is hereby declared, that it shall at all times be free to British subjects, and also to the Indians dwelling on either side of the boundary line of the United States, as settled by the treaty of peace, freely to pass and repass, by land or inland navigation, into and from the territories of the United States, and to navigate all the lakes, rivers and waters thereof, and freely to carry on trade and commerce with the citizens of the United States:

> SEC. 105. *And be it further enacted,* That no duty shall be levied or collected on the importation of peltries brought into the territories of the United States, nor on the proper goods and effects of whatever nature, of Indians passing, or repassing the boundary line aforesaid, unless the same be goods in bales or other large packages unusual among Indians, which shall not be considered as goods belonging bona fide to Indians, nor be entitled to the exemption from duty aforesaid. [62]

After the War of 1812 the Treaty of Ghent, signed in 1814, affirmed the rights of Indian tribes:

---

[62] 3-ER-238–239, Sec. 104-105, March 2, 1799; 3-ER-284.

29

> The United States of America engage to put an end, immediately after the ratification of the present treaty, to hostilities with all tribes of nations of Indians with whom they may be at war at the time of such ratification; and forthwith to restore to such tribes or nations, respectively, all the possessions, rights, and privileges, which they may have enjoyed or been entitled to in one thousand eight hundred and eleven, previous to such hostilities [...][63]

The framers of the Constitution executed treaties with the Indian Tribes prior to and after 1787. These treaties acknowledging Native American rights were intended and understood to be the Supreme Law of the land.[64]

The 1883 Tariff Act included substantially the same language of Section 105 of the 1799 Tariff Act, which is identical to Article III.[65] Exemption from tariffs through the 19th century, when tariffs provided between 50% and 90% of the federal government's income, is significant.[66]

At the same time that tariffs and treaties were acknowledging the Indians commercial way of life prior to the U.S. and British agreeing on the northern border, two thousand miles west, beneath the backbone of the world, the Blackfoot people traded freely across the 49th parallel, without limitation, as nations

---

[63] *U.S. v. Michigan*, 471 F. Supp. 192, 205-206 (W.D.Mich. 1979), Treaty of , 8 Stat. 218, Article IX.

[64] *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 571-2, 8 L. Ed. 483 (1832), Article II, Section 2, Cl. 2; Article VI Cl. 2; Blackhawk, n. 20 supra, *Indian Treaty Making and the Practices of Federal Power*, pp. 229-230.

[65] 3-ER-241, Act of March 3, 1883, ch. 121, § 2512, 22 Stat. 488, 523.

[66] John Dobson, Two Centuries of Tariffs p. 1 (1976).

interacting with other nations.[67] When the commerce clause was written, the Blackfoot were trading in what is now Canada and the U.S., optimizing their economic well-being to ensure survival in their homeland.[68]

This history, together with the recognition of commerce rights in the Jay Treaty, establishes the context that is crucial to understanding the Jay Treaty and the exemption of Indians from tariffs. Today, Rhonda and David Mountain Chief operate their business across the 49th parallel without passports. They travel using their tribal identification, under the rights recognized in the Jay Treaty, and operate their business across the border as if it did not exist. That is, until the illegal tariffs effectively shut out much of their business. Jonathan St. Goddard also travels across the border without a passport under the Jay Treaty, visiting relatives, buying an emergency tractor part, accessing his historical tribal homelands.

The Jay Treaty, understood in context with the Indian Commerce Clause, shows that the framers intentionally placed the regulation of commerce with Congress alone. That constitutional framework must be honored. Jurisdiction over these constitutional claims, which are about whether the executive branch of government may act in this area at all, lies exclusively with the federal court.

---

[67] 3-ER-336–339.
[68] 3-ER-336–339 ¶ 6.

31

**II.    Appellants claims do not fall within the specific categories of exclusive jurisdiction granted to the CIT under 28 U.S.C. § 1581.**

**A.    The CIT has no jurisdiction over tribal commerce.**

The CIT's jurisdiction under 28 U.S.C. § 1581(i) applies only to international trade matters. It does not grant authority over tribal commerce, rendering the transfer legally invalid. The district court erred in conflating Indian Tribes with foreign nations. The jurisprudence interpreting Indian Tribes and the Commerce Clause of Article I, Section 8, Clause 3 makes this a fundamental jurisdiction issue and the CIT has no jurisdiction.

