No. 25-2717

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

SUSAN WEBBER, et al.,

Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants-Appellees

————————————

On Appeal from the United States District Court
for the District of Montana

————————————

**BRIEF FOR APPELLEES**

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*
KURT G. ALME
  *United States Attorney*
SARAH WELCH
  *Counsel to the Assistant Attorney
  General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3180*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................iii

INTRODUCTION .......................................................................................... 1

STATEMENT OF JURISDICTION ...................................................... 4

STATEMENT OF ISSUES ..................................................................... 4

PERTINENT STATUTORY PROVISIONS......................................... 5

STATEMENT OF THE CASE................................................................ 5

     A.    Statutory Background ............................................................5

     B.    Factual Background ...........................................................14

     C.    Litigation.............................................................................19

SUMMARY OF ARGUMENT ............................................................ 23

STANDARD OF REVIEW ................................................................... 25

ARGUMENT ........................................................................................... 25

I.    The Court Lacks Appellate Jurisdiction over the District Court's Transfer Order........................................................................ 25

     A.    The decision below is not appealable under § 1291...................27

     B.    The decision below is not appealable under § 1292(a). .............32

II.    The District Court Properly Transferred This Case............................. 34

     A.    The CIT has exclusive jurisdiction over challenges to the IEEPA and Section 232 tariffs. ........................................................34

B.      Plaintiffs' contrary arguments lack merit. ...................................42

CONCLUSION ............................................................................ 52

STATEMENT OF RELATED CASES .............................................. 53

CERTIFICATE OF COMPLIANCE .................................................. 54

ADDENDUM............................................................................... 55

# TABLE OF AUTHORITIES

**Cases:**                                                                    <u>Page(s)</u>

*A.A.R.P. v. Trump*,
    145 S. Ct. 1364 (2025) ...................................................... 33

*Akins v. Saxbe*,
    380 F. Supp. 1210 (D. Me. 1974) ..................................... 43

*Alimenta (USA), Inc. v. Lyng*,
    872 F.2d 382 (11th Cir. 1989) .......................................... 31

*Amerijet Int'l, Inc. v. U.S. DHS*,
    43 F. Supp. 3d 4 (D.D.C. 2014) ...................................... 50

*Amity Rubberized Pen Co. v. Market Quest Grp. Inc.*,
    793 F.3d 991 (9th Cir. 2015) .......................................... 50

*Arko Foods Int'l, Inc. v. United States*,
    654 F.3d 1361 (Fed. Cir. 2011) ...................................... 36

*Border Infrastructure Env't Litig., In re*,
    915 F.3d 1213 (9th Cir. 2019) ........................................ 38

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
    63 F.4th 25 (Fed. Cir. 2023) .......................................... 13

*Bradshaw v. Zoological Soc'y of S.D.*,
    662 F.2d 1301 (9th Cir. 1981) ........................................ 30

*Breazeale v. Victim Servs., Inc.*,
    878 F.3d 759 (9th Cir. 2017) .......................................... 28

*California v. Trump*,
    2025 WL 1569334 (N.D. Cal. June 2, 2025),
    *appeal pending*, No. 25-3493 (9th Cir.) ........................ 21-22, 38, 40

*Carefirst of Md., Inc., In re*,
    305 F.3d 253 (4th Cir. 2002) .......................................... 31

*Cohen v. Beneficial Indus. Loan Corp.*,
    337 U.S. 541 (1949) ...................................................28, 30

iii

*Commodities Exp. Co. v. U.S. Customs Serv.*,
    957 F.2d 223 (6th Cir. 1992) ............................................ 42

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*,
    18 F.3d 1581 (Fed. Cir. 1994) ........................................... 40

*Cornet Stores v. Morton*,
    632 F.2d 96 (9th Cir. 1980) ............................... 20, 39, 41

*Cruz v. Ridge*,
    383 F.3d 62 (2d Cir. 2004) .............................................. 31

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ................................................. 10, 11

*Dillon v. Montana*,
    634 F.2d 463 (9th Cir. 1980) ........................................... 46

*Earth Island Inst. v. Christopher*,
    6 F.3d 648 (9th Cir. 1993) ..............................................40

*Emily Ley Paper, Inc. v. Trump*,
    2025 WL 1482771 (N.D. Fla. May 20, 2025) ................ 22, 40

*Erwin Hymer Grp. N. Am., Inc. v. United States*,
    930 F.3d 1370 (Fed. Cir. 2019) ....................................... 30

*Federal Deposit Ins. Corp. v. McGlamery*,
    74 F.3d 218 (10th Cir. 1996) ........................................... 31

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
    426 U.S. 548 (1976) ....................................................... 13

*Firestone Tire & Rubber Co. v. Risjord*,
    449 U.S. 368 (1981) ....................................................... 27

*Garcia v. SEIU*,
    993 F.3d 757 (9th Cir. 2021) ........................................... 25

*J.W. Hampton, Jr., & Co. v. United States*
    276 U.S. 394 (1928) ......................................................... 6

iv

*K Mart Corp. v. Cartier, Inc.,*
   485 U.S. 176 (1988) ................................................................ 35, 47

*Kinder v. City of Myrtle Beach,*
   2015 WL 4456562 (6th Cir. July 20, 2015) .................................. 31

*Learning Res., Inc. v. Trump,*
   2025 WL 1525376 (D.D.C. May 29, 2025),
   *appeal pending*, No. 25-5202 (D.C. Cir.) .......................................... 22

*Marshall Field & Co. v. Clark,*
   143 U.S. 649 (1892) .................................................................. 5, 6

*Miami Free Zone Corp. v. Foreign Trade Zones Bd.,*
   22 F.3d 1110 (D.C. Cir. 1994) ...................................................... 42

*Michael Simon Design, Inc. v. United States,*
   609 F.3d 1335 (Fed. Cir. 2010) ..................................................... 36

*Miller v. Hambrick,*
   905 F.2d 259 (9th Cir. 1990) ................................................... 50, 51

*Mohawk Indus., Inc. v. Carpenter,*
   558 U.S. 100 (2009) ............................................................... 28, 29

*Montana Wildlife Fed'n v. Haaland,*
   127 F.4th 1 (9th Cir. 2025) ............................................. 30-31, 32, 33

*National Indus., Inc. v. Republic Nat'l Life Ins. Co.,*
   677 F.2d 1258 (9th Cir. 1982) ......................................................26

*Pentax Corp. v. Myhra,*
   72 F.3d 708 (9th Cir. 1995) ................................................. 29, 41, 42

*Persyn v. United States,*
   935 F.2d 69 (5th Cir. 1991) ......................................................... 31

*Posnanski v. Gibney,*
   421 F.3d 977 (9th Cir. 2005) ....................................................... 30

*PrimeSource Bldg. Prods., Inc. v. United States,*
    59 F.4th 1255 (Fed. Cir. 2023),
    *cert. denied,* 144 S. Ct. 345 ......................................................... 13, 43

*Quinault Tribe of Indians v. Gallagher,*
    368 F.2d 648 (9th Cir. 1966) ........................................................... 46

*Regan v. Wald,*
    468 U.S. 222 (1984) ........................................................................ 10

*SCM Corp. v. U.S. ITC,*
    549 F.2d 812 (D.C. Cir. 1977) ........................................................ 42

*Security Alarm Fin. Enters., L.P. v. Nebel,*
    200 F. Supp. 3d 976 (N.D. Cal. 2016) ........................................... 50

*Sheldon v. Sill,*
    49 U.S. (8 How.) 441 (1850) .......................................................... 46

*Subsalve USA Corp. v. Watson Mfg., Inc.,*
    462 F.3d 41 (1st Cir. 2006) ............................................................ 31

*Transpacific Steel LLC v. United States,*
    4 F.4th 1306 (Fed. Cir. 2021),
    *cert. denied,* 142 S. Ct. 1414 (2022) ........................... 3, 13, 29, 39, 43

*Ukiah Adventist Hosp. v. FTC,*
    981 F.2d 543 (D.C. Cir. 1992) .................................................. 27, 31

*United States v. Garrow,*
    88 F.2d 318 (C.C.P.A. 1937) .......................................................... 44

*United States v. Haggar Apparel Co.,*
    526 U.S. 380 (1999) ........................................................................ 40

*United States v. Universal Fruits & Vegetables Corp.,*
    370 F.3d 829 (9th Cir. 2004) ..................................................... 29, 41

*United States v. Yoshida Int'l, Inc.,*
    526 F.2d 560 (C.C.P.A. 1975) .......................................................... 8

vi

*United States ex rel. Felton v. Allflex USA, Inc.*,
  155 F.3d 570 (Fed. Cir. 1998) ........................................... 31

*V.O.S. Selections, Inc. v. United States*,
  772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025),
  *appeals pending*, Nos. 25-1812, -1813 (Fed. Cir.) ..................... 3, 22, 24, 29, 38

*Webber v. DHS*:
  2025 WL 1222175 (D. Mont. Apr. 28, 2025) ........................... 21, 32
  2025 WL 1207587 (D. Mont. Apr. 25, 2025) ................................ 40

*Will v. Hallock*,
  546 U.S. 345 (2006) ..................................................... 28


**U.S. Constitution:**

Art. I, § 8, cl. 3 ........................................................ 45

Art. III, § 1, cl. 1 ..................................................... 45


**Statutes:**

Act of Mar. 2, 1799,
  ch. 22, 1 Stat. 627 ......................................................5

Act of May 28, 1926,
  ch. 411, 44 Stat. 669 ...................................................40

Customs Administration Act of 1890,
  ch. 407, 26 Stat. 131 ...................................................40

First War Powers Act,
  ch. 593, 55 Stat. 838 (1941) ............................................7

International Emergency Economic Powers Act (IEEPA),
  Pub. L. No. 95-223, tit. II, 91 Stat. 1626 (1977)
  (codified as amended at 50 U.S.C. § 1701 *et seq*.)........................ 1
  50 U.S.C. § 1701(a) ................................................. 1, 10
  50 U.S.C. § 1702(a)(1)(A) ............................................... 10
  50 U.S.C. § 1702(a)(1)(B) ........................................... 1, 10

50 U.S.C. § 1702(a)(1)(C) .................................................. 10
50 U.S.C. § 1702(b)(1)-(4) ................................................. 11
50 U.S.C. § 1702(b)(3) ..................................................... 11
50 U.S.C. § 1703(a) ........................................................ 11
50 U.S.C. § 1703(b)-(c) .................................................... 11
50 U.S.C. § 1703(d) ........................................................ 11

