No. 25-2717

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

Susan Webber, Jonathan St. Goddard,
Rhonda Mountain Chief and David Mountain Chief,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, THE UNITED
STATES OF AMERICA, and,
in her official capacity, KRISTI NOEM
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Montana
No. CV 25-26-GF-DLC
Hon. Dana Christensen

---

## APPELLANTS REPLY BRIEF

---

Monica J. Tranel
TRANEL LAW FIRM, P.C.
401 Washington Street
Missoula, MT 59802
(406) 926-2662
*mtranel@tranelfirm.com*

*Attorneys for Appellants*
Susan Webber, Jonathan St. Goddard,
Rhonda Mountain Chief and David Mountain Chief

# REPLY TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

REPLY SUMMARY ...................................................................................1

CONSTITUTIONAL FRAMEWORK ON REPLY ...................................2

ARGUMENT ..............................................................................................6

    I.    The President has no authority to impose tariffs on Tribes. ...............6

        A. Constitutional claims by Tribal members are reviewable...............6

        B. This case is about subject matter jurisdiction, not venue..............11

    II.    Executive Orders unlawfully raise revenue from Tribes ...................16

    III.    Orders and Proclamations unlawfully regulate tribal commerce........18

        A. The Canada Orders are unhinged from the claimed emergency....18

        B. The President made the trade deficit worse ..................................21

        C.  The Proclamations unlawfully regulate Tribal commerce ...........23

    IV.    Interests of justice ...............................................................................24

CONCLUSION ...........................................................................................25

CERTIFICATE OF COMPLIANCE ...........................................................26

CERTIFICATE OF SERVICE.....................................................................27

# TABLE OF AUTHORITIES

## Cases

*Akins v. Saxbe,*
    380 F. Supp. 1210 (D. Me. 1974) ................................................................. 9

*Akins v. United States,*
    551 F.2d 1222 (1977) ......................................................................... 9-10

*AARP v. Trump,*
    605 U.S. ___ (2025) ............................................................................ 16

*Andrews v. City of Henderson,*
    35 F.4th 710 (9th Cir. 2022) ................................................................ 14

*Arizona v. Navajo Nation,*
    599 U.S. 555, 143 S. Ct. 1804 (2023) ................................................... 8

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .......................................................... 25

*Bell v. Hood,*
    327 U.S. 678 (1946) ............................................................................. 7

*Bowen v. Michigan Acad. of Family Physicians*,
    476 U.S. 667, 679–80 (1986) ............................................................. 12

*Califano v. Sanders,*
    430 U.S. 99 (1977) ............................................................................. 11

*Carson v. American Brands, Inc.,*
    450 U.S. 79 (1981) ............................................................................. 16

*Cherokee Nation v. Georgia,*
    5 Pet. 1 (1831) .............................................................................. 6, 11

*Coeur D'Alene Tribe v. Hawks,*
    933 F.3d 1052 (9th Cir. 2019) ........................................................ 12-13

*Cotton Petroleum Corp. v. New Mexico,*
    490 U.S. 163 (1989) ................................................................6, 11

*Erwin Hymer Grp. N. Am., Inc. v. United States,*
    930 F.3d 1370 (Fed. Cir. 2019) ..........................................15

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
    426 U.S. 548, 559–60 (1976) ..............................................18

*Field v. Clark,*
    143 U.S. 649 (1892) ...............................................................4

*Gila River v. Schoubroek,*
    23-2743 slip op. at 13-14 (9th Cir. 2025) .........................13

*Gower v. Lehman,*
    799 F.2d 925 (4th Cir. 1986) ...............................................13

*Haaland v. Brackeen,*
    143 S. Ct. 1609 (2023) ........................................ 6, 8-9, 12

*Hampton Co. v. United States,*
    276 U.S. 394 (1928) ...........................................................5, 18

*Herrera v. Wyoming,*
    139 S.Ct. 1686, 1698 (2019) ..............................................10

*In re Carefirst of Maryland, Inc.,*
    305 F.3d 253 (4th Cir. 2002) ........................................ 14-15

*In re U.S. Dept. of Educ.,*
    25 F.4th 692 (9th Cir. 2022) .......................................... 7, 14-15

*Jarrett v. Terrell (unpublished),*
    21-55263 (9th Cir. 2022) ....................................................14

*Learning Resources v. Trump et al,*
    Cause No. 25-1248 p. 2 (May 29, 2025) ...........................1, 14, 24

*Matlock v. Sullivan,*
  908 F.2d 492 (9th Cir. 1990) ......................................................................11

*Menominee Tribe v. U.S.,*
  391 U.S. 404, 413 (1968) ............................................................................9

*Metlakatla Indian Cmty. v. Dunleavy,*
  58 F.4th 1034 (9th Cir. 2022) ....................................................................7

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172, 202–03 (1999) ....................................................................10

*Montana Wildlife Federation v. Haaland,*
  127 F.4th 1 (9th Cir. 2025) ......................................................................16

*Navajo Nation v. United States,*
  26 F.4th 794 (9th Cir. 2022) ....................................................................7

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................24

*Posnanski v. Gibney,*
  421 F.3d 977 (9th Cir. 2005) ............................................................. 7-8, 14

*Primesource Bldg. v. United States,*
  59 F.4th 1255 (Fed. Cir. 2023) ................................................................23

*Rent-A-Center, Inc. v. Canyon Television,*
  944 F.2d 597 (9th Cir. 1991) ....................................................................25

*Rigsby v. GoDaddy Inc.,*
  59 F.4th 998 (9th Cir. 2023) ....................................................................7

*Rodrigues v. Donovan,*
  769 F.2d 1344, 1348 (9th Cir.1985) ........................................................12

*Seminole Nation v. United States,*
  316 U.S. 286 (1942) ..................................................................................7

*Staacke v. U.S. Sec'y of Labor,*
    841 F.2d 278 (9th Cir. 1988) .......................................................................12

*State of California v. Trump*, *No. 3:25-cv-03372*, 2025 WL 1569334 (N.D. Cal.
    June 2, 2025), appeal docketed, *No. 25-3493* (9th Cir. June 3, 2025) .........17

*Terenkian v. Republic of Iraq,*
    694 F.3d 1122 (9th Cir. 2012) .................................................................7, 14

*Tunik v. Merit Systems Protection Board*,
    407 F.3d 1326, 1332 (Fed. Cir. 2005) .......................................................15