The CIT's permissive process to hear constitutional claims under an explicit process is a narrow grant where the CIT already has jurisdiction.[69] Constitutional claims do not give the CIT jurisdiction where there otherwise is none. The CIT can only hear constitutional claims that properly fall within its statutorily defined jurisdiction under 28 U.S.C. § 1581 or § 1582.[70] The CIT, like other specialized courts, "operates within precise and narrow jurisdictional limits" explicitly granted by Congress.[71] The actions over which the CIT has exclusive jurisdiction are statutorily defined at 28 U.S.C. §§ 1581 & 1582. Section 1582 provides the CIT with exclusive jurisdiction over certain import-related actions instituted by the

---

[69] 28 U.S.C. § 255.
[70] *Pentax Corp. v. Myhra*, 844 F.Supp. 611 (D. Mont. 1994).
[71] *U.S. v. Biehl & Co., 3 CIT* 158, 539 F.Supp. 1218, 1221 (1982).

United States against an importer. Section 1581, subsections (a)-(i), provides the CIT with exclusive jurisdiction over certain import-related actions filed against the United States. If a particular action is not listed under § 1581 or § 1582, the CIT does not have exclusive jurisdiction.[72] A constitutional claim to the President's ability to regulate tribal commerce is not listed under § 1581 or § 1582.

The Canada Orders claim the President can regulate commerce. The constitution prohibits that. The executive branch may not regulate commerce with the Indian Tribes, and the Executive Orders are unconstitutional. The CIT has no jurisdiction over a claim that the President is unconstitutionally regulating commerce with the Indian Tribes. The claims here are that the Canada Orders are unconstitutional and must be enjoined. These constitutional claims are not within the CIT's narrow jurisdictional scope.[73]

District courts remain the primary forum for adjudicating constitutional questions not tied to specific trade matters, as is the case here.[74] The Supreme Court has recognized the "primacy... of federal courts in deciding questions of federal law."[75] This is essential in matters of constitutional questions of Native

---

[72] *Trayco, Inc. v. U.S.*, 994 F.2d 832 (Fed. Cir.1993).
[73] Supreme Court Unanimously Allows 'Existential' Constitutional Challenges To SEC & FTC To Be Brought In Federal Court (2023-05-02).
[74] *Davis v. Billington*, Civil Action No. 10-00036 (RBW) (D. D.C. Jun 25, 2014).
[75] Litigating Imperfect Solutions: State Constitutional Claims In Federal Court (2020-09-22).

American rights, especially under the Indian Commerce Clause. 28 U.S.C. § 1581 does not expressly preclude district court jurisdiction over constitutional claims that merely touch upon trade issues without falling squarely within the enumerated categories.[76] The constitutional claims are not primarily about customs classifications, tariff protests, or other specific matters listed in § 1581, and are not "of the type" Congress intended for CIT review.[77]

The district court on reconsideration deferred to the CIT's determination that it had jurisdiction in a different case challenging the Executive Orders. However, it failed to distinguish *Emily Ley*, in which importers brought administrative law claims, from the claims here, where individual tribal members are bringing constitutional claims.[78] Where there is doubt about the CIT's jurisdiction over certain types of constitutional claims, courts should carefully consider whether transfer is appropriate rather than automatically deferring to the specialized court. The district court erred in deferring to the CIT's finding, without differentiating between the nature of the claims being brought and who the litigants are.

This Court should reverse the district court and enjoin the Canada Orders.

---

[76] *Keirton U.S. Inc. v. U.S. Customs & Border Prot.,* C21-224 TSZ (W.D. Wash. Apr 16, 2021).

[77] *Sybron Corp. v. Carter*, 438 F.Supp. 863 (W.D. N.Y. 1977).

[78] 1-ER-26, citing *Emily Ley Paper, Inc. v. Trump*, 3:25-cv-00464-TKW-ZCB, Dkt. 37 (N.D. Fla. May 20, 2025).

## B.     Tariffs intended to raise revenue defeat CIT jurisdiction.

28 U.S.C. § 1340 establishes that "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Court of International Trade."[79] This provision creates a general rule of district court jurisdiction over revenue matters, with an exception carved out specifically for matters within the CIT's jurisdiction.

The CIT, operates within "precise and narrow jurisdictional limits explicitly granted by Congress."[80] The district court relied on 28 U.S.C. § 1581(i) to conclude that the CIT has exclusive jurisdiction, but the tariffs here are intended to raise revenue and the explicit language of § 1581(i) exempts revenue raising tariffs from the CIT's narrow grant of jurisdiction.[81] In fact, the administration is illegally and unconstitutionally imposing tariffs *for the express purpose of* raising revenue, as it has said repeatedly. The facts make it clear that the CIT's statutory predicate of jurisdiction does not apply to the Canada Orders, where tariffs are being imposed for the purpose of raising revenue:

- "You're going to see billions of dollars, even trillions of dollars coming into our country very soon in the form of tariffs."[82]

---

[79] 28 U.S.C. § 1340 (2025).