National Emergencies Act (NEA),
    Pub. L. No. 94-412, 90 Stat. 1255 (1976) ...........................8
    50 U.S.C. § 1621(a) ..................................................... 8
    50 U.S.C. § 1622(a)(1) .................................................. 9
    50 U.S.C. § 1622(b) ..................................................... 9
    50 U.S.C. § 1622(c)(3) .................................................. 9
    50 U.S.C. § 1622(d) ..................................................... 9

Reciprocal Trade Agreements Act of 1934,
    ch. 474, 48 Stat. 943, 943-945
    (codified as amended at 19 U.S.C. § 1351) .......................6

Smoot-Hawley Tariff Act of 1930,
    ch. 497, § 338, 46 Stat. 590, 704-706
    (codified as amended at 19 U.S.C. § 1338) .......................6

Trade Act of 1974,
    Pub. L. No. 93-618, 88 Stat. 1978 (1975):
        Tit. II, 88 Stat. at 2011-2041
            (codified as amended at 19 U.S.C. § 2251 *et seq.*) ...................6
        Tit. III, 88 Stat. at 2041-2056
            (codified as amended at 19 U.S.C. § 2411 *et seq.*) ...................7

Trade Expansion Act of 1962,
    Pub. L. No. 87-794, 76 Stat. 872
    (codified as amended at 19 U.S.C. § 1862) .......................6
        19 U.S.C. § 1862 ....................................................... 12
        19 U.S.C. § 1862(c)(1)(A)(ii) .......................................... 6

Trading with the Enemy Act (TWEA),
    ch. 106, 40 Stat. 411 (1917) ....................................................7
        50 U.S.C. § 4302 ..........................................................9

Pub. L. No. 95-223, § 101(a),
    91 Stat. 1625 (1977) ...........................................................9

19 U.S.C. § 1202 ..................................................................36

19 U.S.C. § 3004(c)(1) ..........................................................36

19 U.S.C. § 3004(c)(1)(C) ................................................. 3, 24

19 U.S.C. § 3007 ..................................................................36

28 U.S.C. § 251 ....................................................................34

28 U.S.C. § 1291 .......................................................... 4, 26, 27

28 U.S.C. § 1292(a) ................................................................4

28 U.S.C. § 1292(a)(1) ...................................................... 26, 32

28 U.S.C. § 1294 ..................................................................26

28 U.S.C. § 1331 ..................................................................47

28 U.S.C. § 1338 ..................................................................47

28 U.S.C. § 1362 .............................................................. 22, 46

28 U.S.C. § 1404 ..................................................................26

28 U.S.C. § 1406 ..................................................................26

28 U.S.C. § 1581(i) ........................................................ 4, 35, 46

28 U.S.C. § 1581(i)(1) .................................................. 2, 24, 35, 38

28 U.S.C. § 1581(i)(1)(A)-(B) ................................................47

28 U.S.C. § 1581(i)(1)(B) ............................................ 2, 24, 35, 36

ix

28 U.S.C. § 1581(i)(1)(D) ...................................................................... 2, 24, 35, 36

28 U.S.C. § 1631 ......................................................... 20, 23, 25, 27, 28, 49

**Regulatory Materials:**

Exec. Order No. 12,543,
    51 Fed. Reg. 875 (Jan. 9, 1986) ................................................................ 12

Exec. Order No. 12,544,
    51 Fed. Reg. 1235 (Jan. 10, 1986) ........................................................... 12

Exec. Order No. 13,159,
    65 Fed. Reg. 39,279 (June 21, 2000) ........................................................ 12

Exec. Order No. 13,222,
    66 Fed. Reg. 44,025 (Aug. 17, 2001) ....................................................... 12

Exec. Order No. 14,105,
    88 Fed. Reg. 54,867 (Aug. 9, 2023) ......................................................... 12

Exec. Order No. 14,144,
    90 Fed. Reg. 6755 (Jan. 16, 2025) ........................................................... 12

Exec. Order No. 14,193,
    90 Fed. Reg. 9113 (Feb. 7, 2025) ................................................... 14, 15, 37

Exec. Order No. 14,194,
    90 Fed. Reg. 9117 (Feb. 7, 2025) ......................................................... 14, 15

Exec. Order No. 14,257,
    90 Fed. Reg. 15,041 (Apr. 7, 2025) ........................................ 1, 15, 16, 36-37, 48

Exec. Order No. 14,259,
    90 Fed. Reg. 15,509 (Apr. 14, 2025) ......................................................... 16

Exec. Order No. 14,266,
    90 Fed. Reg. 15,625 (Apr. 15, 2025) ................................................ 16, 17, 37

Exec. Order No. 14,298,
    90 Fed. Reg. 21,831 (May 21, 2025) ......................................................... 17

Exec. Order No. 14,309,
    90 Fed. Reg. 26,419 (June 16, 2025) ............................................... 17

Proclamation No. 4074,
    36 Fed. Reg. 15,724 (Aug. 17, 1971) ............................................ 7, 8

Proclamation No. 9704,
    83 Fed. Reg. 11,619 (Mar. 15, 2018) ............................................. 13

Proclamation No. 9705,
    83 Fed. Reg. 11,625 (Mar. 15, 2018) ............................................. 13

Proclamation No. 9980,
    85 Fed. Reg. 5281 (Jan. 29, 2020) ................................................. 13

Proclamation No. 10,886,
    90 Fed. Reg. 8327 (Jan. 29, 2025) ................................................. 14

Proclamation No. 10,895,
    90 Fed. Reg. 9807 (Feb. 18, 2025) ....................................... 18, 37, 48

Proclamation No. 10,896,
    90 Fed. Reg. 9817 (Feb. 18, 2025) ....................................... 18, 37, 48

**Legislative Materials:**

H.R. Rep. No. 95-459 (1977) ...................................................................8

*National Emergencies Act: Hearings on H.R. 3884 Before the
    Subcomm. on Admin. Law & Gov't Relations of the S. Comm.
    on the Judiciary*, 94th Cong. 27 (1975) .........................................8, 9

S. Rep. No. 96-466 (1979) ....................................................................41

**Other Authorities:**

89 Fed. Reg. 66,187 (Aug. 13, 2024) ................................................... 12

89 Fed. Reg. 87,761 (Nov. 4, 2024) ..................................................... 11

xi

89 Fed. Reg. 88,869 (Nov. 7, 2024) ...................................................... 12

*Implementation of Duties on Steel Pursuant to Proclamation*
*10896 Adjusting Imports of Steel Into the United States*,
90 Fed. Reg. 11,249 (Mar. 5, 2025) .......................................... 18, 37

*Implementation of Duties on Aluminum Pursuant to Proclamation*
*10895 Adjusting Imports of Aluminum Into the United States*,
90 Fed. Reg. 11,251 (Mar. 5, 2025) .................................... 18-19, 37

Joint Statement on U.S.-China Economic and Trade
Meeting in Geneva (May 12, 2025),
https://www.whitehouse.gov/briefings-statements/
2025/05/joint-statement-on-u-s-china-economic-and-
trade-meeting-in-geneva/ ...............................................................17

Joint Statement on Framework for United States-Indonesia
Agreement on Reciprocal Trade (July 22, 2025),
https://www.whitehouse.gov/briefings-statements/
2025/07/joint-statement-on-framework-for-united-
states-indonesia-agreement-on-reciprocal-trade/ .....................................17

*Notice of Implementation of Addressing Certain Tariffs on*
*Imported Articles Pursuant to the President's Executive*
*Order 14289*, 90 Fed. Reg. 21,487 (May 20, 2025) .......................................... 37

*Notice of Implementation of Additional Duties on Products of*
*Canada Pursuant to the President's Executive Order 14193,*
*Imposing Duties To Address the Flow of Illicit Drugs Across*
*Our Northern Border*, 90 Fed. Reg. 11,423 (Mar. 6, 2025) ...........................37

Order, *V.O.S. Selections, Inc. v. United States*, No. 1:25-cv-66
(Ct. Int'l Trade June 3, 2025), Dkt. 63 ...............................................39

U.S. Int'l Trade Comm'n, *Harmonized Tariff Schedule*,
https://hts.usitc.gov/ (last visited July 27, 2025) .......................................36

## INTRODUCTION

President Trump has found that America's exploding trade deficit, the implications of that deficit for our economy and national security, and a fentanyl importation crisis that has claimed thousands of American lives constitute national emergencies. To address those emergencies, the President invoked his authority under the International Emergency Economic Powers Act (IEEPA), which authorizes him to "regulate … importation" of foreign goods to "deal with any unusual and extraordinary threat" to "national security, foreign policy, or [the U.S.] economy." 50 U.S.C. §§ 1701(a), 1702(a)(1)(B); *see* Pub. L. No. 95-223, tit. II, 91 Stat. 1626 (1977) (codified as amended at 50 U.S.C. § 1701 *et seq.*). Under that authority, the President has imposed tariffs on Canada to stem the fentanyl crisis and imposed further reciprocal tariffs on imports from all trading partners to remedy "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits," Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 7, 2025). Under separate statutory authority, the President has also

imposed tariffs on steel and aluminum imports from Canada based on a finding that they present a national security threat.

Plaintiffs here challenge the imposition of these tariffs, contending that because of the President's actions, they and others will pay higher tariff rates than Congress has authorized. The district court properly declined to reach the merits of those claims, recognizing that such challenges fall within the exclusive jurisdiction of the Court of International Trade (CIT), a specialized Article III court of national jurisdiction that addresses disputes of this nature. Congress has given the CIT "exclusive jurisdiction" over "any civil action commenced against" the federal government "that arises out of any law of the United States providing for … tariffs" or for "administration and enforcement with respect to" such tariffs. 28 U.S.C. § 1581(i)(1), (B), (D). The district court accordingly transferred the case to the CIT.

The Court lacks appellate jurisdiction to review the transfer order. That order is not a final judgment, nor—as every court to consider the question has held—is it an immediately appealable collateral order. It likewise is not appealable as an order denying a preliminary injunction. Plaintiffs' preliminary injunction motion remains pending, and the CIT could have promptly decided it had plaintiffs not delayed transfer by appealing.

- 2 -

If the Court were to conclude that it has jurisdiction to review the district court's decision to transfer the case, it should affirm. This action plainly falls within the CIT's jurisdiction because plaintiffs challenge modifications to the Harmonized Tariff Schedule of the United States (HTSUS). The HTSUS is the substantive law that prescribes the tariffs, and modifications to it are "considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1)(C).