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
    672 F.3d 1160, 1165 (9th Cir. 2012) ...........................................................16

*United States v. Garrow,*
    88 F.2d 318 (1937) ......................................................................................9

*United States v. Haggar Apparel*,
    526 U.S. 380, 392 (1999) ............................................................................18

*United States v. Holliday,*
    70 U.S. (3 Wall.) 407 (1866) .................................................................3, 12

*United States v. Jicarilla Apache Nation,*
    564 U.S. 162 (2011) ......................................................................................8

*United States v. Mitchell,*
    463 U.S. 206 (1983) ......................................................................................7

*United States v. Sioux Nation of Indians,*
    448 U.S. 371 (1980) .................................................................................8, 17

*United States v. Yoshida Int'l, Inc.,*
    526 F.2d 560 (C.C.P.A. 1975) .................................................5, 18, 20, 22

*V.O.S. Selections Inc. v. Trump*
    No. 1:25-cv-00066-(Ct. Intl. Trade) ............................................................18

v

*Worcester v. Georgia,*
 31 U.S. (6 Pet.) 515 (1832) ........................................................3, 8

*Youngstown Sheet & Tube Co. v. Sawyer,*
 343 U.S. 579 (1952)...................................................................18

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ...........................................3, 6, 11, 13

U.S. Const. art. I, § 8, cl. 3 (Indian Commerce Clause)...................1, 3, 6, 9, 11, 13

U.S. Const. art. III, § 2 ....................................................... 6, 12-13, 17

U.S. Const. art. VI ..............................................................1, 13

U.S. Const. amend. V .............................................................13

**Treaties**

Jay's Treaty (1794)..............................................................2-4, 8, 9-13

Explanatory Article to Jay's Treaty, May 5, 1796 ...................................9

**Statutes**

Tariff Act of 1799, ch. 22, 1 Stat. 673............................................2–3

McKinley Tariff Act of 1890, ch. 1244, 26 Stat. 567 ...............................4

Tariff Act of 1922, ch. 356, § 315, 42 Stat. 858.................................5

19 U.S.C. § 1862
 (Trade Expansion Act of 1962, § 232, 76 Stat. 872) ......................... 5, 23-24

19 U.S.C. § 1338
 (Tariff Act of 1930, § 338, 46 Stat. 59) .....................................5

19 U.S.C. § 1351
    (Reciprocal Trade Agreements Act, 48 Stat. 943) ...........................................5

19 U.S.C. § 2251
    (Trade Act of 1974, §§ 201–204, 301–310, 88 Stat. 1978). .........................5

19 U.S.C. § 2411
    (Trade Act of 1974, Title III, §§ 301–310, 88 Stat. at 2041–2056). ...............5

28 U.S.C. §§ 251–258
    (Customs Courts Act of 1980, Pub. L. No. 96-417) ................................6, 12
    House Report accompanying the 1980 Act (H.R. Rep. No. 96-1235)......6, 12

28 U.S.C. § 1291 ..............................................................................................14

28 U.S.C. § 1294 ..............................................................................................14

28 U.S.C. § 1581(i) ..................................................................... 6, 11, 15-17

28 U.S.C. § 1631 ...................................................................................... 13-14

50 U.S.C. § 1702(a)(1)(B).............................................................................17

## OTHER AUTHORITIES

Blackhawk, Ned
    The Rediscovery of America, Native Peoples and the Unmaking of U.S.
    History, (2023) Ch. 5 Settler Uprising, The Indigenous Origins of the
    American Revolution, pp. 155- 158 ...........................................................10

Canada Department of Finance, Canada Announces Robust Tariff Package in
    Response to Unjustified U.S. Tariffs, March 2025................................. 22-23

Cohen's Handbook of Federal Indian Law § 3.02[3]
    Nell Jessup Newton ed. (2017) ...................................................................7

History and Framework of U.S. Tariffs................................................................17

vii

*Int. Trade During the COVID-19 Pandemic: Big Shifts and Uncertainty*, OECD Policy Responses to Coronavirus (COVID-19), March 10, 2022.................24

*ITC, Two Centuries of Tariffs: The Background and Emergence of the United States International Trade Commission*........................................................17

Caulkins, Jonathan and Giri, Bishu
*Fentanyl at the Gates: Comparing Large Seizures at the U.S.–Mexican and U.S.–Canadian Borders*, July 2025 Report p. 1...........................................19

Smith, Kaighn Jr.
*Federal Courts, State Power, and Indian Tribes: Confronting the Well-Pleaded Complaint Rule*, 35 N.M. L. Rev. 1, 21–23 (2005) .......................13

Steil, Benn
Council on Foreign Relations, *Trump's Japanese and EU Investment Boasts Contradict His Claims of a Trade Deficit "Emergency"* (July 29, 2025) ...................................................................................22

U.S. Bureau of Labor Statistics
*The Impact of COVID on the Price of Steel in Three Phases*, *Beyond the Numbers*, Vol. 14, No. 4 (Feb. 2024)..................................................................................22

U.S. Department of Commerce, International Trade Administration Montana Trade and Economy Factsheet.......................................................20

*World Steel Association*,
"Short Range Outlook October 2020," October 15, 2020 ...........................23

## Executive Orders

Executive Order 14193.......................................................................... 19-20

Amendment to Executive Order 14193, Amendment to Duties to Address the Flow of Illicit Drugs Across our Northern Border................................................20

# REPLY SUMMARY

Susan Webber, Jonathan St. Goddard, and Rhonda and David Mountain Chief, enrolled members of the Blackfeet Tribe, challenge the constitutionality of executive actions that impose tariffs on their cross-border Tribal Nation.

Two issues are before the Court:

1) The President does not have power to impose tariffs on Indian Tribes. Constitution Article I, Sec. 8, Cl. 3 (Indian Commerce Clause); Article VI (Treaties).

2) The Court of International Trade (CIT) does not have power to hear Indian Commerce Clause and Treaty claims.

This case is not about "tariffs qua tariffs. It is about" whether the President has the power to "unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy"[1] and specifically, the economy of Tribal Nations.

This Court has subject matter jurisdiction over Tribal commerce. The CIT does not have subject matter jurisdiction over constitutional separation of powers and Tribal commerce. This case is not about dueling venues. It is about subject matter jurisdiction over the constitutional issues of Indian Commerce and Treaties.

The substantive briefing at the district court showed the Canada Orders are unconstitutional. This is the substantive issue this Court should address.