[80] *Pentax Corp. v. Myhra*, 844 F.Supp. 611 (D. Mont. 1994)

[81] *Barnes v. Trump*, Case No. 18-cv-1025-pp (E.D. Wis. Mar 13, 2019).

[82] https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-ambassador-oval-office-march-25-2025/#210 (last visited June 8, 2025)

- Trade Administration advisor Peter Navarro said the tariffs will bring in $6 trillion in revenue.[83]
- The administration argues that tariffs will make it possible to eventually abolish the federal income tax altogether.[84]
- To help offset the hefty price tag of the Republican tax package, the President has repeatedly held up expansive global tariffs as a way to deliver trillions of dollars in new revenue.[85]
- The president claimed the tariffs are raising $2 billion per day.[86]
- Secretary Rollins: the point is to raise revenue and the goal is free trade.[87]

The Administration's own words defeat jurisdiction under 28 USC § 1581(i)(1)(B).

The CIT lacks jurisdiction over this case according to the plain language of 28 U.S.C. § 1581(i).[88]

The tariffs are intended to raise revenue. The blizzard of announcements and pauses, swinging wildly back and forth, illustrates that these tariffs are not intended to do what the executive orders say, but rather, to make money for people

---

[83] https://www.cnn.com/2025/03/31/economy/tariffs-largest-tax-hike/index.html (last visited June 8, 2025).

[84] https://www.newsweek.com/trump-tariff-revenue-may-2079077 (last visited June 8, 2025).

[85] https://www.nytimes.com/2025/06/05/us/politics/trump-tax-cuts-tariff-revenues.html (last visited June 8, 2025).

[86] https://www.financialexpress.com/world-news/trump-claims-2-billion-daily-in-tariff-revenue-treasury-data-tells-a-different-story/3803630/ (last visited June 8, 2025).

[87] https://www.breitbart.com/clips/2025/04/08/agriculture-secy-tariffs-both-to-raise-revenue-and-get-other-countries-to-lower-tariffs-free-trade-perhaps-the-goal/ (last visited June 8, 2025).

[88] *Jaramillo Spices Corp. v. United States*, 531 F.Supp.3d 1354 (CIT 2021); *K-Mart Corporation v. Cartier, Inc 47Th Street Photo, Inc v. Coalition To Preserve the Integrity of American Trademarks*, 485 U.S. 176, 182 – 183 (1988).

who know when the next wild swing will happen and what direction it will take. 28 U.S.C. § 1581, predicated on non-revenue tariffs, does not apply.

In *K-Mart* the court held that the term "embargoes" did not give the CIT jurisdiction over gray-market goods.[89] The government's use of the word "tariffs" evokes the Princess Bride character Vizzini, who repeatedly uses "inconceivable" to describe situations that are surprising or unexpected to him, even when they are clearly happening. Inigo Montoya, frustrated by Vizzini's misuse of the word, finally tells him, "You keep using that word. I do not think it means what you think it means."[90] Repeated use of the word "tariffs" does not give the CIT jurisdiction over a constitutional claim under the Indian Commerce Clause.

In *Conoco* the Court was tired of the government's jurisdictional game:[91]

> Individuals and firms are often required to expend an inordinate amount of time and money [...] waste time and resources fighting over jurisdiction and oftentimes they are denied a chance to be heard on the merits of the case. These obstacles unnecessarily increase cost and hurt the efforts of the United States to be competitive in the international community.[92]

The district court erred in finding the CIT has exclusive jurisdiction under a statute that only applies to non-revenue tariffs. It should be reversed.

---

[89] *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182 (1988).

[90] The Princess Bride (1987), directed by Rob Reiner, screenwriter William Goldman (adapted from his own 1973 novel, *The Princess Bride: S. Morgenstern's Classic Tale of True Love and High Adventure, The "Good Parts" Version*), acted by Mandy Patinkin (as Inigo Montoya) and Wallace Shawn (as Vizzini).

[91] *Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581 (Fed. Cir. 1994).

[92] *Conoco*, 18 F.3d 1581, 1590 (Fed. Cir. 1994).