Since the district court's ruling, the CIT has correctly concluded that it has exclusive jurisdiction over a similar challenge to the IEEPA tariffs because "a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a 'law providing for' those measures." *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1366 (Ct. Int'l Trade 2025) (per curiam), *appeals pending*, Nos. 25-1812, -1813 (Fed. Cir.). Just one district court has disagreed with that jurisdictional conclusion, in a decision that has been stayed pending the government's appeal. No court has disagreed with the Federal Circuit's conclusion that Section 232 tariffs fall within the CIT's exclusive jurisdiction. *See Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1318 n.5 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 1414 (2022). And this Court has repeatedly held that the CIT, not district

- 3 -

courts, should resolve disputes over the scope of the CIT's exclusive jurisdiction.

## STATEMENT OF JURISDICTION

The district court correctly determined that it lacked jurisdiction because 28 U.S.C. § 1581(i) vests exclusive jurisdiction over this case in the CIT.

This Court lacks jurisdiction to review the district court's interlocutory order transferring the case to the CIT.  As explained below, the order is neither a final order reviewable under 28 U.S.C. § 1291 nor an interlocutory order denying an injunction reviewable under 28 U.S.C. § 1292(a).

## STATEMENT OF ISSUES

1.      Whether this Court lacks appellate jurisdiction because an order transferring a case to another jurisdiction is not a final, appealable order under 28 U.S.C. § 1291 or an order denying an injunction under 28 U.S.C. § 1292(a).

2.      Whether the district court correctly concluded that it lacks jurisdiction because 28 U.S.C. § 1581(i) vests the CIT with exclusive jurisdiction over actions, like this one, arising out of a law providing for tariffs or administration and enforcement with respect to tariffs.

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    Statutory Background

1.    The Constitution grants the President broad powers over foreign affairs and national security.  Congress has long supplemented these powers by delegating to the President the authority to manage tariffs or duties on foreign imports in response to dynamic international conditions.  In 1799, for instance, Congress authorized the President to "establish[] fit and proper regulations for estimating the duties on goods, wares and merchandise imported into the United States, in respect to which the original cost shall be exhibited in a depreciated currency."  Act of Mar. 2, 1799, ch. 22, § 61, 1 Stat. 627, 673.

The Supreme Court has repeatedly upheld presidential exercises of such authority.  In *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), for example, the Court upheld the Tariff Act of 1890, which authorized the President to suspend an exemption for certain products from import duties "for such time as he shall deem just" when he determined that the exporting country was "impos[ing] duties or other exactions" on American products that he

- 5 -

"deem[ed] to be reciprocally unequal and unreasonable," *id.* at 680 (quotation marks omitted). And in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928), the Court upheld the Tariff Act of 1922, which empowered the President to raise import duties if he found that existing tariffs did not equalize the differences between foreign and domestic production costs, and to modify the tariffs "when he determine[d]" that "the differences in costs of production ha[d] changed," *id.* at 401-402.

Congress has since enacted many other statutes authorizing the President to impose or modify tariffs or duties on imports. They include:

- Section 338 of the Smoot-Hawley Tariff Act of 1930, ch. 497, § 338, 46 Stat. 590, 704-706 (codified as amended at 19 U.S.C. § 1338), which authorizes tariffs of up to 50% to combat certain forms of trade discrimination against the United States;

- the Reciprocal Trade Agreements Act of 1934, ch. 474, 48 Stat. 943, 943-945 (codified as amended at 19 U.S.C. § 1351), which authorizes the President to negotiate reductions to U.S. tariff rates through reciprocal trade agreements with other countries;

- Section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862), which authorizes the President to "adjust the imports" of articles and their derivatives to address threats to national security, 19 U.S.C. § 1862(c)(1)(A)(ii);

- Title II of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 2011-2041 (1975) (codified as amended at 19 U.S.C. § 2251 *et seq.*), which authorizes the President to impose duties of up to 50%, for

- 6 -

up to four years (with extensions to eight years), to safeguard do-
mestic industries; and

- Title III of the Trade Act of 1974, 88 Stat. at 2041-2056 (codified as
amended at 19 U.S.C. § 2411 *et seq.*), which authorizes the President
to impose duties for up to four years (with indefinite extensions) in
response to measures that violate trade agreements or that are un-
reasonable or discriminatory and burden or restrict U.S. commerce.

In particular, Congress has long delegated to the President authority
to regulate importation during national emergencies.  In 1917, it enacted the
Trading with the Enemy Act (TWEA), ch. 106, 40 Stat. 411, which authorized
the President to specify foreign goods that may not be imported during war-
time "except at such time or times, and under such regulations or orders …
as the President shall prescribe."  *Id.* § 11, 40 Stat. at 422-423.  And in 1941,
Congress extended that authority to peacetime, amending TWEA to allow
the President to "regulate … importation" of foreign goods not just in war-
time but "during any other period of national emergency" he declares.  First
War Powers Act, ch. 593, tit. III, § 301, 55 Stat. 838, 839-840 (1941).

In 1971, President Nixon imposed peacetime tariffs similar to those at
issue here.  *See* Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971).
Finding that a "prolonged decline in the international monetary reserves" of
the United States over a number of years had seriously threatened its

- 7 -

"international competitive position" and potentially impaired its ability to assure national security, *id.* at 15,724, President Nixon "declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports," H.R. Rep. No. 95-459, at 5 (1977) (IEEPA House Report).  In *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), the Federal Circuit's predecessor held that TWEA authorized those tariffs.  *Id.* at 575-576.

2.    In 1976 and 1977, Congress modified TWEA through two new laws: the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976), and IEEPA.

The NEA "authorize[s]" "the President" "to declare [a] national emergency" "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a).  The NEA does not specify what sorts of conditions the President may declare to be an emergency, given the difficulty of "circumscrib[ing] with words what conditions a President might be confronted." *National Emergencies Act: Hearings on H.R. 3884 Before the Subcomm. on Admin. Law & Gov't Relations of the S. Comm. on the Judiciary*, 94th Cong. 27 (1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it

- 8 -

specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

But Congress retained for itself the power to "terminate[]" a declared emergency through "a joint resolution." 50 U.S.C. § 1622(a)(1). The NEA provides that Congress is directed to consider exercising that oversight power by convening in each House "to consider a vote on a joint resolution" terminating an emergency "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues." *Id.* § 1622(b). It provides a special fast-track procedure, directing that joint resolutions reported by committees be "voted upon within three calendar days." *Id.* § 1622(c)(3). And it provides that any emergency not terminated by joint resolution "shall terminate on the anniversary of the declaration of that emergency if" the President does not timely notify Congress that the emergency "continue[s]." *Id.* § 1622(d).

Congress also separated the President's authority to act in wartime and peacetime. It amended TWEA to remove the President's peacetime emergency powers under that Act. Pub. L. No. 95-223, § 101(a), 91 Stat. 1625, 1625 (1977); *see* 50 U.S.C. § 4302. It then re-enacted in IEEPA "essentially the

same" peacetime powers previously supplied by TWEA. *See Regan v. Wald*, 468 U.S. 222, 227-228 (1984). Indeed, IEEPA's operative language was "directly drawn" from TWEA. *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981).

IEEPA affords the President numerous powers with respect to foreign assets—including, for example, the power to "regulate[] or prohibit" certain foreign monetary transactions, 50 U.S.C. § 1702(a)(1)(A), and to "confiscate" certain property during "armed hostilities" or following an "attack[]," *id.* § 1702(a)(1)(C). The provision of IEEPA most relevant here authorizes the President to "prevent or prohibit" or "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest." *Id.* § 1702(a)(1)(B).

IEEPA provides that "[a]ny authority granted to the President" by § 1702 "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). There are narrow exceptions; for example, the President cannot "regulate or prohibit … the importation from any country … of any

- 10 -

information or informational materials." *Id.* § 1702(b)(3). But none of those exceptions is implicated here. *See id.* § 1702(b)(1)-(4).

Congress gave itself oversight authority over exercises of IEEPA powers beyond that afforded by the NEA. *See* 50 U.S.C. § 1703(d). For example, IEEPA directs the President to "consult regularly with the Congress so long as [IEEPA] authorities are exercised." *Id.* § 1703(a). The President also is directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* § 1703(b)-(c). Even so, the Congress that enacted IEEPA recognized that its "new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." IEEPA House Report 10. For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency." *Id.*

Presidents have invoked IEEPA's authorities numerous times over the years. President Carter, for example, seized Iranian assets in response to the hostage crisis at the American Embassy in Tehran. *See Dames & Moore*, 453 U.S. at 662. That order has been renewed continuously since 1979. *See* 89 Fed. Reg. 87,761 (Nov. 4, 2024) (most recent renewal). President Reagan issued executive orders prohibiting commerce with Libya and freezing Libyan

- 11 -

assets.  Exec. Order No. 12,543, 51 Fed. Reg. 875 (Jan. 9, 1986); Exec. Order No. 12,544, 51 Fed. Reg. 1235 (Jan. 10, 1986).  President Clinton blocked Russian assets related to the implementation of an agreement for the disposition of highly enriched uranium extracted from nuclear weapons.  Exec. Order No. 13,159, 65 Fed. Reg. 39,279 (June 21, 2000).  President George W. Bush invoked IEEPA to maintain the export control system previously established under a different statute; that order, too, has been maintained since its initial promulgation.  *See* Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (Aug. 17, 2001); 89 Fed. Reg. 66,187 (Aug. 13, 2024) (most recent renewal).  And President Biden took numerous actions under IEEPA, on topics ranging from cybersecurity, Exec. Order No. 14,144, 90 Fed. Reg. 6755 (Jan. 16, 2025); to sensitive military- and intelligence-related technologies, Exec. Order No. 14,105, 88 Fed. Reg. 54,867 (Aug. 9, 2023); to securities investments financing People's Republic of China (PRC) companies, 89 Fed. Reg. 88,869 (Nov. 7, 2024).

3.     Congress has also directed the President, after certain preconditions are met, to "adjust the imports" of articles and derivatives that threaten to impair "national security."  19 U.S.C. § 1862.  This authority, conferred in Section 232 of the Trade Expansion Act of 1962, is referred to as Section 232 authority.   The Supreme Court and Federal Circuit have repeatedly

- 12 -

confirmed that Section 232 permits imposition of tariffs and comports with the Constitution. *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976); *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1263 (Fed. Cir. 2023), *cert. denied*, 144 S. Ct. 345; *Transpacific Steel*, 4 F.4th at 1333; *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 34 (Fed. Cir. 2023).