---

[1] *Learning Resources v. Trump et al*, Cause No. 25-1248 p. 2 (May 29, 2025).

1

## CONSTITUTIONAL FRAMEWORK ON REPLY

The government distorts history to argue that "Congress has long supplemented" presidential power to "manage tariffs or duties on foreign imports." Brief pp. 5-14. It never addresses Tribal commerce – the issue of this case.

The government cites part of Section 61 of the 1799 Tariff Act to suggest tariff authority was given to the executive from this nation's founding. Brief p. 5. Reading Section 61 in full shows that Congress allowed the President to use estimates for duties where the original cost was "exhibited in a depreciated currency [.]"[2] Any implication that tariff authority was granted is flat wrong.

The Tariff Act of 1799 is set out in the Complaint.[3] It exempted Indians from tariffs "for the purpose of conforming this act to" the "Treaty of Amity Commerce and Navigation, between His Britannick Majesty; and The United States of America, by Their President, with the advice and consent of Their SENATE" also known as Jay's Treaty, signed on November 19, 1794.[4] Sections 104 and 105 of the Tariff Act of 1799 declared that Indians could pass and repass the "boundary line of the United States" and could "freely [..] carry on trade and commerce" exempt from duties and tariffs. Article III of Jay's Treaty, which has

---

[2] 3-ER-236, Tariff Act of 1799, Fifth Congress, Session III, Ch. 22 p. 673 Sec. 61.
[3] 3-ER-236–237.
[4] 3-ER-234–236, Sec. 104-105, p. 701.

2

never been abrogated, is repeated nearly verbatim in the Tariff Act of 1799.[5] The Blackfoot people actively utilize its protections: Jonathan St Goddard does "not have a passport but [I] go back and forth across the border using my tribal identification card."[6] Jackie and Steve Conway have five children, born on both sides of the border, and "have family ties across the border in all walks of life."[7] The Blackfoot Confederacy Chiefs Society declared: "The Jay Treaty affirms First Nations' inherent right to freely cross the border, a principle that must be upheld in all border matters."[8]

The 1799 Tariff Act delegated no power to the President over any commerce, much less Tribal commerce. The Constitution (1787), the nation's first treaty with an international power (Jay's Treaty 1794), and the Tariff Act of 1799 all unequivocally express Congress's exclusive authority to regulate commerce with Indian Tribes and exempt Tribes from tariffs. Congress' exclusive authority over commerce with Indian Tribes has consistently been recognized and affirmed.[9]

The President has no authority to impose tariffs on Tribes. Not in the Constitution. Not in any Treaty. Not in any statute. It does not exist. The Canada

---

[5] 3-ER-235–236.
[6] 3-ER-167 ¶ 3.
[7] 3-ER-201 ¶ 3.
[8] 3-ER-206 ¶ 9.
[9] U.S. Const. art. I, § 8, cl. 3; *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832); *United States v. Holliday*, 70 U.S. (3 Wall.) 407 (1866).

3

Orders violate basic separation of powers in the Constitution. They cannot stand.

The government suggests the McKinley Tariff of 1890 authorized the President to impose open-ended import duties at will, citing *Field v. Clark*. Brief pp. 5-6. Section 3 of the McKinley Act gave the President ability to suspend duties on "sugar, molasses, coffee, tea, and hides" and "duties shall be levied, collected, and paid from such designated country as follows […]" during the suspension.[10] The Supreme Court upheld this narrow grant, noting the "universally recognized principle" that "Congress cannot delegate legislative power to the President" "as vital to the integrity and maintenance of the system of government ordained by the constitution."[11] The Court held that Section 3 of the McKinley Tariff was "not inconsistent with that principle" because it did not "in any real sense, invest the president with the power of legislation."[12]

The McKinley Act contained and continued Jay's Treaty exemption of tariffs on Native Americans crossing and recrossing the boundary of the U.S.[13] In choosing this snapshot in history to advance a claim that there is some authority for presidential power to impose tariffs, the government again misses the point of this case: The President has no power to impose tariffs on Tribes.

---

[10] *McKinley Tariff Act of 1890*, ch. 1244, 26 Stat. 567 (Oct. 1, 1890), codified as the Tariff Act of 1890.

[11] *Field v. Clark*, 143 U.S. 649, 692-694, 12 S.Ct. 495, 36 L.Ed. 294 (1892).

[12] *Field,* 143 U.S. at 694-694.

[13] Tariff Act of 1890**,** ch. 1244, § 2, ¶ 674, 26 Stat. 567, 602, 608.

The government suggests the 1922 Tariff Act supports presidential power to impose tariffs. But the 1922 Act only delegated ministerial execution of rate adjustments to be executed by a commission under the executive.[14] In *Hampton* the Supreme Court emphasized this was not a delegation of legislative power**,** but a ministerial execution of Congress's policy, carried out by the executive under defined parameters that were "perfectly clear and perfectly intelligible."[15]

Absent from this selection of history is any hint of presidential power to impose tariffs on Tribes. Nor could there be. That power has never existed.

The government implies 20th century legislation authorized "the President to impose or modify tariffs [..]." Brief pp. 6-7. However, every one of the cited statutes reflect a consistent pattern: Congress set narrow policy with strict temporal and substantive parameters, and the President was to execute that policy.[16] Nothing in this history implies any presidential authority to impose tariffs on Tribes.

In this context Congress created the CIT for the narrow role of adjudicating

---

[14] Tariff Act of 1922, ch. 356, § 315, 42 Stat. 858, 941–945 (Sept. 21, 1922).

[15] *Hampton Co v. United States*, 276 U.S. 394, 404, 410-411 (1928).

[16] Tariff Act of 1930, ch. 497, § 338, 46 Stat. 590, 704–706 (codified as amended at 19 U.S.C. § 1338); Reciprocal Trade Agreements Act, ch. 474, 48 Stat. 943–945 (codified as amended at 19 U.S.C. § 1351); *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 579 (1975) (RTAA did not confer unlimited discretion); Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232, 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862); Trade Act of 1974, Pub. L. No. 93-618, Title II, §§ 201–204, 88 Stat. 1978, 2011–2041 (codified as amended at 19 U.S.C. § 2251 *et seq.*); Trade Act of 1974, Title III, §§ 301–310, 88 Stat. at 2041–2056 (codified as amended at 19 U.S.C. § 2411 *et seq.*).

disputes arising from trade regulation, explicitly excluding revenue-raising measures from CIT jurisdiction to preserve the traditional role of district courts in adjudicating tax-related disputes.[17] Tribal commerce is not on the CIT menu.