### III.    The interests of justice.

Under 28 U.S.C. § 1631, transfer is only appropriate "if it is in the interest of justice." The district court did not address whether the interests of justice are served by transferring this case to the CIT. Plaintiffs are individuals – operating small businesses and family ranches. They cannot travel to New York without significant burden. The remedy sought applies on tribal lands that lie within the borders of the state of Montana and to enrolled members in the Blackfoot Nation.

The history and context of the claims are unique to cross border Native American lands and the jurisprudence of Indian law. The question presented is which branch of government has the power to regulate commerce with Indian Tribes, and the import of treaty law from 1794 as it relates to Native American rights. These constitutional claims arise under a body of law that has been developed largely in this Circuit.

Appellants' challenge is based on the Indian Commerce Clause that gives exclusive jurisdiction to regulate commerce "with the Indian Tribes" to Congress. Appellants are enrolled members of the Blackfeet Nation. This Court is the *only* court with jurisdiction to review constitutional claims – the only claims raised by these Appellants.[93]

---

[93] *Califano v. Sanders*, 430 U.S. 99, 109 (1977)(it is a well-established principle that when constitutional questions are in issue, the availability of judicial review is presumed); *Matlock v. Sullivan*, 908 F.2d 492, 493-94 (9th Cir. 1990).

38

Appellants filed for a preliminary injunction for immediate irreparable harm on April 5, 2025 – over two months ago. No hearing has been held, no action has been taken, and nothing has been done to redress Appellants' request for immediate relief from the harm they are experiencing every day. Seventeen declarations have been submitted by real people, who plant and grow food, support families and communities. They are experiencing harm every day.

Farmers were forced to make planting decisions literally while on their tractors in the fields. This is not about money – it is a way of life. A preliminary injunction can be heard in the appellate court when the district court fails to rule.[94] The district court's failure to address Appellant's request for injunctive relief is immediately reviewable under 28 U.S.C. § 1292(a)(1).[95]

Appellants filed suit in Montana as enrolled members of the Blackfeet Tribe. They live in Montana. Their historic homelands lie between the Saskatchewan and Yellowstone rivers. Part of the relief requested is unique to the border between Montana and Canada.

The harm is happening in the district of Montana. Susan Webber, Jonathan St. Goddard, Rhonda Mountain Chief, and David Mountain Chief are people – not

---

[94] FRAP 8(a)(2)(A).
[95] *Transworld Airlines v. American Coupon Exchange*, 913 F.2d 676, 680 (9th Cir. 1990).

multinational corporate importers. The rights they seek to vindicate are granted by the Constitution.

Transferring this case to New York would require enrolled tribal members of the Blackfeet Nation, a federally recognized Tribe, filing in the court located in their historical homelands in Montana, to travel thousands of miles to seek a remedy for constitutional harms. It would be prohibitive for them to seek and obtain redress in the CIT. The interests of justice require the case to remain in the district of Montana, where it was filed, where subject matter jurisdiction lies, where the litigants live and work, and where the relief will be implemented.

## CONCLUSION

The Court should reverse the district court on jurisdiction, declare the Canada Orders unconstitutional, and immediately enjoin them.

Date: June 9, 2025

TRANEL LAW FIRM P.C.

*Monica J. Tranel*
Monica J. Tranel
*Attorneys for Appellants Susan Webber,*
*Jonathan St. Goddard, Rhonda Mountain Chief,*
*and David Mountain Chief*

## STATEMENT OF RELATED CASES

Pursuant to circuit rule 28-2.6, the undersigned is aware of the following

related cases at this time:

*Emily Ley Paper, Inc. v Trump* (N.D. Fla.) Case No. 3:25-cv-00464 (on appeal)

*Oregon v. Trump* (U.S. Court of International Trade) Case No. 1:25-cv-00077-N/A
(on appeal)

*V.O.S. Selections Inc. v. Trump* Case No. 1:25-cv-00066-(Ct. Intl. Trade)
(on appeal)

*State of California v. Trump,* Case No. 3:25-cv-03372 (D.N.D. Cali)(on appeal)

*Barnes v. United States,* Case No. 1:25-cv-00043 (CIT, Closed).

*Learning Resources Inc. v. Trump* Civil Action Case 1:25-cv-01248 (D.D.C.) (on
appeal)

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 27(a)(2)(A), I certify that the foregoing brief has a word count including footnotes as calculated by Microsoft Word for Mac of 9,411 words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED this 9th day of June, 2025.

TRANEL LAW FIRM P.C.

*Monica J. Tranel*
Monica J. Tranel
*Attorneys for Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 9, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 9th day of June, 2025.


*/s/ Monica J. Tranel*
Monica J. Tranel