In January 2018, the Secretary of Commerce transmitted to the President reports on the Secretary's investigations into the effect of imports of steel and aluminum on the United States' national security. The Secretary found that the imports of steel and aluminum articles threatened to impair national security. The President concurred with the Secretary's findings and adjusted imports of steel and aluminum by imposing 25% tariffs on steel articles and 10% tariffs on aluminum articles. Proclamation No. 9705, 83 Fed. Reg. 11,625 (Mar. 15, 2018); Proclamation No. 9704, 83 Fed. Reg. 11,619 (Mar. 15, 2018). Over time, the President modified these tariffs, including by subjecting derivative steel and aluminum articles to tariffs. Proclamation No. 9980, 85 Fed. Reg. 5281 (Jan. 29, 2020). The Federal Circuit upheld these actions against statutory and constitutional challenges. *See, e.g.*, *Transpacific Steel*, 4 F.4th 1306; *PrimeSource*, 59 F.4th 1255.

- 13 -

### B.    Factual Background

1.    Since taking office, President Trump has declared national emergencies and imposed tariffs under IEEPA to address those emergencies.  The IEEPA tariffs challenged here address two types of emergencies identified by the President: the influx of contraband drugs into the United States and conditions resulting from the exploding U.S. trade deficit and the lack of reciprocity in the United States's trading relationships.  No one disputes that President Trump has followed the procedural requirements of the NEA and IEEPA to declare these emergencies or to issue the challenged orders.

*Contraband Drug Tariffs.*  In January 2025, the President declared the flow of contraband drugs like fentanyl through illicit distribution networks, and the public-health consequences, to be a national emergency.  Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025).  The President then "expand[ed] the scope of the national emergency declared in that [p]roclamation to cover" certain conduct by the government of Canada that, in the President's judgment, had contributed to the crisis.  Exec. Order No. 14,193, 90 Fed. Reg. 9113, 9114 (Feb. 7, 2025); Exec. Order No. 14,194, 90 Fed. Reg. 9117, 9118 (Feb. 7, 2025).  Based on that determination, the President invoked IEEPA to impose tariffs on certain imports of Canadian products, concluding

- 14 -

"that action under other authority to impose tariffs [was] inadequate to address this unusual and extraordinary threat." 90 Fed. Reg. at 9114; 90 Fed. Reg. at 9118.

*Reciprocal Tariffs.* The President declared an additional emergency in early April, determining that "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States" with "its source in whole or substantial part outside the United States." Exec. Order No. 14,257, 90 Fed. Reg. at 15,041. In declaring the emergency, the President explained his judgment that "[l]arge and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.* These deficits, the President determined, "are caused in substantial part by a lack of reciprocity in our bilateral trade relationships." *Id.*

- 15 -

The President accordingly acted "to rebalance global trade flows" and to strengthen the United States' domestic manufacturing and defense industrial base by imposing an additional 10% tariff "on all imports from all trading partners," with certain exceptions enumerated in the executive order, which took effect on April 5. 90 Fed. Reg. at 15,045. The President also imposed additional country-specific tariffs, which were set to take effect April 9, on numerous countries. *Id.*

The President has also taken subsequent actions that he determined were necessary and appropriate to address this national emergency. On April 9, he suspended most country-specific tariffs for 90 days, on the ground that many trading partners had taken significant steps "toward remedying non-reciprocal trade arrangements and aligning sufficiently with the United States on economic and national security matters." Exec. Order No. 14,266, 90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025). But he raised the reciprocal tariff rate for imports from the PRC, concluding that doing so was necessary to respond to retaliation by the PRC. *Id.*; *see* Exec. Order No. 14,259, 90 Fed. Reg. 15,509 (Apr. 14, 2025). More recently, the President suspended the additional PRC reciprocal tariffs for 90 days "[i]n recognition of the

- 16 -

intentions of the PRC to facilitate addressing the national emergency." Exec. Order No. 14,298, 90 Fed. Reg. 21,831, 21,832 (May 21, 2025).

The IEEPA tariffs have prompted discussions with trading partners to facilitate solutions to economic and national-security crises found by the President. According to Executive Order 14,266, many "foreign trading partners … have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns." 90 Fed. Reg. at 15,626. These negotiations have, for example, produced the general terms of a historic trade deal with the United Kingdom and frameworks to implement deals with China and Indonesia. *See* Exec. Order No. 14,309, 90 Fed. Reg. 26,419 (June 16, 2025) (starting to implement terms of UK deal); Joint Statement on U.S.-China Economic and Trade Meeting in Geneva (May 12, 2025), https://www.whitehouse.gov/briefings-statements/2025/05/joint-statement-on-u-s-china-economic-and-trade-meeting-in-geneva/; Joint Statement on Framework for United States-Indonesia Agreement on Reciprocal Trade (July 22, 2025), https://www.whitehouse.gov/briefings-statements/2025/07/joint-statement-on-framework-for-united-states-indonesia-agreement-on-reciprocal-trade/.

- 17 -

2.     In addition to tariffs imposed under IEEPA, the President has imposed tariffs under Section 232.  In accordance with the President's directive to monitor steel and aluminum imports, the Secretary of Commerce informed the President that although the Section 232 tariffs were successfully reducing imports and encouraging domestic steel manufacturing, imports of steel and aluminum articles from certain countries like Canada had increased over the past few years and now threatened to impair national security.  *See* Proclamation No. 10,895, 90 Fed. Reg. 9807, 9808 (Feb. 18, 2025); Proclamation No. 10,896, 90 Fed. Reg. 9817, 9818 (Feb. 18, 2025).  Accordingly, the President exercised his discretion and restored the Section 232 tariffs on Canadian steel, aluminum, and certain derivative articles.  90 Fed. Reg. at 9809; 90 Fed. Reg. at 9819.  On February 10, 2025, the President restored the Section 232 tariffs previously upheld by the Federal Circuit, *see supra* p. 13, to Canadian steel and aluminum articles.  90 Fed. Reg. 9817; 90 Fed. Reg. 9807.  The U.S. Department of Commerce, through its Bureau of Industry and Security, implemented these tariffs by modifying the rates imposed on the relevant categories of imports set forth in HTSUS.  *Implementation of Duties on Steel Pursuant to Proclamation 10896 Adjusting Imports of Steel Into the United States*, 90 Fed. Reg. 11,249 (Mar. 5, 2025); *Implementation of*

- 18 -

*Duties on Aluminum Pursuant to Proclamation 10895 Adjusting Imports of Aluminum Into the United States*, 90 Fed. Reg. 11,251 (Mar. 5, 2025).

## C.   Litigation

Appellants are four Montana residents who are enrolled members of the Blackfeet Nation. 3-ER-224–226. They brought this suit to challenge the IEEPA tariffs imposed in Executive Orders 14,193 and 14,257, as amended, and the Section 232 tariffs on steel and aluminum products imposed in Proclamations 10895 and 10896. 3-ER-220–222. Plaintiffs seek a declaration that the challenged actions violate the "Separation of Powers," "Article I and Article VI and the Fifth Amendment to the Constitution," and the Jay Treaty, a 1794 agreement between the United States and Great Britain. 3-ER-275. Plaintiffs also seek a declaration that "tariffs cannot be imposed on cross-border transactions at Montana ports of entry" or "on tribal members." 3-ER-275. And plaintiffs seek injunctive relief against implementation of the challenged actions. 3-ER-275.

Plaintiffs moved for a preliminary injunction. Defendants opposed the motion and moved to transfer the case to the CIT given its exclusive jurisdiction over challenges to tariffs imposed under IEEPA and Section 232.

The district court granted defendants' motion to transfer the case to the CIT. The court recognized that because the CIT's jurisdiction under § 1581(i) is exclusive, the court would be "divested of [its] jurisdiction if the action 'arises out of any law' contemplated by" § 1581(i). 1-ER-13. The court recounted that the CIT and the Federal Circuit have concluded that the CIT has jurisdiction over "a challenge to an imposition of tariffs under Section 232." 1-ER-13. As for the IEEPA tariffs, the court observed that the CIT had begun exercising jurisdiction over several similar actions, and it pointed out that this Court had already "unambiguously held" that the CIT's predecessor court had exclusive jurisdiction over tariffs imposed under IEEPA's predecessor statute. 1-ER-14 (citing *Cornet Stores v. Morton*, 632 F.2d 96, 97, 99–100 (9th Cir. 1980)). The court also rejected plaintiffs' arguments that the CIT lacks jurisdiction because the IEEPA tariffs were imposed to raise revenue and that the CIT lacks jurisdiction to hear claims under the Jay Treaty. 1-ER-15–19. The district court thus entered an order transferring the case to the CIT under 28 U.S.C. § 1631.

That same day, plaintiffs filed a notice of appeal. 3-ER-288–289. Later that day, plaintiffs moved for a preliminary injunction pending appeal. A few days later, plaintiffs also moved for reconsideration of the district court's

transfer order.  The district court denied the motion for a preliminary injunction pending appeal, explaining that plaintiffs' notice of appeal had divested it of jurisdiction over the matter.  *Webber v. DHS*, 2025 WL 1222175, at *1 (D. Mont. Apr. 28, 2025).

In this Court, plaintiffs renewed their request for an injunction pending appeal.  Mot., May 1, 2025.  Defendants moved to dismiss the appeal for lack of appellate jurisdiction.  Mot. to Dismiss, May 1, 2025.  After briefing on both motions was complete, on May 23, a motions panel referred plaintiffs' motion to the merits panel and denied defendants' motion to dismiss "without prejudice to renewing the arguments in the answering brief."  Order 1, May 23, 2025.  The motions panel also stayed further proceedings in the appeal until the district court ruled on plaintiffs' motion for reconsideration.  *Id.*

The district court denied plaintiffs' motion for reconsideration on June 2.  The court first recounted the intervening developments in other cases challenging the IEEPA tariffs.  Two other district courts facing challenges to the same IEEPA tariffs have likewise recognized that suits of this type belong exclusively in the CIT.  1-ER-26–27; *see California v. Trump*, 2025 WL 1569334, at *4 (N.D. Cal. June 2, 2025), *appeal pending*, No. 25-3493 (9th

Cir.); *Emily Ley Paper, Inc. v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025). A third district court reached a different conclusion. 1-ER-27–28; *Learning Res., Inc. v. Trump*, 2025 WL 1525376 (D.D.C. May 29, 2025), *appeal pending*, No. 25-5202 (D.C. Cir.). And the CIT entered an order deciding that it has jurisdiction over challenges to tariffs imposed under IEEPA and blocking many IEEPA tariffs, though the injunction has been stayed pending appeal in the Federal Circuit. 1-ER-27; *see V.O.S. Selections*, 772 F. Supp. 3d at 1366.