## ARGUMENT

## I.    The President has no authority to impose tariffs on Tribes.

### A.    Constitutional claims by Tribal members are reviewable.

The text of Article I, Section 8, Clause 3 draws a clear distinction between "States," "foreign Nations," and "Indian Tribes."[18] The Indian Commerce Clause is an exclusive grant of power *to Congress* to regulate commerce "with the Indian Tribes."[19] Article III, § 2, cl. 1, vests the federal judiciary with jurisdiction over cases "arising under" the Constitution, laws, and Treaties of the United States. The Supreme Court has repeatedly emphasized that virtually all authority over Indian commerce lies with the federal congress, not the states or the executive branch.[20]

The government glosses over the unique status of Tribal members and specific Treaty rights, discussing instead "trade matters." Brief p. 34. But district

---

[17] *Customs Courts Act of 1980*, Pub. L. No. 96-417, § 201, 94 Stat. 1727, 1728–1730 (codified at 28 U.S.C. §§ 251–258); House Report accompanying the 1980 Act (H.R. Rep. No. 96-1235); 28 U.S.C. § 1581; U.S. Const. art. I, § 8, cl. 1.

[18] *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989); *Cherokee Nation v. Georgia*, 5 Pet. 1, 18, 8 L.Ed. 25 (1831).

[19] U.S. Const. art. I, § 8, cl. 3.

[20] *Haaland v. Brackeen,* 599 U.S. 255, 294-95, 143 S.Ct. 1609, 1627-1628, 216 L.Ed.2d 254 (2023).

6

courts are the default forum for constitutional claims, especially where they

implicate the United States' "special duty" to Indian Tribes and their members.[21]

This Court's power to immediately review the transfer order is settled law.[22]

In *Terenkian v. Republic of Iraq*, this Court held: "A district court's transfer

of a case to an out-of-circuit district court does not strip an appellate court of

jurisdiction over an interlocutory […] decision of a district court within its circuit.

[…] Under 28 U.S.C. §1294, we have exclusive jurisdiction over such immediately

appealable orders."[23] Ninth Circuit law is clear: [T]ransfer orders "are reviewable

only in the circuit of the transferor district court."[24]

This Court has held in case after case: the *only* remedy Appellants have from

the transfer order is here.[25] In *Posnanski*, this Court held there is "no principle in

American law that permits a circuit court of appeals to review [..] a transfer order

issued by a district court in another circuit." [..] "[T]ransfer orders… are

---

[21] *Seminole Nation v. United States*, 316 U.S. 286 (1942), accord *Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034 (9th Cir. 2022)(Indian canon is rooted in trust relationship between the federal government and Indian tribes), citing Cohen's Handbook of Federal Indian Law § 3.02[3] (Nell Jessup Newton ed., 2017); *Bell v. Hood*, 327 U.S. 678, 681–83 (1946); *United States v. Mitchell*, 463 U.S. 206, 225 (1983); *Navajo Nation v. U.S.*, 26 F.4th 794, 805–06 (9th Cir. 2022).
[22] *Rigsby v. Godaddy Inc.*, 59 F.4th 998 (9th Cir. 2023), *Posnanski v. Gibney*, 421 F.3d 977, 980 (9th Cir. 2005); see also, *In re U.S. Dept of Educ.*, 25 F.4th 692, 698 (9th Cir. 2022).
[23] *Terenkian v. Rep. of Iraq*, 694 F.3d 1122, 1129–30 (9th Cir. 2012) cleaned up.
[24] *Rigsby,* 59 F.4th at 1004.
[25] *Posnanski*, 421 F.3d at 980-81.

reviewable only in the circuit of the transferor district court.[26] This Court – and only this Court, has jurisdiction to review the transfer order. The government gives the Court no authority for a different result.

The Piegan/Carway and Del Bonita ports of entry lie entirely in Blackfoot lands, and connect the Blackfoot people to the Blackfoot Confederacy north of the 49th parallel that is historically one Nation.[27] Jay's Treaty guaranteed the right of the Blackfoot people to cross and recross the boundary, without duties. That Treaty has never been abrogated. The *Sioux Nation* line of cases, including *Arizona v. Navajo Nation*, establish that where a clear duty has been set out, the federal government has a special obligation to Tribes, and may not act in a national interest at the expense of Tribal interests.[28]

The Constitution's Indian Commerce Clause is the bedrock of federal authority over Tribal commerce. For two centuries, the Supreme Court has interpreted this clause as granting Congress — not the executive branch or the states — exclusive power to regulate commerce with Indian Tribes.[29] This exclusivity means that any tariffs or restrictions on Tribal commerce, including at

---

[26] *Posnanski*, 421 F.3d at 980.
[27] 3-ER-205–207 Dec. of Blackfoot Chiefs; 3-ER-173–180 Hall Dec.
[28] *United States v. Sioux Nation of Indians*, 448 U.S. 371, 408-409 (1980); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 175 (2011); *Arizona v. Navajo Nation*, 599 U.S. 555, 143 S.Ct. 1804, 1814 (2023).
[29] *Worcester*, 31 U.S. 515; *Haaland*, 143 S.Ct. at 1627-1628.

border ports such as Del Bonita and Piegan/Carway, must be authorized by Congress. Executive action alone, without congressional authorization, is unlawful.

The government cites *Akins* and *Garrow* for the proposition that CIT has historically exercised jurisdiction over claims brought by enrolled tribal members challenging import and duty related actions. Brief pp. 43-44. But the issue in *Akins* was *congressional* regulation of commerce with Indian Tribes.[30] Here the *executive* is regulating commerce with the Indian Tribes, which is illegal. This Court has exclusive jurisdiction to review and decide this Constitutional question.