Given the CIT's "express finding of its own jurisdiction," the district court concluded that "transfer remains the appropriate action." 1-ER-28. The court rejected plaintiffs' new arguments that only the district court could exercise jurisdiction over their claims based on the Indian Commerce Clause and 28 U.S.C. § 1362 and reiterated its explanation that the CIT can hear plaintiffs' treaty-based claims. 1-ER-29–37. It also made clear that transferring the case did not amount to a ruling on plaintiffs' motion for a preliminary injunction, which remained pending. 1-ER-34. And the court emphasized that the transfer was based on a conclusion that it "lacks jurisdiction over the challenges currently pending." 1-ER-37 (citation and alteration omitted).

- 22 -

Following the district court's resolution of the motion for reconsideration, the Court dissolved the stay of appellate proceedings and ordered expedited briefing. Order, June 18, 2025.

## SUMMARY OF ARGUMENT

I.    The Court lacks jurisdiction over this appeal of an interlocutory order transferring the case, under 28 U.S.C. § 1631, to the CIT for further proceedings. Every court to consider the question has held that a § 1631 transfer order is not appealable, and this Court has held that materially identical orders transferring for lack of venue are not appealable. Section 1631 transfer orders have none of the characteristics of a collateral order. The transferee court must independently evaluate its jurisdiction, so transfer orders do not conclusively determine jurisdiction. Subject-matter jurisdiction is an indispensable step toward judgment. And transfer for lack of jurisdiction can readily be reviewed on appeal from a final judgment.

Likewise, the transfer order did not deny a preliminary injunction in form or function. Plaintiffs' motion for a preliminary injunction remains pending. If not for this appeal, the CIT could have ruled on the motion months ago—as it has in similar cases.

- 23 -

II.    If the Court concludes that it has jurisdiction to review the transfer order, it should affirm because the district court correctly concluded that it lacked jurisdiction.  The CIT's exclusive jurisdiction encompasses all "civil actions" against the government that "arise[] out of any law of the United States providing for … tariffs" or "for … administration and enforcement with respect to" tariffs.  28 U.S.C. § 1581(i)(1), (B), (D).  This is such a case because plaintiffs challenge executive orders and proclamations modifying the HTSUS, and both the HTSUS and modifications to it are "considered to be statutory provisions of law for all purposes."  19 U.S.C. § 3004(c)(1)(C).  The CIT has accordingly concluded that it has exclusive jurisdiction over a materially identical suit, *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1366 (Ct. Int'l Trade 2025) (per curiam), *appeals pending*, Nos. 25-1812, -1813 (Fed. Cir.), and the district courts are virtually unanimous that challenges to these tariffs fall within the CIT's exclusive jurisdiction.

Plaintiffs' contrary arguments are insubstantial.  Their claims arise out of the executive orders and proclamations and the resulting HTSUS modifications, regardless of whether Plaintiffs' arguments are statutory, constitutional, or treaty-based.  That is why the CIT regularly hears constitutional challenges and has even heard Jay Treaty claims.  The Constitution does not

- 24 -

directly vest the District of Montana with jurisdiction to hear plaintiffs' claims. The grant of jurisdiction permitting district courts to hear claims "brought by any Indian tribe or band" lacks relevance here, where no "Indian tribe or band" is a plaintiff, and it would not displace the CIT's exclusive jurisdiction in any event. It is immaterial to the CIT's jurisdiction whether the tariffs are intended to raise revenue or not. And transfer was in "the interest of justice," 28 U.S.C. § 1631, because it saved plaintiffs the delay and inconvenience of having to refile their action in the CIT.

## STANDARD OF REVIEW

The Court "review[s] the existence of subject matter jurisdiction de novo." *Garcia v. SEIU*, 993 F.3d 757, 762 (9th Cir. 2021).

## ARGUMENT

## I.    The Court Lacks Appellate Jurisdiction over the District Court's Transfer Order.

The district court did not take any action on the substance of plaintiffs' claims. It instead concluded that the CIT has exclusive jurisdiction over this suit and ordered transfer of the case to that court under 28 U.S.C. § 1631, which permits a court to transfer a case instead of dismissing it when the court lacks subject-matter jurisdiction. The district court thus did not rule

- 25 -

on plaintiffs' preliminary injunction motion, which the CIT could have addressed upon completion of the transfer. Instead, plaintiffs filed this appeal.

Every circuit to consider the question has held that transfer orders under § 1361 are not appealable orders. And this Court, in the materially identical context of transfer orders under 28 U.S.C. §§ 1404 and 1406, has likewise recognized that transfer orders are not appealable. The same result follows here, and the Court should dismiss the appeal for lack of appellate jurisdiction.[1]

Plaintiffs suggest two possible grounds for appellate jurisdiction: the Court's jurisdiction over "final decisions of the district courts," 28 U.S.C. § 1291, and its jurisdiction over "[i]nterlocutory orders of the district courts … refusing … injunctions," *id.* § 1292(a)(1). *See* Br. 3.[2] The district court's

---

[1] As noted above, a motions panel of this Court denied a motion to dismiss on this basis "without prejudice to renewing the arguments in the answering brief," Order, May 23, 2025, leaving the Court free to evaluate jurisdiction in the first instance, *see id.* (citing *National Indus., Inc. v. Republic Nat'l Life Ins. Co.*, 677 F.2d 1258, 1262 (9th Cir. 1982)).

[2] Plaintiffs also cite 28 U.S.C. § 1294, but that provision addresses only to which circuit "reviewable decisions" of district courts are to be appealed, and the issue here is whether the transfer order is a "reviewable decision" under § 1291 or § 1292(a)(1).

- 26 -

order transferring plaintiffs' action to the CIT under 28 U.S.C. § 1631 is not appealable on either basis.

### A.    The decision below is not appealable under § 1291.

The district court's order transferring the case from one Article III court to another under 28 U.S.C. § 1631 is not immediately appealable under § 1291.  It is not a final order, nor is it an immediately appealable collateral order.

Section 1291 permits appeal of "final decisions of the district courts." 28 U.S.C. § 1291.  A final decision is one that resolves all the claims in the case and "leaves nothing for the court to do but execute the judgment." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373-374 (1981).

The order plaintiffs appealed is not a final decision.  It transferred the case to another Article III court for the transferee court to resolve the claims. At present, none of plaintiffs' claims has been resolved.  After all, "the very purpose" of a transfer order "is to allow the case to continue, rather than terminating it." *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 546 (D.C. Cir. 1992).  That is reflected in the text of § 1631, which provides that after transfer, the case "shall proceed as if it had been filed in or noticed for the court

to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." 28 U.S.C. § 1631.

The transfer order is not a "final" order under § 1291 via the collateral order doctrine, either. That doctrine permits courts to hear interlocutory appeals of a "small class" of orders that are "appropriately deemed 'final'" even though they "do not end the litigation." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545-546 (1949)). That "narrow and selective" class, *Will v. Hallock*, 546 U.S. 345, 350 (2006), encompasses only orders that "determine[] the disputed question conclusively, resolve[] an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment," *Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766 (9th Cir. 2017).

Orders transferring a case from one Article III court to another fail to meet any of the three requirements, and it is unsurprising that no court of appeals has held that such orders are reviewable under the collateral order doctrine. First, a § 1631 transfer order does not conclusively determine the jurisdiction of the transferee court. The transferee court has an independent obligation to evaluate its own jurisdiction. That independent evaluation is

- 28 -

especially important when it comes to orders transferring cases to special-ized courts with complex jurisdictional statutes, where the transferee court is best situated to determine the scope of its own jurisdiction. This Court has held that transfer is warranted if "the CIT may be able to hear" a case, *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836 (9th Cir. 2004) (quotation marks omitted), and noted that even in cases of doubt transfer is still "the prudent thing to do," "so that the CIT can determine the question of its own jurisdiction," *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995).

Of course, there is little chance that the CIT will conclude that it lacks jurisdiction over *this* case. The CIT has concluded that it has jurisdiction over challenges to both the IEEPA tariffs challenged here and Section 232 tariffs, and the Federal Circuit has already affirmed with respect to Section 232 tar-iffs. *V.O.S. Selections*, 772 F. Supp. 3d at 1366; *Transpacific Steel*, 4 F.4th at 1318 n.5. That only confirms that plaintiffs' case can be heard on the merits in the CIT, and it does not change that, when it comes to the category of Section 1631 orders "taken as a whole," *Mohawk*, 558 U.S. at 107, the trans-feree court must evaluate its own jurisdiction. As a class, § 1631 orders trans-ferring cases to the CIT do not conclusively determine the CIT's jurisdiction.

Second, a § 1631 transfer order does not resolve an important issue separable from the merits. A court's subject-matter jurisdiction over a case is "intimately related to the substance of 'the cause itself,'" and a ruling on jurisdiction is a "'step[]' toward final judgment" that is not separable from the merits. *Bradshaw v. Zoological Soc'y of S.D.*, 662 F.2d 1301, 1307 (9th Cir. 1981) (quoting *Cohen*, 337 U.S. at 546). Indeed, when subject-matter jurisdiction is absent, it is the *only* step. *Id.*

Third, transfer for lack of subject-matter jurisdiction can readily be reviewed on appeal from a final judgment. Like any other Article III court, the CIT must determine whether it has jurisdiction. That determination is reviewable on appeal to the Federal Circuit. *See, e.g.*, *Erwin Hymer Grp. N. Am., Inc. v. United States*, 930 F.3d 1370, 1371 (Fed. Cir. 2019) (reversing the CIT's determination that it had jurisdiction). Plaintiffs could also ask the CIT "to retransfer the action" to the district court, and the denial of that motion would likewise be "reviewable in the transferee circuit" after final judgment is entered. *Posnanski v. Gibney*, 421 F.3d 977, 980-981 (9th Cir. 2005).

This Court and others have recognized the same rule for orders granting or denying transfer for lack of venue, which are "interlocutory in nature and are not appealable prior to final judgment." *Montana Wildlife Fed'n v.*

- 30 -

*Haaland*, 127 F.4th 1, 32 (9th Cir. 2025). After a district court orders transfer to a new venue, litigation continues in the transferee court. Transfer under § 1631 for lack of jurisdiction is no different, and courts have accordingly recognized "the common sense view that section 1631 orders are interlocutory for the same reason that venue transfers are: the very purpose of transfer provisions is to allow the case to continue, rather than terminating it." *Ukiah Adventist Hosp.*, 981 F.2d at 546.