To the extent *Akins* implies Jay's Treaty was abrogated, it is wrong. Jay's Treaty was self-executing. It acknowledged Indian commerce rights which had their source in the Constitution. Those rights cannot be abrogated by statutory silence or passage of time or by executive order.[31] Jay's Treaty was not the source of Indian commerce rights. Rather, Article III and its Explanatory Note – entered into between Britain and the U.S. – were adopted to explicitly acknowledge and implement Native Americans' commerce and passage rights.[32] Jay's Treaty must be read in historical context. Article I, Section 8, Clause 3 was a transformational

---

[30] *Akins v. U.S.*, 551 F.2d 1222, (1977); *Akins v. Saxbe*, 380 F.Supp 1210, 1217 (D.Me. 1974); *U.S. v. Garrow*, 88 F.2d 318 (1937).
[31] *Haaland*, 143 S.Ct. at 1628; *Menominee Tribe v. U.S.*, 391 U.S. 404, 413 (1968).
[32] 3-ER-234, Explanatory Article to Jay's Treaty, May 5, 1796.

grant of power to Congress to conduct commerce *with the Indian Tribes*.[33] At the time, the Blackfoot people "functioned across the 49th parallel as if there were no border" and "used their strategic homelands straddling the border to their economic and political leverage, crossing it internally and using it to their own advantage."[34] These Constitutional rights, acknowledged in Jay's Treaty, cannot be extinguished by judicial decisions, statehood admissions, or executive actions.[35] *Akins'* statement that "statutory manifestations subsequent to the Jay Treaty indicate that Congress intended that the duty exemption no longer remained in force" is an incorrect analysis of Indian law.[36] But congressional power to act is not before the Court. The question is whether the President can impose tariffs on Tribes. This is a Constitutional question that only this Court can decide.

Jay's Treaty is the basis for legislation proposed in 2024, a bison exchange in 2025, and St. Goddard's and the Mountain Chiefs passing and repassing the 49th parallel using their Tribal identification cards alone.[37] The historical record and the

---

[33] Ned Blackhawk, <u>The Rediscovery of America, Native Peoples and the Unmaking of U.S. History,</u> (2023) Ch. 5 *Settler Uprising, The Indigenous Origins of the American Revolution*, pp. 155- 158.
[34] 3-ER-173–174 ¶¶ 5-6.
[35] *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202–03 (1999); *Herrera v. Wyoming*, 139 S.Ct. 1686, 1698 (2019)(Wyoming's admission to the Union did not abrogate Crow Tribe's off-reservation treaty hunting right).
[36] *Akins*, 551 F.2d at 1230.
[37] 3-ER-243 ¶¶ 64-65; 3-ER-165 ¶ 7-8; 3-ER-167 ¶ 3; 3-ER-217 ¶ 4; 3-ER-201 ¶ 3; 3-ER-205 ¶ 4; 3-ER-206 ¶¶ 8-10; 3-ER-278 ¶ 7; 3-ER-280 ¶ 8.

Constitution support Appellants rights to engage in commerce across the ports of authority at Del Bonita and Piegan/Carway, on their Tribal lands, without unlawful executive tariffs, as they have done for millennia across the northwest plains.[38]

This Court is the *only* court with jurisdiction to review Constitutional claims raised by enrolled Blackfoot Nation members. The district court's failure to address Constitutional claims is immediately reviewable.[39]

### B. This case is about subject matter jurisdiction, not venue.

The Indian Commerce Clause of Article I, Section 8, Clause 3, makes this far more than a question of dueling venues. It is a fundamental jurisdiction issue and the CIT has no jurisdiction. Congress has plenary authority over Indian commerce, an issues that is exclusively reviewable in federal district court.[40]

In contrast, the CIT's exclusive jurisdiction under 28 U.S.C. § 1581(i) is limited to cases "arising out of any law of the United States providing for tariffs, duties, fees, or other taxes on the importation of merchandise *for reasons other than the raising of revenue*," or the "administration and enforcement with respect to" such laws.[41] 28 U.S.C. § 1581(i) does not grant authority over Tribal

---

[38] 3-ER-173–180.
[39] *Califano v. Sanders*, 430 U.S. 99, 109 (1977); *Matlock v. Sullivan*, 908 F.2d 492, 493-94 (9th Cir. 1990).
[40] *Cotton Petroleum*, 490 U.S. at 191-92, *Cherokee Nation,* at 18.
[41] 28 U.S.C. § 1581(i) emphasis added.

commerce, rendering the transfer invalid.[42]

In *Couer D'Alene Tribe* this Court recognized that federal courts have exclusive jurisdiction over Indian Tribes, including individuals that comprise the Tribe, and over "all civil actions arising *under the Constitution*, laws, or *treaties of the United States*."[43] An action arises under federal law if "federal law creates the cause of action."[44] This case arises under the Constitution and Jay's Treaty. Federal courts have exclusive jurisdiction.

The government concedes that Article III, Section 2 "describes the scope of the federal judicial power and does not allocate that power among inferior courts," but then asserts, without support, that Congress may allocate all such claims to the CIT. Brief p. 58. But statutes conferring exclusive jurisdiction on specialized courts must be strictly construed and cannot divest district courts of jurisdiction over constitutional claims.[45] As this Court discussed in its recent holding in *Gila River*, under Article III, the judicial power of the federal courts extends to all cases

---

[42] Customs Court Act of 1980 (Public Law 96-417); H.R. Rep. No. 96-1235 (1980) at 33, 47.

[43] *Coeur D'Alene Tribe v. Hawks*, 933 F.3d 1052, 1055 (9th Cir. 2019) emphasis added; see also *Holliday*, 70 U.S. 407, 418 (1865); *Haaland,* 599 U.S. 274-75.

[44] *Coeur D'Alene Tribe,* 933 F.3d at 1055 (cleaned up).

[45] *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 679–80 (1986) (strong presumption that Congress will not preclude judicial review of executive action); *Staacke v. U.S. Sec'y of Labor*, 841 F.2d 278, 281 (9th Cir. 1988)(courts maintain jurisdiction to consider constitutional claims) citing *Rodrigues v. Donovan*, 769 F.2d 1344, 1348 (9th Cir.1985).

"arising under this Constitution, the Laws of the United States, and Treaties made ... under their Authority."[46]

Where the complaint "plainly" alleges violations of federal law, federal jurisdiction is a powerful "preemptive force."[47] Fifty pages detail the relationship between Tribal commerce, the Constitution, and the critical role Tribes had that led to Jay's Treaty. The Appellants request the Court: "Declare the Canada Orders as unconstitutional as violative of: the Separation of Powers; Article I and Article VI and the Fifth Amendment to the Constitution; and the Jay Treaty."[48] The Complaint sets out plain allegations that federal law has been violated.