Given these principles, "every court of appeals" to have confronted this question has thus "concluded that section 1631 transfer orders are not immediately appealable" as final judgments. *Subsalve USA Corp. v. Watson Mfg., Inc.*, 462 F.3d 41, 47 & n.4 (1st Cir. 2006); *see Cruz v. Ridge*, 383 F.3d 62, 65 (2d Cir. 2004) (per curiam); *Ukiah Adventist Hosp.*, 981 F.2d at 546-548; *In re Carefirst of Md., Inc.*, 305 F.3d 253, 262 (4th Cir. 2002); *United States ex rel. Felton v. Allflex USA, Inc.*, 155 F.3d 570 (Fed. Cir. 1998) (table); *Federal Deposit Ins. Corp. v. McGlamery*, 74 F.3d 218, 221 (10th Cir. 1996); *Persyn v. United States*, 935 F.2d 69, 73 (5th Cir. 1991); *Alimenta (USA), Inc. v. Lyng*, 872 F.2d 382, 384-385 (11th Cir. 1989); *Kinder v. City of Myrtle Beach*, 2015 WL 4456562, at *1 (6th Cir. July 20, 2015).

**B.    The decision below is not appealable under § 1292(a).**

The district court's order transferring the case, including all pending motions, is not appealable as an interlocutory order denying a preliminary injunction, either.   Appellate courts have jurisdiction to hear appeals of "[i]nterlocutory orders … refusing or dissolving injunctions."   28 U.S.C. 1292(a)(1).  Such an order must have the "practical effect" of denying an injunction and carry "serious, perhaps irreparable consequences," and "immediate appeal" must be "the only effective way to challenge" the order. *Montana Wildlife Fed'n*, 127 F.4th at 28 (citation omitted).

The district court's transfer order did not deny plaintiffs' motion for a preliminary injunction in form or practical effect.  Plaintiffs' motion remains pending, and it will be ripe for the CIT's consideration if the case is transferred there.   *See Webber*, 2025 WL 1222175, at *1 ("[T]he Court neither granted nor denied plaintiffs' initial motion for a preliminary injunction."). Nor did the transfer order itself cause any delay that could amount to a constructive denial of the preliminary injunction motion.  Instead, the delay in adjudicating plaintiffs' motion resulted from plaintiffs' decision to challenge that order through an interlocutory appeal—which has delayed the CIT's consideration of plaintiffs' motion—and a motion for reconsideration in the

- 32 -

district court that has, in turn, delayed this Court's consideration of plaintiffs' appeal. That sets this case far apart from the rare circumstance in which "[a] district court's inaction in the face of extreme urgency and a high risk of 'serious, perhaps irreparable,' consequences may have the effect of refusing an injunction." *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025) (per curiam); *see* Br. 3 (citing *A.A.R.P.*).

Likewise, the district court's transfer order did not carry any "serious, perhaps irreparable," consequences, and plaintiffs do not attempt to identify such consequences. *Montana Wildlife Fed'n*, 127 F.4th at 28. The order transferred the case from an Article III court without jurisdiction to an Article III court with jurisdiction. In the ordinary course, that order would have permitted the CIT to promptly pick up where the district court left off by considering plaintiffs' motion for a preliminary injunction. In another challenge to the IEEPA tariffs, for example, the Northern District of Florida granted the government's motion to transfer the case to the CIT on May 20, 2025, and the CIT docketed the transferred case just three days later on May 23, 2025. *See Emily Ley Paper, Inc. v. Trump*, No. 1:25-cv-96 (Ct. Int'l Trade), ECF Nos. 37, 41. Plaintiffs could litigate in the CIT just as in the district court.

- 33 -

The Court should accordingly hold that it lacks jurisdiction to hear this interlocutory appeal, dismiss it, and allow proceedings to continue in the CIT.

## II.  The District Court Properly Transferred This Case.

Even if this Court were to review the district court's transfer order, it should affirm.  The CIT, not the district court, has jurisdiction to hear plaintiffs' lawsuit challenging imposition of tariffs under IEEPA and Section 232, and this Court has instructed that any doubt on this score should be resolved in favor of transfer.  Plaintiffs' contrary arguments lack merit.

### A.  The CIT has exclusive jurisdiction over challenges to the IEEPA and Section 232 tariffs.

The district court correctly ruled that it lacked jurisdiction over plaintiffs' lawsuit because the CIT has exclusive jurisdiction, which divests the district court of jurisdiction.  1-ER-11–19.

1.  The CIT is an Article III court with specialized, nationwide jurisdiction over a host of trade matters.  *See* 28 U.S.C. § 251 (establishing the CIT "under article III of the Constitution of the United States").  As relevant here, Congress has given the CIT "exclusive jurisdiction" over "any civil action commenced against the United States, its agencies, or its officers, that arises

- 34 -

out of any law of the United States providing for … tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" or "any law of the United States providing for … administration and enforcement with respect to" such tariffs. *Id.* § 1581(i)(1), (B), (D).

The district courts lack jurisdiction over actions that fall within the CIT's exclusive jurisdiction.  That is what it means for a court's jurisdiction to be exclusive.  As the Supreme Court has explained, the "specific grants of exclusive jurisdiction to the Court of International Trade" function by "divest[ing]" the district courts of jurisdiction under other grants of jurisdiction. *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182-183 (1988).

The CIT has exclusive jurisdiction over the challenges here under 28 U.S.C. § 1581(i), which provides that "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" and "administration and enforcement with respect to" such tariffs.   28 U.S.C. § 1581(i)(1)(B), (D).  Plaintiffs here challenge tariffs imposed under IEEPA

- 35 -

and Section 232 via executive orders and proclamations effecting or directing modifications to the HTSUS.  The HTSUS establishes the tariff rates for most merchandise imported into the United States.  *See* 19 U.S.C. § 1202; *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1336 (Fed. Cir. 2010).[3]  The statute establishing the HTSUS specifies that "[e]ach modification or change made to the Harmonized Tariff Schedule by the President under authority of law," as well as "[t]he provisions of the Harmonized Tariff Schedule … enacted by" Congress, "shall be considered to be statutory provisions of law for all purposes."  19 U.S.C. § 3004(c)(1).  The HTSUS, and modifications to it, are therefore both "law[s] of the United States providing for … tariffs" and "law[s] of the United States providing for … administration and enforcement with respect to" tariffs, 28 U.S.C. § 1581(i)(1)(B), (D).

The challenged executive orders imposing tariffs under IEEPA modified the HTSUS—for example, by "inserting … new headings" providing for specific tariff rates applicable to goods from each country, 90 Fed. Reg. at

---

[3] Although it is "codified at 19 U.S.C. § 1202," *Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1363 (Fed. Cir. 2011), the HTSUS is not published in the U.S. Code; it is instead separately published by the International Trade Commission.  *See* 19 U.S.C. § 3007; U.S. Int'l Trade Comm'n, *Harmonized Tariff Schedule*, https://hts.usitc.gov/ (last visited July 27, 2025).

15,090, by "modifying the HTSUS to temporarily suspend" certain tariffs, 90 Fed. Reg. at 15,626, or by directing the Secretary of Homeland Security to alter the HTSUS to effectuate the orders, 90 Fed. Reg. at 9115. That is why plaintiffs ask for relief from these executive orders and their implementation—which includes the publication of notices modifying the HTSUS. 3-ER-220–222, 3-ER-275; *see, e.g.*, *Notice of Implementation of Additional Duties on Products of Canada Pursuant to the President's Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,423 (Mar. 6, 2025); *Notice of Implementation of Addressing Certain Tariffs on Imported Articles Pursuant to the President's Executive Order 14289*, 90 Fed. Reg. 21,487 (May 20, 2025).

The challenged proclamations imposing Section 232 tariffs likewise modified the HTSUS and directed further modifications. 3-ER-221, 3-ER-275. The Section 232 tariffs were imposed in two presidential proclamations that identified relevant HTSUS headings in detail and instructed the agencies to "revise the HTSUS" to conform to the duties imposed in the proclamations. 90 Fed. Reg. at 9813, 9815-9816; 90 Fed. Reg. at 9826, 9828-9830. The agencies did so, publishing Federal Register notices modifying the HTSUS. *See* 90 Fed. Reg. 11,251; 90 Fed. Reg. 11,249.

- 37 -

This case thus plainly "arises out of," 28 U.S.C. § 1581(i)(1), the HTSUS and the executive orders and proclamations modifying it. The crux of plaintiffs' claims is that paying higher tariff rates will harm them. *See, e.g.*, 3-ER-224–226. Those higher tariff rates are imposed by the President's orders and the modifications to the HTSUS that the orders effectuate or direct. Plaintiffs' challenge to the IEEPA and Section 232 tariffs "originates from, grows out of, and flows from the executive orders through which the President imposed tariffs," which modify, or instruct the agencies to modify, the HTSUS. *California v. Trump*, 2025 WL 1569334, at *4 (N.D. Cal. June 2, 2025); *see In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1220 (9th Cir. 2019) (discussing this Court's interpretation of the phrase "arising out of").

Indeed, as noted above, the CIT has already exercised jurisdiction over other challenges to tariffs under both IEEPA and Section 232. The CIT recently explained that it has exclusive jurisdiction to entertain challenges to tariffs imposed under IEEPA, noting that the relevant orders "made amendments to the HTSUS," which "is the law of the United States setting tariffs." *V.O.S. Selections*, 772 F. Supp. 3d at 1366. And after the district court's decision here, the CIT reiterated (in a ruling addressing the government's motions to stay the injunction the CIT had issued) that it had jurisdiction

- 38 -

because the challenged executive orders "effect changes to the [HTSUS]" and are thus "laws" within the meaning of § 1581(i)(1), in that they "they modify a statute" and "bind Customs to collect duties at the rates they prescribe." *V.O.S. Selections, Inc. v. United States*, No. 1:25-cv-66 (Ct. Int'l Trade June 3, 2025), Dkt. 63, at 3; *see* 1-ER-28 (identifying the CIT's "express finding of its own jurisdiction" in *V.O.S.* as further supporting transfer).

Both the CIT and the Federal Circuit have reached the same conclusion for challenges to Section 232 tariffs, with the Federal Circuit explaining that such challenges are "clearly cover[ed]" by § 1581(i). *Transpacific Steel*, 4 F.4th at 1318 n.5.