The government claims that because transfer orders allow a case to continue, they are not final. Brief p. 27. But this presupposes jurisdiction lies equally in two different venues. The case could only continue in the transferee court if it could have been filed there in the first place. That is not the situation here. These members of the Blackfoot Tribe could not have filed this case at the CIT, because the CIT *has no jurisdiction* over the fundamental issue in this case –the power to impose tariffs under the Indian Commerce Clause.

---

[46] *Gila River v. Schoubroek*, 23-2743 slip op. at 13-14 (9th Cir. 2025), quoting U.S. Const. art. III, § 2, cl. 1.
[47] *Coeur D'Alene Tribe*, 933 F.3d at 1055, citing Kaighn Smith, Jr., *Federal Courts, State Power, and Indian Tribes: Confronting the Well-Pleaded Complaint Rule*, 35 N.M. L. Rev. 1, 21–23 (2005).
[48] 3-ER-275 ¶ 170.

13

The transfer order closes the door on the constitutional claims unique to cross-border Tribes, leaving Appellants with no forum for relief, and is therefore immediately reviewable.[49] The transfer order pre-ordains the outcome by viewing this case as one of "tariffs qua tariffs." But this is wrong. This case is about the power of the President to unilaterally re-order Tribal economies.[50]

The government acknowledges the CIT will assert jurisdiction, which would render the transfer order effectively unreviewable and accentuates the venue-based nature of the government's argument. Brief p. 29. "When a case has been transferred" to the CIT "and an appeal is brought" the Federal Circuit Court "does not have jurisdiction to review the *change of venue order* entered by the transferor court."[51] The government's confidence in the CIT's assertion of "jurisdiction," paired with the Montana district court's failure to find a "want" of jurisdiction, underscores the conflation of venue and jurisdiction, which is what led to the error.

The question for this Court is not one of venue. The question is subject matter jurisdiction, which is immediately reviewable by this Court.[52]

---

[49] See, *Andrews v. City of Henderson*, 35 F.4th 710, 715 (9th Cir. 2022).

[50] *Learning Resources*, p. 2.

[51] *Jarrett v. Terrell*, 21-55263 (9th Cir. 2022)(unpublished opinion), *Posnanski*, 421 F.3d 977, 980 (emphasis added).

[52] *Terenkian*, 694 F.3d at 1129–30 (Orders transferring cases for lack of jurisdiction are immediately appealable); *In re U.S. Dep't of Educ.*, 25 F.4th 692, 698 (9th Cir. 2022) (jurisdiction to review the district court's transfer order on jurisdiction under 28 U.S.C. §§ 1291 and 1294).

In *In re Carefirst of Maryland* the Fourth Circuit held that "in a case involving the lack of subject matter jurisdiction, this court has concluded that a section 1631 transfer order was immediately appealable."[53] In *Gower v. Lehman*, 799 F.2d 925, 927 (4th Cir.1986), the Fourth Circuit vacated and remanded a transfer to the Claims Court, finding that the district court had jurisdiction.[54] In *In re U.S. Dep't of Educ*, this Court held it has jurisdiction to review a district court's determination of subject matter jurisdiction.[55] That is the correct approach here.

The government relies on *Erwin Hymer*, but that is a procedural ruling that has nothing to do with subject matter jurisdiction.[56] The Federal Circuit does not have jurisdiction to review a transfer order which "must be reviewed [...] by the court of appeals with *jurisdiction* over the district court."[57] The Ninth Circuit – and only the Ninth Circuit – has jurisdiction to review the transfer order.

The government claims that if the CIT denies a re-transfer, Appellants can come trotting back here. Brief p. 30. Again this highlights the fundamental error from conflating venue and jurisdiction. In *Montana v. Haaland*, this Court held that it had jurisdiction to review interlocutory orders by looking to an order's

---

[53] *In re Carefirst of Maryland, Inc.*, 305 F.3d 253, 256 (4th Cir. 2002).
[54] *Gower v. Lehman*, 799 F.2d 925 (4th Cir. 1986).
[55] *In re U.S. Dept. of Educ.,* 25 F.4th at 698.
[56] *Erwin Hymer Grp. N. Am., Inc. v. United States*, 930 F.3d 1370 (Fed. Cir. 2019).
[57] *Tunik v. Merit Systems Protection Board*, 407 F.3d 1326, 1332 (Fed. Cir. 2005).

"substantial effect rather than its terminology."[58] The transfer order divests the Appellants of any forum for relief, and allows unconstitutional executive actions to stand without challenge. *Montana* supports this Court's jurisdiction to review the fundamental question of subject matter jurisdiction.

The government cites a string of cases that approach transfer in the context of venue, not jurisdiction. Brief p. 31. None of these cases involve commerce among Indian Tribes under the Indian Commerce Clause. Every single decision involves a circuit court review of an in-circuit transfer order to another court out of circuit. Every case supports the jurisdictional outcome Appellants seek: this Court, and only this Court, has the power to review this transfer order.

The transfer order had the practical effect of denying Appellants' request for a preliminary injunction, making it immediately reviewable.[59]

## II. Executive Orders unlawfully raise revenue from Tribes.

Contradicting the government's brief (14-23), the President has consistently and publicly stated a key objective of his tariffs is to generate revenue.[60] The

---

[58] *Montana Wildlife Federation v. Haaland*, 127 F.4th 1, 27-28 (9th Cir. 2025), citing *Turtle Island Restoration Network v. U.S. Dep't of Com.,* 672 F.3d 1160, 1165 (9th Cir. 2012).

[59] *AARP v. Trump*, 605 U.S. ___ (2025), slip op. p. 3, citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981); see also *Montana*, 127 F.4th at 28.

[60] See https://www.independent.co.uk/news/world/americas/us-politics/trump-tariffs-billions-dollars-trade-war-b2803450.html (last visited August 16, 2025); https://www.kare11.com/article/news/nation-world/trump-rebate-checks-tariffs-possibility-floated/507-97e069fd-e135-472f-9b84-

government fails to address the salient issue here: The President has no authority to raise revenue by imposing tariffs on Indian Tribes.[61] The executive orders violate the *Sioux Nation* principle that national interests cannot be pursued to the detriment of sovereign Tribal Nations.[62]

In addition to violating the Indian Commerce Clause, the President's revenue-raising tariffs defeat the government's reliance on 28 U.S.C. § 1581(i) as support for its claim that the CIT has exclusive jurisdiction. That provision *only* applies to non-revenue tariffs.[63]

The government's arguments regarding authority "to regulate" "importation of property" under 50 U.S.C. § 1702(a)(1)(B) are addressed in *California*, which the Court is hearing along with this case.[64] Relevant here is the fact that there is *no law* delegating Tribal commerce to the President. The executive orders contain no

---

b446aba96c71#:~:text=Trump%20considers%20rebate%20checks%20funded,kare 11.com (last visited August 16, 2025).