This Court's precedent further bolsters the point. As discussed above, *see supra* pp. 7-8, the Federal Circuit's predecessor affirmed the imposition of tariffs by President Nixon as an exercise of authority under TWEA, the predecessor to IEEPA. As the district court observed, this Court rejected efforts to litigate a parallel challenge to the Nixon tariffs, holding "that jurisdiction over an import duty enacted pursuant to TWEA belongs with the Customs Court, the predecessor to the Court of International Trade." 1-ER-14 (citing *Cornet*, 632 F.2d at 97, 99-100). The intervening creation of the CIT and modifications to its jurisdiction have only "expanded the jurisdiction of

- 39 -

the Court of International Trade beyond that of the Customs Court." 1-ER-14 (quoting *Earth Island Inst. v. Christopher*, 6 F.3d 648, 651 (9th Cir. 1993)). Those decisions support the district court's conclusion that it lacks jurisdiction.

Moreover, recognizing the CIT's exclusive jurisdiction over these challenges respects Congress's choice to consolidate tariff challenges in the CIT, with appellate review in the Federal Circuit, and Congress's longstanding view of the importance of judicial uniformity in this specialized domain. For more than a century, Congress has vested a single national court with exclusive jurisdiction over tariff cases, *see* Customs Administration Act of 1890, ch. 407, 26 Stat. 131 (establishing Board of Appraisers); Act of May 28, 1926, ch. 411, 44 Stat. 669 (establishing Customs Court), ensuring "uniformity and consistency" by designating a single forum with "expertise in international trade and tariff matters," *Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994); *see, e.g.*, *United States v. Haggar Apparel Co.*, 526 U.S. 380, 394 (1999) (CIT's "expertise … guides it in making complex determinations in a specialized area of the law"); *California*, 2025 WL 1569334, at *5-6; *Webber v. U.S. DHS*, 2025 WL 1207587, at *7 (D. Mont. Apr. 25, 2025); *Emily Ley Paper*, 2025 WL 1482771, at *8. That choice reflects the importance,

- 40 -

in the international-trade arena, of "eliminat[ing] the possibility of conflicting decision[s]" from different courts and ensuring "expeditious decisions in matters which are important both to our country and to our trading partners." S. Rep. No. 96-466, at 3-4 (1979).

2. Even if any doubt remained about the CIT's jurisdiction over this case, the district court followed the course this Court has repeatedly directed for resolving these issues by transferring the case. This Court has tasked district courts with "upholding the exclusivity of the Customs Court jurisdiction." *Cornet Stores*, 632 F.2d at 98 (quotation marks omitted) (affirming district court's jurisdictional dismissal of a case challenging President Nixon's TWEA tariffs). Even if a court doubts the correctness of the CIT's prior jurisdictional ruling, "the prudent thing to do" is still to "transfer the case to the CIT so that the CIT can determine the question of its own jurisdiction," rather than introducing uncertainty into this area through conflicting rulings. *Pentax*, 72 F.3d at 711; *see Universal Fruits & Vegetables Corp.*, 370 F.3d at 836 (remanding with instructions to transfer because "the CIT may be able to hear this case" (alteration and quotation marks omitted)). The district court followed that course here, noting that transfer was appropriate

- 41 -

"[b]ecause the Court of International Trade may be able to hear this case."
1-ER-17 (alteration and quotation marks omitted).

Other courts sensibly take the same approach. *See Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110, 1113 (D.C. Cir. 1994) (affirming dismissal for lack of jurisdiction, despite "some support" for a view that the CIT lacks jurisdiction); *SCM Corp. v. U.S. ITC*, 549 F.2d 812, 821 (D.C. Cir. 1977) (concluding "that the Customs Court itself should be given the opportunity to … determine whether or not it has jurisdiction" despite "far from frivolous doubts concerning" its jurisdiction); *see also Commodities Exp. Co. v. U.S. Customs Serv.*, 957 F.2d 223, 227 (6th Cir. 1992) (granting preclusive effect to CIT's determination of its own jurisdiction because "the CIT has the power to decide its own jurisdiction").

Thus, even if it were doubtful whether the CIT has jurisdiction, there would be no basis to reverse the district court's "prudent" decision to transfer the case "so that the CIT can determine the question of its own jurisdiction." *Pentax*, 72 F.3d at 711.

### B.    Plaintiffs' contrary arguments lack merit.

Plaintiffs identify no persuasive reason to reject the district court's determination that it lacked jurisdiction or the CIT's evaluation of its own

- 42 -

jurisdiction. And at a minimum, none of plaintiffs' contentions suggests that the district court erred in transferring the case as a matter of prudence.

1. Plaintiffs primarily argue that the CIT lacks jurisdiction over their lawsuit because they press constitutional and treaty-based claims, so the case "aris[es] under the commerce clause and the treaty clause." Br. 9; *see, e.g.*, Br. 27 (denying that the CIT can hear "a wholly constitutional challenge to the [President's] power to act at all"). But Congress gave the CIT jurisdiction over cases "arising out of" modifications to the HTSUS, and plaintiffs' lawsuit arises out of those modifications because they impose the tariffs that plaintiffs say cause their injuries. That places the lawsuit within the CIT's jurisdiction, no matter "who the litigants are" and no matter whether "the claims being brought" to challenge the tariffs are constitutional, statutory, regulatory, or treaty-based. Br. 34; *see, e.g.*, *PrimeSource*, 59 F.4th 1255 (reviewing the CIT's adjudication of a constitutional challenge to Section 232); *Transpacific Steel*, 4 F.4th 1306 (same). Underscoring this, as the district court explained, "the CIT has historically exercised jurisdiction over claims brought by enrolled tribal members challenging import and duty-related actions." 1-ER-34–35; *see Akins v. Saxbe*, 380 F. Supp. 1210, 1214, 1217 (D. Me. 1974) (acknowledging exclusive jurisdiction of Customs Court over

- 43 -

case involving the Jay Treaty); *United States v. Garrow*, 88 F.2d 318 (C.C.P.A. 1937) (deciding a case involving the Jay Treaty).

Plaintiffs appear to acknowledge that the CIT may hear at least some constitutional claims. *See* Br. 32, 34. But they argue that Indian law matters implicate the federal government's unique "special duty" toward Indian tribes and their members, Br. 22, that their claims are "not tied to specific trade matters," Br. 33, and that their claims challenge "whether the executive branch can constitutionally regulate commerce with the Indian Tribes" rather than "congressional regulation of commerce," Br. 11. Again, none of those attempted distinctions changes the fact that the case falls within the CIT's exclusive jurisdiction because plaintiffs' challenges spring from and target the executive orders and proclamations that modified or directed modification of the HTSUS, regardless of the basis of plaintiffs' challenge to the orders and proclamations. Nor can plaintiffs escape that their case is inextricably "tied to" the "specific trade matters" they are challenging (Br. 33)—the specific tariffs that they argue are unlawful. And plaintiffs never explain, nor is it apparent, how a "special duty" to Indian tribes could be relevant in evaluating the scope of the CIT's jurisdiction.

- 44 -

2.      Plaintiffs also argue that the Indian Commerce Clause and Article III give the district court exclusive "Constitutional jurisdiction" over this action.  Br. 16; *see id.* (arguing that the district court "elevate[d] the statutory jurisdiction of the CIT above the Constitution"); Br. 17-18 (asserting a "constitutional grant of jurisdiction over cases arising under the Indian Commerce Clause," and citing "Art. III, Section 2, Cl. 1"); Br. 18-19 ("The district court has exclusive jurisdiction over Indian Tribes as set out in Article III § 2 Cl. 1.").

Plaintiffs identify no decision or other authority endorsing their theory that either provision directly confers subject-matter jurisdiction on the district courts, let alone exclusive jurisdiction.  The Indian Commerce Clause grants Congress the power to "regulate Commerce … with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  It does not speak to the jurisdiction of district courts.  Article III, Section 2 simply describes the scope of the federal judicial power and does not allocate that power among inferior courts.  The district court and the CIT are both Article III courts created by Congress, and Congress may allocate jurisdiction among them as it sees fit.  *See id.* art. III, § 1, cl. 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time

- 45 -

to time ordain and establish."); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers.").

3.     To the extent plaintiffs argue that 28 U.S.C. § 1362 forecloses the CIT's jurisdiction over this action, that argument is mistaken.  Br. 16-20.

Section 1362 does not apply to plaintiffs' action.  It grants jurisdiction to the district courts to hear "all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1362.  As its text indicates, this grant of jurisdiction "is not available to individual Indians" like plaintiffs. *Dillon v. Montana*, 634 F.2d 463, 469 (9th Cir. 1980); *see Quinault Tribe of Indians v. Gallagher*, 368 F.2d 648, 656 (9th Cir. 1966) (concluding that § 1362 did not provide jurisdiction over individual plaintiffs).  Instead, it is available only to "Indian tribe[s] or band[s]."  28 U.S.C. § 1362.  No Indian tribes or bands are plaintiffs here, so § 1362 is inapposite.

Section 1362 would not displace the CIT's exclusive jurisdiction in any event.  The grant of exclusive jurisdiction to the CIT over specific trade matters in 28 U.S.C. § 1581(i) controls over general grants of jurisdiction like the

- 46 -

grant of federal-question jurisdiction in 28 U.S.C. § 1331. *See K Mart Corp.*, 485 U.S. at 182-183. It also controls over narrower grants of jurisdiction, like the grant of jurisdiction over actions arising under trademark laws. *See* 28 U.S.C. § 1338. That is why the Supreme Court did not hesitate to conclude that a district court would lack jurisdiction under either § 1331 or § 1338 if an action "fell within one of" the "specific grants of exclusive jurisdiction to the Court of International Trade." *K Mart Corp.*, 485 U.S. at 182-183. So too for § 1362.

4.    Plaintiffs' argument that the tariffs fall outside the CIT's jurisdiction because they are revenue-raising tariffs likewise fails. Br. 35-36. There would be no defect in jurisdiction even if the tariffs were imposed to raise revenue. While § 1581(i)(1)(B) grants the CIT exclusive jurisdiction over cases arising out of laws providing for "tariffs … on the importation of merchandise for reasons other than the raising of revenue," a neighboring provision grants the CIT exclusive jurisdiction over cases arising out of laws providing for "revenue from imports," too. 28 U.S.C. § 1581(i)(1)(A)–(B). Even if plaintiffs were right about the purpose of the tariffs, the CIT would still have jurisdiction.