[61] *The History and Framework of U.S. Tariffs, citing ITC, Two Centuries of Tariffs: The Background and Emergence of the United States International Trade Commission*, pp. 1-2, 6-7, available at https://www.reuters.com/practical-law-the-journal/government/history-framework-us-tariffs-2025-04-01/ (last visited August 16, 2025).

[62] *United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980).

[63] 28 U.S.C. § 1581(i)(1)(B).

[64] *State of California v. Trump*, No. 3:25-cv-03372, 2025 WL 1569334 (N.D. Cal. June 2, 2025), appeal docketed, *No. 25-3493* (9th Cir. June 3, 2025).

17

intelligible principle setting guardrails on the claimed power to impose tariffs, in violation of the nondelegation doctrine.[65]

While irrelevant to the Indian Commerce issues, the Harmonized Tariff Schedule of the United States (HTSUS) is not a source of legal authority.[66] It is the instrument through which tariff rates are published. Publishing unlawful tariffs in HTSUS does not cure constitutional violations in the executive orders.[67]

## III. Orders and Proclamations unlawfully regulate Tribal commerce.

### A. The Canada Orders are unhinged from the claimed emergency.

No justification would make it constitutional for the President to unilaterally impose tariffs on Tribes, but the government's assertion that Canada has a central role in the influx of illicit opioids into the United States is false. Brief pp. 18, 48.

The 5,525 mile Canada-U.S. border is the longest international border in the world, more than double the 1,954 U.S. Mexico border.[68] It has 120 land ports of entry, two on the Blackfoot Nation, with sparse fencing, and as Jonathan St. Goddard experienced, limited service.[69] 11 of the 80 counties along the U.S. land

---

[65] *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066, appeal docketed, No. 25-1812 (Fed. Cir. 2025); *Fed. Energy Admin. v. Algonquin SNG, Inc.,* 426 U.S. 548, 559–60 (1976); citing *Hampton,* 276 U.S. at 409 (1928).
[66] *U.S. v. Haggar Apparel*, 526 U.S. 380, 392 (1999)(discussing distinction between substantive rules and documentary requirements).
[67] *Youngstown v. Sawyer*, 343 U.S. 579, 587 (1952); cf. *Yoshida* 526 F.2d at 579.
[68] 3-ER-231–232.
[69] 3-ER-167–169.

borders are Montana counties. Montana shares 14 border crossings with British Columbia, Alberta, and Saskatchewan provinces along the longest contiguous land border any state has with Canada (545 miles).[70]

In 2025 less than 37 pounds of fentanyl were seized at the Canada border compared to more than 5,515 pounds at the Mexican border.[71] From 2013 to 2024, 99 per cent of pills and 97 per cent of powder-form fentanyl came from Mexico.[72] Of the 37 pounds of fentanyl seized in 2025, less than 1.5 pounds – 0.03% – came from Montana crossings.[73] David Mountain Chief doesn't "believe much of the fentanyl and illegal drugs comes in through the Canadian border as much as through the Mexican border. A lot of the drug bust here indicates to me it is transported up through the I-15 corridor from the south. And I believe the tariffs are unconstitutional and illegal through misinformation and deceit."[74]

Despite these magnitudinous disparities, Executive Order 14193 imposes universal tariffs in the same way on both Mexico and Canada, disproportionately and unlawfully harming the Blackfoot people.[75] Inexplicably, on July 31, 2025 the

---

[70] 3-ER-232–233.

[71] See *https://www.visualcapitalist.com/mapped-fentanyl-seized-at-u-s-borders-over-time/* (last visited August 16, 2025).

[72]Jonathan Caulkins and Bishu Giri, *Fentanyl at the Gates: Comparing Large Seizures at the U.S.–Mexican and U.S.–Canadian Borders*, July 2025 Report p. 1.

[73] *Id.*

[74] 3-ER-280 ¶ 6.

[75] 3-ER-253.

19

administration issued another executive order *increasing* Canada tariffs, while the tariffs on Mexico remained the same: "[T]he rate of duty shall increase from 25 percent to 35 percent. In my judgment, this action is necessary and appropriate to deal with the emergency declared in Executive Order 14193."[76] This disparity in tariffs is totally unrelated to the facts on the ground, and completely illogical. "The President's choice of means of execution must [..] bear a reasonable relation to the particular emergency confronted."[77] Here, the President stopped even pretending there is a reasonable relationship between the Canada Orders and the claimed "emergency."

In addition to being factually wrong, the unlawful tariffs disproportionately harm the Blackfoot people. Canada is Montana's number one trade partner: Montana imported $6.8 billion of goods from Canada in 2024, and sells more goods to Canada than its next 20 largest foreign markets combined.[78]

Walter Schweitzer, President of the Montana Farmer's Union, explains the "significant amount of cross ownership between Canadians and Montanans" and

---

[76] Amendment to Executive Order 14193, Amendment to Duties to Address the Flow of Illicit Drugs Across our Northern Border, available at *https://www.whitehouse.gov/presidential-actions/2025/07/amendment-to-duties-to-address-the-flow-of-illicit-drugs-across-our-northern-border-9350/* (last visited August 16, 2025).

[77] *Yoshida*, 526 F.2d at 579.

[78] U.S. Department of Commerce, International Trade Administration, Montana Trade and Economy Factsheet available at *https://www.trade.gov/data-visualization/state-trade-and-economy-factsheets* (last visited August 16, 2025).

that "Montana does significant cross border business with Canada's agriculture suppliers. Many farms and ranches are physically located closer to suppliers in Canada than other places in the United States, and in an emergency, it is essential for them to be able to get parts quickly." In addition "some farmers will take their feeder calves across the border for finishing, then bring them back to the U.S. side for slaughter and sale."[79]

The arbitrary tariffs are causing irreparable harm to the Blackfoot people. As set out in the 18 declarations this harm cannot be repaired.[80] The district court refused to rule on the injunction in April, before the short and economically critical summer season. Refusal to act was effectively a final order, and is immediately appealable. This Court has jurisdiction and should grant the injunction.