- 47 -

In any event, as the district court recognized, the executive orders and proclamations explain why the tariffs were imposed. 1-ER-16–17. The Section 232 tariffs were imposed based on the President's findings that aluminum and steel were "being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States." 90 Fed. Reg. at 9807; 90 Fed. Reg. at 9817. The drug-trafficking IEEPA tariffs were imposed to address "the sustained influx of illicit opioids and other drugs" across America's borders and the "central role" Canada has played in this problem, "including by failing to devote sufficient attention and resources" to the problem. 90 Fed. Reg. at 9113. And the worldwide and reciprocal IEEPA tariffs were imposed to "abate and resolve" an emergency arising out of large and persistent annual trade deficits, "caused in substantial part" by our trading partners' "disparate tariff rates and non-tariff barriers," and leading to serious deficits in domestic manufacturing capacity, vulnerability of "critical supply chains," and reliance by our "defense-industrial base" on "foreign adversaries." 90 Fed. Reg. at 15,041.

5.     Last, plaintiffs argue that the district court's analysis was incomplete because the district court "consider[ed] transfer akin to venue" and

- 48 -

"never found" that "there was a lack of jurisdiction in the Montana federal district court," Br. 11-12, 15, and because the district court did not specifically address "the interest of justice" under § 1631, Br. 38-40.

Plaintiffs repeatedly mistake the district court's assessment of its own jurisdiction. *See* Br. 9, 11-12, 15-17, 23. The district court correctly pointed out "the exclusivity of the Court of International Trade's jurisdiction over matters falling within its purview." 1-ER-12. As the court explained, that grant of exclusive jurisdiction "removes specific actions from the general federal-question jurisdiction of the district courts." 1-ER-12. The district court's conclusion was plain: "the decision of whether to transfer this matter" to the CIT was "not a discretionary one," because the CIT's exclusive grant of jurisdiction "divested" the district court "of its jurisdiction," meaning the matter "*must* be transferred." 1-ER-19. If that were not enough, the district court reiterated the basis of its ruling in its order denying plaintiffs' motion for reconsideration: The transfer was based on a conclusion that it "lacks jurisdiction over the challenges currently pending." 1-ER-37 (alteration and alteration omitted).

Plaintiffs' belated argument that the "interest of justice" does not support transfer fares no better. 28 U.S.C. § 1631. Plaintiffs did not raise this

argument in the district court—which is why the district court "did not ad-dress" that consideration independently. Br. 12. The "interest of justice" requirement does not allow the district court to exercise subject-matter juris-diction it does not have; it instead allows the court to evaluate whether to transfer the action instead of dismissing it. Plaintiffs do not urge that the district court should have dismissed their action instead.

In any event, under § 1631, transfer is "normally" in the interest of jus-tice because "dismissal of an action that could be brought elsewhere is 'time-consuming and justice-defeating.'" *Security Alarm Fin. Enters., L.P. v. Nebel*, 200 F. Supp. 3d 976, 987 (N.D. Cal. 2016) (quoting *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990)). That is especially so where, as here, the transferee court—the CIT—is already evaluating "markedly similar" "factual, legal, and procedural issues," so "transfer, not dismissal, is the preferable disposi-tion." *Amerijet Int'l, Inc. v. U.S. DHS*, 43 F. Supp. 3d 4, 21 (D.D.C. 2014). So courts in this Circuit "have rarely found that transfer would not serve the interest of justice" under § 1631. *See Amity Rubberized Pen Co. v. Market Quest Grp. Inc.*, 793 F.3d 991, 996 (9th Cir. 2015). Plaintiffs are, of course, free to dismiss their action in the CIT rather than pursue it if they believe that that forum is too inconvenient (Br. 38, 40), but that does not alter the district

court's determination that transfer to a court with jurisdiction was appropriate.  And plaintiffs' desire for a prompt decision on their preliminary injunction motion cuts in *favor* of transfer, which saves a plaintiff from the "time-consuming" exercise of refiling in the correct court.  *Miller*, 905 F.2d at 262.

## CONCLUSION

The Court should dismiss the appeal for lack of appellate jurisdiction.

In the alternative, the Court should affirm the district court's order transfer-

ring the case to the CIT.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

KURT G. ALME
   *United States Attorney*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
   *Attorneys, Appellate Staff*

 */s/ Sarah Welch*
   SARAH WELCH
   *Counsel to the Assistant Attorney*
    *General, Civil Division*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-3180*
   *sarah.e.welch@usdoj.gov*

## STATEMENT OF RELATED CASES

Appellees are aware of no related cases not identified as related in Appellants' brief.

/s/ Sarah Welch

Sarah Welch

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** <u>No. 25-3493</u>

I am the attorney or self-represented party.

**This brief contains** <u>10,649</u> **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ *Sarah Welch*</u>      **Date** <u>July 28, 2025</u>

- 54 -

**ADDENDUM**

# TABLE OF CONTENTS

19 U.S.C. § 3004 ................................................................. A1

28 U.S.C. § 1581 ................................................................. A1

50 U.S.C. § 1621 ................................................................. A2

50 U.S.C. § 1622 ................................................................. A2

50 U.S.C. § 1701 ................................................................. A5

50 U.S.C. § 1702 ................................................................. A5

50 U.S.C. § 1703 ................................................................. A8

**19 U.S.C. § 3004**

**§ 3004.  Enactment of Harmonized Tariff Schedule**

…

(c) Status of Harmonized Tariff Schedule

(1) The following shall be considered to be statutory provisions of law for all purposes:

(A)  The provisions of the Harmonized Tariff Schedule as enacted by this chapter.

(B) Each statutory amendment to the Harmonized Tariff Schedule.

(C) Each modification or change made to the Harmonized Tariff Schedule by the President under authority of law (including section 604 of the Trade Act of 1974 [19 U.S.C. § 2483]).

**28 U.S.C. § 1581**

**§ 1581. Civil actions against the United States and agencies and officers thereof**

…

(i)(1) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--

(A) revenue from imports or tonnage;

(B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

(C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

…

**50 U.S.C. § 1621**

**§ 1621. Declaration of national emergency by President; publication in Federal Register; effect on other laws; superseding legislation**

(a) With respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency. Such proclamation shall immediately be transmitted to the Congress and published in the Federal Register.

(b) Any provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section), specifically declares a national emergency, and (2) only in accordance with this chapter. No law enacted after September 14, 1976, shall supersede this subchapter unless it does so in specific terms, referring to this subchapter, and declaring that the new law supersedes the provisions of this subchapter.

**50 U.S.C. § 1622**

**§ 1622. National emergencies**

(a) Termination methods

Any national emergency declared by the President in accordance with this subchapter shall terminate if—

(1) there is enacted into law a joint resolution terminating the emergency; or

(2) the President issues a proclamation terminating the emergency.

Any national emergency declared by the President shall be terminated on the date specified in any joint resolution referred to in clause (1) or on the

date specified in a proclamation by the President terminating the emergency as provided in clause (2) of this subsection, whichever date is earlier, and any powers or authorities exercised by reason of said emergency shall cease to be exercised after such specified date, except that such termination shall not affect—

 (A) any action taken or proceeding pending not finally concluded or determined on such date;

 (B) any action or proceeding based on any act committed prior to such date; or

 (C) any rights or duties that matured or penalties that were incurred prior to such date.

 (b) Termination review of national emergencies by Congress

Not later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated.

 (c) Joint resolution; referral to Congressional committees; conference committee in event of disagreement; filing of report; termination procedure deemed part of rules of House and Senate

 (1) A joint resolution to terminate a national emergency declared by the President shall be referred to the appropriate committee of the House of Representatives or the Senate, as the case may be.  One such joint resolution shall be reported out by such committee together with its recommendations within fifteen calendar days after the day on which such resolution is referred to such committee, unless such House shall otherwise determine by the yeas and nays.

 (2) Any joint resolution so reported shall become the pending business of the House in question (in the case of the Senate the time for debate shall be equally divided between the proponents and the opponents) and shall be voted on within three calendar days after the day on which such resolution is reported, unless such House shall otherwise determine by yeas and nays.

(3) Such a joint resolution passed by one House shall be referred to the appropriate committee of the other House and shall be reported out by such committee together with its recommendations within fifteen calendar days after the day on which such resolution is referred to such committee and shall thereupon become the pending business of such House and shall be voted upon within three calendar days after the day on which such resolution is reported, unless such House shall otherwise determine by yeas and nays.

(4) In the case of any disagreement between the two Houses of Congress with respect to a joint resolution passed by both Houses, conferees shall be promptly appointed and the committee of conference shall make and file a report with respect to such joint resolution within six calendar days after the day on which managers on the part of the Senate and the House have been appointed. Notwithstanding any rule in either House concerning the printing of conference reports or concerning any delay in the consideration of such reports, such report shall be acted on by both Houses not later than six calendar days after the conference report is filed in the House in which such report is filed first. In the event the conferees are unable to agree within forty-eight hours, they shall report back to their respective Houses in disagreement.

(5) Paragraphs (1)-(4) of this subsection, subsection (b) of this section, and section 1651(b) of this title are enacted by Congress--

(A) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such they are deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in the House in the case of resolutions described by this subsection; and they supersede other rules only to the extent that they are inconsistent therewith; and

(B) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House.

(d) Automatic termination of national emergency; continuation notice from President to Congress; publication in Federal Register

Any national emergency declared by the President in accordance with this subchapter, and not otherwise previously terminated, shall terminate on the anniversary of the declaration of that emergency if, within the ninety-day period prior to each anniversary date, the President does not publish in the Federal Register and transmit to the Congress a notice stating that such emergency is to continue in effect after such anniversary.

## 50 U.S.C. § 1701

### § 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities

(a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

(b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

## 50 U.S.C. § 1702

### § 1702. Presidential authorities

(a) In general

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

           (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

           (iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

           (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

           (C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

           (2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require

the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

(b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 46043 of this title, or under section 46053 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information.—In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

**50 U.S.C. § 1703**

**§ 1703. Consultation and reports**

(a) Consultation with Congress

The President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter and shall consult regularly with the Congress so long as such authorities are exercised.

(b) Report to Congress upon exercise of Presidential authorities

Whenever the President exercises any of the authorities granted by this chapter, he shall immediately transmit to the Congress a report specifying—

(1) the circumstances which necessitate such exercise of authority;

(2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;

(3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

(c) Periodic follow-up reports

At least once during each succeeding six-month period after transmitting a report pursuant to subsection (b) with respect to an exercise of authorities under this chapter, the President shall report to the Congress with respect to the actions taken, since the last such report, in the exercise of such authorities, and with respect to any changes which have occurred concerning any information previously furnished pursuant to paragraphs (1) through (5) of subsection (b).

(d) Supplemental requirements

The requirements of this section are supplemental to those contained in title IV of the National Emergencies Act.