## B. The President made the trade deficit worse.

While no set of facts would justify the President's imposition of tariffs on Tribes, the claim that a trade deficit constitutes a national emergency is flawed. The trade deficit is a byproduct of foreign investment in the U.S. and reflects America's global financial dominance, especially the attractiveness of the U.S. dollar and capital markets.[81] A trade deficit is not an "unusual and extraordinary" emergency, especially since "trade deficits are not new; they have existed as long

---

[79] 3-ER-170 – 172 ¶¶ 4, 9-10.
[80] 3-ER-164-283.
[81] 3-ER-282–287.

as trade has existed."[82]

The government says the executive orders resulted in "deals" that will solve persistent trade deficits. Brief p. 17, 48. In fact, if the boasts of $1.15 trillion in new investment from Japan and the EU are true, that will *increase* the trade deficit. The "solution" exacerbates the "emergency" – it does not solve it.[83] As *Yoshida* found, there must be a reasonable relationship between the President's actions, and "the particular emergency confronted."[84] Even if one accepted the premise that trade deficits are an emergency, the action taken to address that has sent the U.S. in the wrong direction, harming the Blackfoot people.

Despite claims that tariffs would reduce the deficit, the data tell a different story: Canada has imposed counter-tariffs on $155 billion in U.S. goods, eroding U.S. export competitiveness across agriculture, manufacturing, and energy sectors, particularly harming cross-border Tribal members in Montana dependent on Canada trade.[85]

---

[82] 3-ER-284 ¶ 4.

[83] Benn Steil, *Trump's Japanese and EU Investment Boasts Contradict His Claims of a Trade Deficit "Emergency"*, Council on Foreign Relations, (July 29, 2025) available at https://www.cfr.org/article/trumps-japanese-and-eu-investment-boasts-contradict-his-claims-trade-deficit-emergency (last visited August 16, 2025); U.S. Bureau of Labor Statistics *The Impact of COVID on the Price of Steel in Three Phases*, *Beyond the Numbers*, Vol. 14, No. 4 (Feb. 2024).

[84] *Yoshida*, 526 F.2d at 579.

[85] 3-ER-198; 3-ER-199; 3-ER-201; 3-ER-206; Canada Department of Finance, *Canada Announces Robust Tariff Package in Response to Unjustified U.S. Tariffs*, March 2025 *https://www.canada.ca/en/department-*

### C.  The Proclamations unlawfully regulate Tribal commerce.

As Jonathan St. Goddard experienced, the President's tariffs on Tribal members followed no process. Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862) sets out mandatory deadlines for imposing tariffs or other trade restrictions for national security reasons.[86]

Those processes were not followed here, as the government concedes. Brief p. 13. The proclamations rest on findings that are more than seven years old, well beyond the narrow timelines Congress allowed in delegating tariff authority for national security purposes under Section 232.[87] Section 232 imposes a strict sequence of *mandatory* deadlines and "where the underlying finding or objective has become substantively stale" the President is no longer acting within the "clear preconditions" that are required under Section 232.[88]

The 2020 lockdowns and global economic contraction led to a sharp decline in steel demand.[89] Section 232 requires presidential action based on *current* findings of a national security threat. Pre-pandemic benchmarks do not justify

---

*finance/news/2025/03/canada-announces-robust-tariff-package-in-response-to-unjustified-us-tariffs.html* (last visited August 16, 2025).

[86] *Primesource Bldg. v. U.S.*, 59 F.4th 1255, 1257-1258 (Fed. Cir. 2023).

[87] 19 U.S.C. § 1862; *Primesource*, 59 F.4th at 1263.

[88] *Primesource*, 59 F.4th at 1263.

[89] *World Steel Association*, "Short Range Outlook October 2020," October 15, 2020, *https://worldsteel.org/wp-content/uploads/Press-release---worldsteel-Short-Range-Outlook-October-2020.pdf* (last visited August 16, 2025).

post-COVID executive action.[90]

Whatever the delegation in Section 232, and regardless of the process, there is no delegation to the President to regulate commerce with the Indian Tribes, making the Proclamations unlawful as applied to these Appellants.

## IV. Interests of justice.

Where the government is the defendant, balance of equities and the public interest merge.[91]

The family ranches and businesses at issue are more than money – they are a way of life.[92] Jonathan St. Goddard, Wayne Smith, and Sarah Degn show the instability in agriculture due to the tariffs, affecting their ability to plan and sustain their operations. The tariffs have decreased international markets for soybeans, corn, and wheat, while costs for equipment have gone up.[93] Rhonda Mountain Chief and Stephen Conway describe a decline in tourism due to tariffs, which harms their transportation and campground businesses.[94] The Blackfoot Confederacy Chiefs corroborate the disruption of cross-border relations and

---

[90] *Int. Trade During the COVID-19 Pandemic: Big Shifts and Uncertainty*, OECD Policy Responses to Coronavirus (COVID-19), March 10, 2022 *https://www.oecd.org/en/publications/international-trade-during-the-covid-19-pandemic-big-shifts-and-uncertainty_d1131663-en.html* (last visited August 10, 2025).

[91] *Learning Resources* at p. 30; *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[92] 3-ER-201-202; 3-ER-274-279.

[93] 3-ER-167-169; 3-ER-206-207; 3-ER-189-191.

[94] 3-ER-274-279; 3-ER-199-200.

cultural exchanges due to tariffs, which affect the Blackfoot traditional territory and economic activities.[95] These declarations describe harms that are irreparable. An injunction is proper.[96]

## CONCLUSION

The Court should vacate the transfer order, declare the Canada Orders unconstitutional, and immediately enjoin them.

Date:  August 18, 2025

TRANEL LAW FIRM P.C.

*Monica J. Tranel*
Monica J. Tranel
*Attorneys for Appellants Susan Webber,*
*Jonathan St. Goddard, Rhonda Mountain Chief,*
*and David Mountain Chief*

---

[95] 3-ER-203-205.
[96] *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991).

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(5) and (a)(7) and Ninth Circuit Rule 32-1, I certify that the foregoing brief has a word count including footnotes as calculated by Microsoft Word for Mac of 5890 words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1 requiring that the reply brief not exceed 7,000 words.

DATED this 18th day of August, 2025.

TRANEL LAW FIRM P.C.

*Monica J. Tranel*
Monica J. Tranel
*Attorneys for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 18, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 18th day of August, 2025.


*/s/ Monica J. Tranel*
Monica J. Tranel